ACCEPTED
01-15-00877-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/15/2015 10:35:46 AM
CHRISTOPHER PRINE
CLERK

NO. <u>01-15-00877-</u> CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/15/2015 10:35:46 AM
CHRISTOPHER A. PRINE
Clerk

IN RE CVR ENERGY, INC., CVR PARTNERS, LP, CVR REFINING, LP,
GARY-WILLIAMS ENERGY COMPANY, LLC
RELATORS

Original Proceeding
From the 434th Judicial District Court of Fort Bend County, Texas
Cause No. 2013-DCV-209679
The Honorable James H. Shoemake, Presiding

**PETITION FOR WRIT OF MANDAMUS**

| Phillip D. Sharp | Lee M. Smithyman |
|---|---|
| Texas State Bar No. 18118680 | Kansas State Bar No. 09391 |
| MARTIN, DISIERE, JEFFERSON & WISDOM, LLP | SMITHYMAN & ZAKOURA, CHARTERED |
| 808 Travis, 20th Floor | 750 Commerce Plaza II Building |
| Houston, Texas 77002 | 7400 West 110th Street |
| (713) 632-1700 – Telephone | Overland Park, Kansas 66210-2362 |
| (713) 222-0101 – Facsimile | (913) 661-9800 – Telephone |
| *sharp@mdjwlaw.com* | (913) 661-9861 – Facsimile |
| | *lee@smizak-law.com* |
| | *Application for pro hac admission pending* |

**ORAL ARGUMENT REQUESTED**

**Relators/Defendants**:

**CVR Energy, Inc.; CVR Refining, LP; Gary-Williams Energy Company, LLC.**

In the trial court, the relators/defendants are represented by the following attorneys:

Phillip D. Sharp
Texas State Bar No. 18118680
Martin, Disiere, Jefferson & Wisdom, LLP
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile
*sharp@mdjwlaw.com*

Lee M. Smithyman
Kansas State Bar No. 09391
Smithyman & Zakoura, Chartered
750 Commerce Plaza II Building
7400 West 110th Street
Overland Park, Kansas 66210-2362
(913) 661-9800 – Telephone
(913) 661-9861 – Facsimile
*lee@smizak-law.com*

In this original proceeding, the relators/defendants are represented by the following attorneys:

Mr. Sharp

Mr. Smithyman
*Application for admission pro hac vice pending.*

**Real Parties In Interest/Plaintiffs**:

Leeanna Mann and Kari Smith

In the trial court the real parties in interest/plaintiffs are represented by the following attorneys:

Mr. Gary M. Riebschlager
Texas State Bar No. 16902200
THE RIEBSCHLAGER LAW FIRM, PC
801 Congress, Suite 250
Houston, Texas 77002
Telephone: (713) 980-5300
Facsimile: (713) 583-5915
*gary@riebschlagerlaw.com*

Mr. Richard L. Tate
Texas State Bar No. 19664460
TATE, MOERER & KING, LLP
206 South 2nd Street
Richmond, Texas 77469
Telephone: (281) 341-0077
Facsimile: (281) 341-1003
*rltate@tate-law.com*

Sidney F. Robert
Texas State Bar No. 24074968
BRENT COON & ASSOCIATES
300 Fannin, Suite 200
Houston, Texas 77002
Facsimile: (713) 225-1785
*sidney.robert@bcoonlaw.com*

David M. Medina
Texas State Bar No. 00000088
THE MEDINA LAW FIRM
5800 Memorial Drive, Suite 890
Houston, Texas 77007
Facsimile: (713) 583-5915
*davidmedina@justicemedina.com*

**Respondent**:

The Honorable James H. Shoemake
434th JUDICIAL DISTRICT COURT
Fort Bend County Justice Center
1422 Eugene Heimann Circle
Courtroom: Room 3I
Telephone: 281-341-4409
Facsimile: unknown
e-mail: unknown

# TABLE OF CONTENTS

**PAGE**

IDENTITY OF PARTIES AND COUNSEL ..........................................................i

TABLE OF CONTENTS.....................................................................................iv

TABLE OF AUTHORITIES ..............................................................................vi

STATEMENT OF THE CASE..............................................................................x

STATEMENT REGARDING ORAL ARGUMENT ...........................................xi

STATEMENT OF JURISDICTION...................................................................xi

ISSUE PRESENTED ..........................................................................................xi

STATEMENT OF FACTS .................................................................................13

SUMMARY OF THE ARGUMENT ..................................................................20

ARGUMENT ......................................................................................................22

I.     DESIGNATIONS OF RESPONSIBLE THIRD PARTIES ARE LIBERALLY GRANTED..............................................................................22

    A.     Wynnewood's responsibility was intended to be considered and apportioned by the jury at virtually all times. ...................................22

    B.     The statutory scheme encourages liability apportionment among all responsible entities. .......................................................24

II.    THE DISTRICT COURT'S REFUSAL TO ALLOW THE DESIGNATION OF WYNNEWOOD AS A RESPONSIBLE THIRD PARTY WARRANTS MANDAMUS RELIEF. .........................................28

    A.     The mandamus standard is satisfied.................................................28

    B.     Mandamus relief is the rule for improper denial of a motion to designate a responsible third party.....................................................30

C.     The issues, facts, and evidence concerning Wynnewood are interwoven with Plaintiffs' allegations against Relators.....................34

D.     Relators' motion for leave to designate a responsible third party was timely........................................................................36

      (1)     Relators filed their motion more than 60 days before trial......36

      (2)     The statute of limitations did not bar Relators from designating Wynnewood as a responsible third party. ............39

      (3)     Timely designation of Wynnewood avoided the restrictions of section 33.004(d). .............................................40

E.     Relators pleaded sufficient facts to designate Wynnewood as a responsible third party. ......................................................44

III.     CONCLUSION AND PRAYER. ....................................................47

CERTIFICATION ..............................................................................49

CERTIFICATE OF COMPLIANCE......................................................49

CERTIFICATE OF SERVICE .............................................................50

**Cases**

*Avila v. St. Luke's Lutheran Hosp.*,
948 S.W.2d 841 (Tex. App.—San Antonio 1997, writ denied)............................39

*City of Dallas v. Abbott,*
304 S.W.3d 380 (Tex. 2010) .......................................................................40

*Coastal Corp. v. Torres,*
133 S.W.3d 776 (Tex. App.—Corpus Christi 2004, pet. denied)........................17

*Encisco v. Chmielewshi,*
16 S.W.3d 858 (Tex. App.—Houston [14th Dist.] 2000, no pet.) .......................39

*Galbraith Eng'r Consultants, Inc. v. Pochucha,*
290 S.W.3d 863 (Tex. 2009) ................................................................ 26, 27, 38

*Horizon/CMS Healthcare Corp. v. Auld,*
34 S.W.3d 887 (Tex. 2000) ........................................................................ 44, 46

*In re Arthur Andersen LLP,*
121 S.W.3d 471 (Tex. App.—Houston [14th Dist.] 2003,
orig. proceeding)....................................................................................... passim

*In re Brokers Logistics, Ltd.,*
320 S.W.3d 402 (Tex. App.—El Paso 2010,
orig. proceeding).................................................................... 29, 30, 31, 32

*In re Energy Res[s]. Tech. GOM, Inc.,*
2012 WL 4754006 (Tex. App.—Houston [14th Dist.]
Oct. 4, 2012, orig. proceeding)........................................................ 29, 31, 32, 33

*In re Greyhound Lines, Inc.,*
2014 WL 1022329 (Tex. App.—Dallas Feb. 21, 2014,
orig. proceeding).............................................................................. 24, 30, 31

*In re Houston M. Smith,*
366 S.W.3d 282 (Tex. App.–Dallas 2012, orig. proceeding).............................30

*In re Lewis Casing Crews, Inc.,*
　　2014 WL 3398170 (Tex. App.—Eastland July 10, 2014,
　　orig. proceeding)......................................................................... passim

*In re Oncor Elec. Delivery Co.,*
　　355 S.W.3d 304 (Tex. App.—Dallas 2011,
　　orig. proceeding)............................................................. 25, 30, 31, 46

*In re Team Rocket, L.P.,*
　　256 S.W.3d 257 (Tex. 2008) ...................................................... 29, 33

*In re Unitec Elevator Servs. Co.,*
　　178 S.W.3d 53 (Tex. App.—Houston [1st Dist.] 2005,
　　orig. proceeding)....................................................................................26

*Jones v. Ray,*
　　886 S.W.2d 817 (Tex. App.—Houston [14th Dist.] 1994, no writ) ............. 27, 31

*Kimbrell v. Molinet,*
　　288 S.W.3d 464 (Tex. App.—San Antonio 2009, no pet.**)**..................... 24, 25, 27

*Love v. Four Mills of Am.,*
　　647 F.2d 1058 (Okla. 1981) ......................................................................17

*Oscar Luis Lopez v. La Madeleine of Tex., Inc.,*
　　200 S.W.3d 854 (Tex. App.—Dallas 2006, no pet.)..........................................40

*Roark v. Allen,*
　　633 S.W.2d 804 (Tex. 1982) ..............................................................44

*Ryland Group, Inc. v. White,*
　　723 S.W.2d 160 (Tex. App.—Houston [1st Dist.] 1986, no writ)......................31

*Spencer v. BMW Of North America, LLC,*
　　2015 WL 1529773 (W.D. Tex. April 2, 2015)..................................................42

*Tex. Health Enters., Inc. v. Geisler,*
　　9 S.W.3d 163 (Tex. App.—Fort Worth, pet. dism'd) ........................................39

*Withers v. Schneider Nat'l. Carriers, Inc.,*
　　13 F.Supp.3d 686 (E.D. Tex. 2014) .......................................................... 40, 41

*Yeldell v. Holiday Hills Retirement & Nursing Ctr., Inc.*,
  701 S.W.2d 243 (Tex.1985) ...................................................................40

**Statutes**

Okla. Stat. Ann. tit. 12 § 1054 ...............................................................17

Okla. Stat. Ann. tit. 85 § 302.................................................................16

TEX. CIV. PRAC. & REM CODE
  § 33.003 ..................................................................................... passim

TEX. CIV. PRAC. & REM CODE
  § 33.004 ..................................................................................... passim

TEX. CIV. PRAC. & REM. CODE
  § 16.001 ......................................................................................39

TEX. CIV. PRAC. & REM. CODE
  § 16.001(b)...................................................................................39

TEX. CIV. PRAC. & REM. CODE
  § 16.003(b)...................................................................................18

TEX. GOV'T CODE,
  § 22.221(b)................................................................................... xi

**Other Authorities**

David W. Holman, *Responsible Third Parties,* 46 S. TEX. L. REV. 869, 885 (2005)
  .........................................................................................................26

TEX. CONST.
  Article V, Section 6 ......................................................................... xi

## Rules

TEX. R. APP. P., Rule 52 ................................................................................ viii

TEX. R. CIV. P. 193.5 ......................................................................................37

Tex. R. Civ. P. 193.6(a) ..................................................................................37

## STATEMENT OF THE CASE

This petition for a writ of mandamus addresses Judge Shoemake's denial of a motion for leave to designate a responsible third party pursuant to Chapter 33 of the Texas Civil Practice and Remedies Code for the 434th District Court of Fort Bend County, Texas.

The Real Parties in Interest are the Plaintiffs, who filed wrongful death claims regarding the demise of Russell Mann and Billy Smith which occurred in a refinery explosion in Wynnewood, Oklahoma during their employment for Wynnewood Refining Company, LLC ("Wynnewood"). The Relators, who are the remaining named defendants, are affiliated parent companies with equity interests in and affiliated relationships with Wynnewood. The respondent is the Honorable James H. Shoemake.

The Plaintiffs' Original Petition was filed on September 30, 2013, naming Wynnewood as a Defendant despite Wynnewood's status as the decedents' immune employer under Oklahoma's workers' compensation laws. For nineteen months, Wynnewood participated as a party in all aspects of the litigation. Throughout extended discovery and this litigation, Relators anticipated that Wynnewood's fault would be compared at trial.

On April 22, 2015, without advance notice and fifty-five days before the original trial date, Plaintiffs non-suited their claims against Wynnewood. Twenty-

six days later, Relators amended their Rule 194 designations and filed their motion to designate Wynnewood as a responsible third party to ensure that Wynnewood's fault, if any, could continue to be compared. That May 18, 2015 motion was not ruled upon until October 12, 2015, when Judge Shoemake denied it. Trial, which is now scheduled to begin October 20, 2015, is expected to last more than two weeks and require more than fifteen out-of-state witnesses.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would materially assist the Court in understanding the complex legal and factual background which supports the Relators' proposed designation.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to issue a writ of mandamus in this case under Article V, Section 6 of the Texas Constitution, Section 22.221(b) of the Texas Government Code, and Rule 52 of the Texas Rules of Appellate Procedure.

## ISSUE PRESENTED

Did the district court abuse its discretion by denying Relators' motion to designate Wynnewood as a responsible third party where: (1) Wynnewood had been an actively represented defendant in discovery and motion practice for more than nineteen months; (2) without notice Plaintiffs non-suited Wynnewood fifty-five days before the original trial date and five months before the final trial date; (3) the Relators moved to designate Wynnewood as a responsible third party

twenty-six days thereafter; and (4) the facts, evidence and issues concerning Wynnewood's responsibility for the accident are inseparable from Plaintiffs' allegations against Relators?

1.    On September 28, 2012, while Russell Mann and Billy Smith were assisting in a re-start of the Wickes boiler at the Wynnewood Refinery in Wynnewood, Oklahoma, the Wickes boiler suddenly exploded, killing both.  Rec. Tab 2 at ¶¶ 15-17.

2.    At that time, Russell Mann and Billy Smith were employees of Wynnewood Refining Company, LLC ("Wynnewood"), which is a subsidiary of Relators, as explained below.  *Id*. at ¶ 15.

3.    The Plaintiffs/Real Parties in Interest are surviving family members of Russell Mann and Billy Smith.  *Id*. at ¶ 2-4; Rec. Tab 3 at ¶ 4.

4.    On September 30, 2013, Plaintiffs filed their Original Petition, naming Wynnewood and affiliated parent companies as Defendants.  Rec. Tab 3. Wynnewood and the Defendant Relators are affiliated entities within the CVR Energy, Inc. group of companies.

5.    CVR Energy, Inc. serves as the corporate parent of subsidiary entities which own and operate two refineries,[1] a fertilizer manufacturing operation, oil and product pipelines, and related transportation assets.  Rec. Tab 5 at Walter Affidavit ¶ 2.

---

[1]  One in Coffeyville, Kansas and one in Wynnewood, Oklahoma.

13

6.     CVR Energy, Inc. is a Delaware corporation which has its corporate offices in Sugar Land, Texas. CVR Energy, Inc. is a publicly-traded corporation (NYSE: CVI) which owns the general partner and two-thirds of the limited partner unit interests of CVR Refining, LP. *Id.* at ¶ 3.

7.     At the time of the September 28, 2012 accident:

(i)     CVR Refining, LP was an indirect, wholly-owned subsidiary of CVR Energy, Inc. which had no interest in Gary-Williams Energy Company, LLC or in Wynnewood Refining Company, LLC;

(ii)     Gary-Williams Energy Company, LLC was an indirect, wholly-owned subsidiary of CVR Energy, Inc.; and

(iii)     Wynnewood Refining Company, LLC was a wholly-owned subsidiary of Gary-Williams Energy Company, LLC.

*Id.* at ¶ 6 and attachment.

8.     Wynnewood Refining Company, LLC ("Wynnewood") is a Delaware limited liability company which has its principal place of business in Wynnewood, Oklahoma. Since a CVR corporate group reorganization in 2013, Wynnewood is presently an indirect, subsidiary of CVR Refining, LP. Two-thirds' interest of CVR Refining, LP is owned by CVR Energy, Inc. *Id.* at ¶ 8 and attachment.

14

## Plaintiffs' Allegations

9.      Plaintiffs' Original, Amended Original Petitions (Rec. Tabs 2, 4, 6, 7, and 8) and First Supplemental Petition (Rec. Tab 3) all allege negligence, gross negligence or intentional conduct by Wynnewood.  For illustrative purposes, the following paragraphs will cite to the Third Amended and First Supplemental Petitions, filed respectively on April 26 and May 29, 2015, as those were filed before and after the Wynnewood non-suit and Relators' May 28, 2015 motion to designate Wynnewood as a Responsible Third Party.

10.      Plaintiffs allege that the Wickes boiler was gargantuan and archaic, and was not equipped with a Boiler Management System (BMS) which would have allowed for re-starts from a safe and remote site.   Plaintiffs' First Supplemental Petition, Rec. Tab 3 at ¶¶ 15, 27, 18, 22, and Third Amended Petition, Rec. Tab 2 at ¶¶ 16, 17, 18.

11.      Plaintiffs claim that Wynnewood "was rife with dangerous practices and working conditions."  Rec. Tab 3 at ¶ 23; Rec. Tab 2 at ¶ 24.

12.      Plaintiffs assert that Wynnewood had actual knowledge of prior detonations that occurred with that same boiler, but failed to properly repair, maintain, and update the boiler to ensure that such occurrences would be minimized or deterred.  Rec. Tab 3 at ¶ 23; Rec. Tab 2 at ¶ 23.

15

13. Plaintiffs allege that Wynnewood's acts and omissions were negligent and grossly negligent and proximately caused Mann and Smith's injuries. Rec. Tab 3 at ¶ 38; Rec. Tab 2 at ¶ 39.

14. Plaintiffs allege that Relators—by sheer virtue of their Wynnewood ownership rights—were negligent and grossly negligent and proximately caused Mann and Smith's injuries. Rec. Tab 3 at ¶¶ 38-40; Rec. Tab 2 at ¶¶ 39-41. Specifically, Plaintiffs claim that Relators failed to exercise control over the refinery to monitor dangerous conditions, upgrade equipment, and repair hazardous conditions. *Id.*

## Workers' Compensation Benefits

15. The Mann family and the Smith family each received and will continue to receive workers' compensation benefits whose net present value is more than $500,000 per family. Rec. Tab 5 at Ex. 2, Morrow Affidavit ¶¶ 4-5.

16. Wynnewood is an immune employer under the Oklahoma Worker's Compensation Statute based on payments made on its behalf to the Plaintiffs. Okla. Stat. Ann. tit. 85 § 302(A).

17. The Oklahoma workers' compensation benefits, provided pursuant to the American Zurich policy, will ultimately pay approximately $1,181,654.00 to the heirs of Russell Mann and Billy Smith. Rec. Tab 5 at Ex. 2, Morrow Affidavit ¶¶ 4-5.

## Third Party Designation Pleadings

18. Plaintiffs sued Wynnewood and the Defendant Relator affiliated and parent companies, alleging that the Relators, as corporate affiliates of Wynnewood, had "alter ego" liability and/or "parental liability"[2] for the actions of Wynnewood. (Rec. Tab 2 at ¶¶ 35-36; Rec. Tab 3 at ¶ 35.

19. Rigorous and substantial discovery commenced from the outset. On December 30, 2013, in their initial response to discovery requests, the CVR and Wynnewood Defendants produced the fifteen page Incident Report (Rec. Tab 1) which faulted the operations, standard operating procedures, training, and operator leadership of Wynnewood Refining Company, LLC (*Id.* at 14).

20. Plaintiffs thereafter took approximately sixteen depositions, eleven of which were of Wynnewood employees. In four separate submissions, the Plaintiffs served more than 150 requests for production, upon which Relators and Wynnewood produced more than 16,000 pages of refinery documents, more than 1,000 emails, and more than 1,200 email attachments.

21. The applicable two-year statute of limitations (Okla. Stat. Ann. tit. 12 § 1054) ran on September 28, 2014, for the wrongful death claims related to

---

[2] There is no such thing as parental liability (i.e. a duty to control by reason of a corporate entity's equity interests) in Texas, Oklahoma or the remaining states. *See, e.g., Coastal Corp. v. Torres,* 133 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2004, pet. denied); *Love v. Four Mills of Am.*, 647 F.2d 1058, 1062-63 (Okla. 1981).

Russell Mann.[3]  However, being a minor, the Plaintiff Rogan Smith's wrongful death claims related to Billy Smith will not expire for a number of years, until the three-year-old Rogan reaches majority.

22.  On April 22, 2015, without advance notice and fifty-five days prior to the original trial date, Plaintiffs non-suited Wynnewood.  Rec. Tab 14.

23.  Twenty-six days later, on May 18, 2015, Relators served Supplemental Rule 194 Disclosures designating Wynnewood as a responsible third party, and filed a motion for leave to designate Wynnewood as a responsible third party to ensure that Wynnewood's negligence would be compared at trial.  Rec. Tab 9.

24.  Plaintiffs objected to Defendants Motion for Leave to Designate on May 27, 2015.  Rec. Tab. 10.

25.  Defendants provided a written Reply in support of the Motion for Leave to Designate on June 10, 2015.  Rec. Tab 11.

26.  On September 14, 2015, eight days before the jury trial then scheduled for September 22, the Plaintiffs filed their Fourth Amended Original Petition.  Rec. Tab 8.  In that pleading, the Plaintiffs continually alleged (as they

---

[3]  The Texas statute of limitation is substantively identical.  TEX. CIV. PRAC. & REM. CODE § 16.003(b).

had throughout the underlying litigation) that Wynnewood Refining Company, LLC's acts and omissions caused the deaths of Russell Mann and Billy Smith:

> 37. . . . although Russell Mann and Billy Smith were employees of Wynnewood Refining Company, LLC, Plaintiffs will show this Court that Wynnewood Refining Company, LLC acted willfully, deliberately and with specific intent to cause Russell Mann's and Billy Smith's deaths.
>
> 38. Wynnewood Refining Company, LLC willfully, deliberately, and intentionally caused the deaths of Billy Smith and Russell Mann by willfully, deliberately, and intentionally committing the following acts: . . . .
>
> 42. Accordingly, the actions of Wynnewood Refining Company, LLC as referenced above evidence a willful and deliberate intent to cause the deaths of Billy Smith and Russell Mann."
>
> 43. . . . Wynnewood Refining Company, LLC acted with knowledge that death or injury was substantially certain to result from these actions. . . .

Rec. Tab 4.

27. Plaintiffs' petitions have consistently and steadfastly identified Wynnewood as a responsible defendant and/or responsible third party throughout the litigation, upon allegations of negligence, gross negligence or intentional conduct by Wynnewood. Many of these allegations were made **after** the non-suit notice of April 22, 2015:

19

| Petitions | Date | Wynnewood Allegations | Record Tab |
|-----------|------|----------------------|------------|
| Original | 09/30/13 | ¶¶ 35, 39, 40 | 4 |
| First | 09/18/14 | ¶¶ 35, 40, 41 | 6 |
| Second | 11/07/14 | ¶¶ 35, 44, 45 | 7 |
| Third | 04/06/15 | ¶¶ 36, 45, 46 | 2 |
| First Supp. | 05/29/15 | ¶¶ 35, 43, 44, 45 | 3 |
| Fourth | 09/14/15 | ¶¶ 33, 38, 42, 43 | 8 |
| Fifth | 09/15/15 | | 13[4] |

28. On September 22, 2015, Judge Shoemake heard oral arguments on the Relators' motion to designate. Rec. Tab 17.

29. On October 12, 2015, Judge Shoemake denied Relators' motion to name Wynnewood Refining Company, LLC as a responsible third party. Rec. Tab 16.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion by denying Relators' Motion for Leave to Designate Third Party. Texas case law establishes that a post-trial appeal is not an adequate remedy because the court's denial skews the proceedings, affects the outcome, and compromises the defense in ways unlikely to be apparent in the appellate record.

---

[4] After the Relators filed a Supplemental Brief (Rec. Tab 12) identifying the allegations in paragraph 26 above, and noting that all parties were in agreement concerning Wynnewood's Responsible Third Party status, the Plaintiffs filed their Fifth Amended Petition deleting their previous allegations Wynnewood (Rec. Tab 13).

The evidence presented to the district court demonstrated that Wynnewood, should be submitted to the jury as a responsible third party. Specifically both the CVR Entities and the Plaintiffs alleged that the accident occurred: (1) on Wynnewood property, (2) under the supervision of Wynnewood personnel, (3) within the scope of the deceased workers' employment with Wynnewood, and (4) as the result of the explosion of a boiler which was owned, operated and maintained by Wynnewood. *See* Rec. Tab 9.

Relators' motion complied with all applicable provisions of Texas Civil Practice and Remedies Code § 33.004. Relators' motion was filed more than 60 days prior to trial. *Id.* at § 33.004(a). Said motion was timely; it was filed 26 days after Plaintiffs non-suited Wynnewood. *Id*. at § 33.004(d). Wynnewood was a party during the entire time the statute of limitations was running. Plaintiffs voluntarily non-suited Wynnewood seven months **after** the statute of limitations would preclude the reassertion of wrongful death claims on behalf of Russell Mann. However, then as now, the wrongful death claims related to Billy Smith could be asserted through his minor son, Rogan Smith. Plaintiffs obviated the necessity of Relators filing their designation and motion prior to said limitations expiration, because Wynnewood need not be designated as a responsible third party while it remained a party defendant. TEX. CIV. PRAC. & REM. CODE § 33.003 (a). The designation motion's liability allegation pleadings were sufficient; they

21

came from Plaintiffs' Petitions. TEX. CIV. PRAC. & REM. CODE § 33.004(g). Moreover, the district court did not provide Relators with the opportunity to replead the facts concerning Wynnewood's responsibility prior to denying the motion for leave as required by the Texas Civil Practice and Remedies Code. *See id.*

## ARGUMENT

### I. DESIGNATIONS OF RESPONSIBLE THIRD PARTIES ARE LIBERALLY GRANTED.

#### A. Wynnewood's responsibility was intended to be considered and apportioned by the jury at virtually all times.

The Texas proportionate responsibility law "provides a framework for apportioning percentages of responsibility in the calculation of damages in any case in which more than one person, including the plaintiff, is alleged to have caused or contributed to cause the harm for which recovery of damages is sought." *In re Lewis Casing Crews, Inc.,* 2014 WL 3398170 at * 2 (Tex. App.—Eastland July 10, 2014, orig. proceeding). Section 33.003(a) categorizes the persons and/or entities to be compared for a determination of responsibility by the trier of fact. *See* TEX. CIV. PRAC. & REM. CODE § 33.003. Wynnewood, as a named defendant, met the criteria.

> (a) The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any

22

defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

(1)     each claimant;

(2)     each defendant;

(3)     each settling person; and

(4)     each responsible third party who has been designated under

Section 33.004.

TEX. CIV. PRAC. & REM. CODE § 33.003.

> Subsection (2) of § 33.011 defines "Defendant" as:
>
> any person from whom, at the time of the submission of the case to the trier of fact, a claimant seeks recovery of damages.

*Id.*     Subsection (6) of § 33.011 defines "Responsible third party" as:

> any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these. The term "responsible third party" does not include a seller eligible for indemnity under Section 82.002.

*Id.* Thus, from September 30, 2013 through April 22, 2015, all parties deemed Wynnewood Refining Company, LLC to be a "defendant" which would be compared on the verdict form of the trier of fact. *See* Rec. Tab 4, 13. On April 22, 2015, the Real Parties in Interest non-suited Wynnewood Refining Company, LLC. Rec. Tab 13. For twenty-six days thereafter, Wynnewood would not be included

23

in the submission of a case for damage recovery. However, on May 18, 2015, the Relators designated Wynnewood as a responsible third party and alleged that Wynnewood caused or contributed to the harm for which recovery was being sought. Rec. Tab 9. Thus, for all but twenty-six days of the twenty-four months the parties have been in litigation, all knew that Wynnewood's determination of responsibility was expected and intended. By means of discovery and of the pleadings, the parties clearly knew and understood that Wynnewood's negligence or fault would be compared with the Relators' potential responsibility.

## B. The statutory scheme encourages liability apportionment among all responsible entities.

Courts liberally grant designations of responsible third parties. *See, Kimbrell v. Molinet,* 288 S.W.3d 464, 468 (Tex. App.—San Antonio 2009, no pet.**)** ("Key to the application of Chapter 33 is the ability of defendants to liberally designate responsible third parties . . . .").

This statutory scheme has evolved into its current form which enables juries to review the actions (or inactions) of all persons and entities potentially responsible for the accident. *See, e.g., In re Greyhound Lines, Inc.,* 2014 WL 1022329 at * 4 (Tex. App.—Dallas Feb. 21, 2014, orig. proceeding) ("The proportionate responsibility statu[t]e grants parties the right to have one jury apportion liability among all responsible parties."); *In re Arthur Andersen LLP,* 121 S.W.3d 471, 481, 486 (Tex. App.—Houston [14th

24

Dist.] 2003, orig. proceeding) (granting mandamus relief of denial of motion to designate responsible third party, and discouraging the practice of asking the jury to "put on blinders so that they can see only the alleged bad acts of [defendants]."). The end result is that a defendant's conduct is compared with all persons and entities involved in the incident, and percentages of fault are attributed accordingly.

Indeed, in *Kimbrell,* the court provided this historical overview:

> In 2003, Chapter 33's proportionate responsibility framework was amended to significantly liberalize the defendant's ability to seek or shift or spread liability to others. Under the amended section 33.004, the defendant could merely designate a responsible third party rather than join the responsible third party in the lawsuit as previously required. Further, the definition of a responsible third party was broadened to include 'any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought.' . . . [I]f the defendant properly designates a responsible third party by filing a motion for leave, the court must grant leave if there is no objection within fifteen days. **Even if there is an objection, the court must grant the designation unless the defendant did not plead sufficient facts concerning the alleged responsibility of the designated responsible third party**.

*Kimbrell v. Molinet,* 288 S.W.3d at 469 (emphasis added; citations omitted). If a defendant does not plead sufficient facts concerning the responsibility of the designated third party, the court must grant leave to replead so that the defendant can supplement the factual basis. TEX. CIV. PRAC. & REM. CODE § 33.004(g)(2). Failure to do so is an abuse of discretion. *See In re Oncor Elec. Delivery Co.*, 355 S.W.3d 304, 305 (Tex. App.—Dallas 2011, orig. proceeding) ("We conclude the

25

trial court abused its discretion in [denying motion for leave to designate responsible third party] without granting leave to replead. . . .").

Under the prior 1995 statute, certain parties, "such as the claimant's employer and the bankrupt were expressly exempt." *Galbraith Eng'r Consultants, Inc. v. Pochucha,* 290 S.W.3d 863, 868 n. 6 (Tex. 2009). "The 2003 amendments substantially broadened the meaning of the term 'responsible third party' to eliminate these restrictions." *Id.*; *see also, In re Unitec Elevator Services Co.,* 178 S.W.3d 53, 58 n.5 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding) ("[U]nlike the predecessor statute, under the amended version a claimant's employer that is a subscriber to the workers compensation system is not precluded from being designated as a responsible third party.").[5] "Although the scheme initially equated responsibility with liability to the plaintiff or claimant, this is no longer the case." *Galbraith,* 290 S.W.3d at 868. Now, "a defendant may designate a responsible third party even though that party possesses a defense to liability, or cannot be formally joined as a defendant, or both." *Id.* at 868-69. As such,

---

[5] To counter balance the designation of an immune employer, the Legislature provided that the worker's compensation lien shall be reduced by the percentage of fault attributed to the employer. *See* David W. Holman, *Responsible Third Parties,* 46 S. Tex. L. Rev. 869, 885 (2005) ("[T]he 2003 statute now permits immune employers to be submitted as an RTP and to be used to reduce a defendants' (sic) thresholds for joint and several liability. As a trade off for this unusual submission, the legislators provided that the worker's compensation carrier's subrogated lien will be reduced in accordance with the percentage of fault attributed by the trier of fact to the employer.").

Chapter 33 is "unconcerned with the substantive defenses of responsible third parties." *Id.* at 869.

The designations (and resulting fault assessment) may not be used in other proceedings to impose liability on responsible third parties. *See Kimbrell,* at 469 ("[T]he designation of a responsible third party may not be used in any other proceeding to impose liability on the designee."). This protects third parties while eliminating defendants' use of the "empty chair defense." *See In re Arthur Andersen LLP,* 121 S.W.3d at 486 (quoting *Jones v. Ray,* 886 S.W.2d 817, 822 (Tex. App.—Houston [14th Dist.] 1994, no writ) (noting that the "empty chair defense" is one of several ill effects of a court's denial of a motion to designate a responsible third party).

While *Andersen* was decided under the 1995 statute, its holding captures the thrust of the 2003 changes and the now accepted rationale for providing mandamus relief for the denial of motions to designate a responsible third party:

> Even if Andersen could prosecute a separate suit against the third parties, it is the opportunity to have *one* jury apportion liability among all responsible third parties that Andersen seeks.

> Relator has a substantial right to present the complete set of intertwined facts and issues germane to his claims, to *one* factfinder, in *one* proceeding, rather than in two separate suits that are all but foreordained to generate, collectively, a decision destined to fail in the appellate process. The denial of that right would introduce the 'empty chair defense,' and thereby skew the progress and entire conduct of the proceedings–with the resultant potential to affect the outcome of the litigation profoundly, and to compromise the presentation of the

27

parties' respective claims or defenses in ways unlikely to be apparent in the appellate record.

*Id.* In sum, Chapter 33 ensures that defendants have the opportunity to submit the entire universe of facts and issues for the jury's determination of fault attributable to each person and entity potentially responsible for the accident and must be interpreted and applied consistently with that purpose.

## II. THE DISTRICT COURT'S REFUSAL TO ALLOW THE DESIGNATION OF WYNNEWOOD AS A RESPONSIBLE THIRD PARTY WARRANTS MANDAMUS RELIEF.

### A. The mandamus standard is satisfied.

Relators seek mandamus relief regarding the trial court's erroneous application of Chapter 33 to the facts of this case. The standard for mandamus relief on a legal issue has been summarized as follows:

> To be entitled to mandamus relief, a relator must meet two requirements. First, the relator must show that the trial court clearly abused its discretion. Second, the relator must demonstrate it has no adequate remedy by appeal.

> A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law. When reviewing the trial court's decision for an abuse of discretion, the reviewing court may not substitute its judgment for that of the trial court with respect to resolution of factual issues or matters committed to the trial court's discretion. **Review of the trial court's determination of the legal principles controlling its ruling is much less deferential. A trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion.**

*In re Brokers Logistics, Ltd.,* 320 S.W.3d 402, 405 (Tex. App.—El Paso 2010, orig. proceeding) (Citations omitted, emphasis added); *see also In re Arthur Andersen LLP,* 121 S.W.3d at 486 ("[A]s to legal issues, an error amounting to an abuse of discretion can be as simple as misinterpreting or misapplying the law.").

"An appellate remedy is 'adequate' when any benefits to mandamus review are outweighed by the detriments." *In re Energy Res[s]. Tech. GOM, Inc.,* 2012 WL 4754006 at * 1 (Tex. App.—Houston [14th Dist.] Oct. 4, 2012, orig. proceeding). "This determination depends heavily on the circumstances presented and is better guided by general principles than by simple rules." *Id.* In benefit-detriment evaluations, courts "consider whether mandamus will preserve important substantive and procedural rights from impairment or loss." *In re Brokers Logistics, Ltd.,* 320 S.W.2d at 408. Courts also consider "whether mandamus review will "allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments." *Id.* (quoting *In re Team Rocket, L.P.,* 256 S.W.3d 257, 262 (Tex. 2008)). Finally, courts consider whether mandamus relief will spare litigants and the public "the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *Team Rocket,* 256 S.W.3d at 262.

**B.** **Mandamus relief is the rule for improper denial of a motion to designate a responsible third party.**

Mandamus relief is appropriate where, as here, a district court abuses its discretion by denying a motion to designate a responsible third party. Each of the following opinions grant mandamus relief based on the now well-established rule of law that an appeal is an inadequate remedy for the denial of a motion to designate a responsible third party. *In re Arthur Andersen LLP,* 121 S.W.3d at 486; *In re Brokers Logistics, Ltd.,* 320 S.W.2d at 408-09; *In re Lewis Casing Crews, Inc.,* 2014 WL 3398170 at * 5; *In re Greyhound Lines, Inc.,* 2014 WL 1022329 at * 4; *In re Houston M. Smith,* 366 S.W.3d 282, 287-89 (Tex. App.–Dallas 2012, orig. proceeding); *In re Oncor Elec. Delivery Co.,* 355 S.W.3d at 306.

For example, in *Lewis Casing*, the appellate court reviewed a petition for mandamus relief under very similar circumstances to the case at bar. The plaintiff was injured while working on a drilling rig within the scope of his employment. *Lewis Casing,* 2014 WL 1022329 at * 1. The plaintiff sued several companies, but omitted his immune employer, Diamond D. *Id.* The trial court denied Lewis Casing's motion to designate the employer as a responsible third party. *Id.* When Lewis Casing's motion to reconsider was denied, it petitioned for writ of mandamus, which was granted. *Id.*

The *Lewis Casing* court noted that "Lewis Casing does not have the ability to seek contribution from [plaintiff's] employer, Diamond D, because Diamond D

30

has provided [plaintiff] with workers' compensation benefits." *Id.* at * 4. The Court held that the trial court's denial of Lewis Casing's motion to designate the employer as a responsible party could not be adequately addressed by an appeal because the denial "'would skew the proceedings, potentially affect the outcome of the litigation, and compromise the presentation of [Lewis Casing's] defense in ways unlikely to be apparent in the appellate record.'" *Id.* at * 5 (citations omitted). *See also Brokers Logistics,* 320 S.W.2d at 408 (same); *Oncor Elec.*, 355 S.W.3d at 306 (same); *Andersen,* 121 S.W.3d at 486 (same); *Greyhound Lines,* 2014 WL 1022329 at * 4 (same).[6]

The present trial is estimated to continue for more than two weeks. It will require at least twenty witnesses, fifteen being from states other than Texas. The

---

[6] The *Andersen* court cited these "severance" cases in which mandamus was granted based on the same principle:

> *Jones v. Ray,* 886 S.W.2d at 822-23 (granting mandamus relief because severance of the plaintiffs' claims against some defendants from claims against other defendants would prohibit jury from apportioning appropriate percentage of responsibility for each defendants' conduct."); *Ryland Group, Inc. v. White,* 723 S.W.2d 160, 163 (Tex. App.— Houston [1st Dist.] 1986, no writ) (granting mandamus relief because severance of defendants' third-party claims violated the defendants' right to have the liability of all original third-party defendants determined in the primary suit under then version of Chapter 33).

*Andersen,* 121 S.W.3d at 483. *See also In re Energy Res[s]. Tech. GOM,* 2012 WL 4754006 at * 1-2 (Tex. App.–Houston [14th Dist.] Oct. 4, 2012, orig. proceeding) (granting mandamus relief to reverse trial court's granting of plaintiffs' motion to sever claim against a designated responsible third party on grounds that "the third party claim is interwoven with the remaining action so that they involve the same facts and issues.").

*Lewis Casing* court held that mandamus relief was appropriate to avoid the waste of resources caused by improper proceedings:

> There will be a substantial waste of the litigants' time and money if they proceed to trial without the trial court's error being corrected, proceed through a direct appeal only to have the judgment reversed, and then retry the entire case with Diamond D designated as a responsible third party. . . . **In this case, the potential waste of resources, when combined with the possibility that Lewis Casing may be unable to successfully prosecute an appeal from an adverse judgment, supports the conclusion that Lewis Casing does not have an adequate remedy by appeal.**

*Id.* (emphasis added, citations omitted). *See also Andersen,* 121 S.W.3d at 486 (same); *Brokers Logistics,* 320 S.W.2d at 409 (same). As such, the Court held that the trial court clearly abused its discretion by denying the motion to designate. *Id.*

*In re Energy Resources Technology GOM,* 2012 WL 4754006 at * 1-2 (Tex. App.—Houston [14th Dist.] Oct. 4, 2012, orig. proceeding) presented similar issues. There, a worker was fatally injured by a crane that collapsed while he was working on a platform. *Id.* His parents filed a wrongful death action against the companies that owned and operated the platform. *Id.* The defendants were granted leave to designate as a responsible third party the company (Cargotec) responsible for the maintenance and safety inspection of the crane. *Id.* The trial court, however, subsequently granted the plaintiffs' motion to sever the third party claims. *Id.* at * 1.

The appellate court granted mandamus relief because the third party claims were interwoven with the facts and issues alleged by the plaintiffs. *Id.* For instance, the plaintiffs alleged that the defendants failed to properly inspect and maintain the platform and its appurtenances. *Id.* The defendants alleged that Cargotec was retained to inspect, maintain, and repair the crane and its component parts. The *Energy Resources* Court held:

> Whether the collapse of the crane was due to Cargotec's negligence is relevant to the plaintiffs' claim against relators and **will involve the same issues, facts, and evidence. We find the third-party claim is interwoven with the remaining action so that they involve the same facts and issues**. Accordingly, severance of relators' contribution claims against Cargotec was an abuse of discretion.

*Id.* at * 2 (emphasis added; citations omitted). As shown below, this same rule of law applies to the case at hand.

Clearly, an appeal is not an adequate remedy for the denial of Relators' motion to designate a responsible third party. Mandamus relief in the instant matter will "spare litigants and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *In re Team Rocket, L.P.*, 256 S.W.3d at 262. The present issues, facts, and evidence concerning Wynnewood are interwoven with Plaintiffs' allegations against Relators. As such, the benefits of mandamus review clearly outweigh the detriments.

**C.** **The issues, facts, and evidence concerning Wynnewood are interwoven with Plaintiffs' allegations against Relators.**

Relators herein designated Wynnewood as a responsible third party because it would be impossible to explain the occurrence without including Wynnewood's role. The accident occurred: (1) on Wynnewood property, (2) under the supervision of Wynnewood personnel, (3) within the scope of the deceased workers' employment with Wynnewood, and (4) as the result of the explosion of a boiler which was owned, operated and maintained by Wynnewood. Any and all evidence regarding the explosion has a nexus with Wynnewood.

Any of the Relators' alleged failures of control address the underlying deficiencies of Wynnewood's operations. Indeed, Plaintiffs allege that Relators failed to exercise control over Wynnewood refinery's safety responsibilities to monitor dangerous conditions, upgrade equipment, and repair hazardous conditions at the refinery. Plaintiffs' Third Amended Petition, Rec. Tab 2 at ¶ 29. It is impossible to discuss these alleged deficiencies without explaining the involvement of Wynnewood personnel. Comparison of the Relators' involvement requires that Wynnewood's role be viewed in proportional perspective, with fault attributed accordingly.

The Formal Incident Investigation Report (Rec. Tab 1), dated December 5, 2012, addressed the fault for the Wynnewood accident, citing these "Root Causes":

(a)     Lead Operator used burner pressure as startup criteria;

(b)   Operations failed to recognize high gas flow;
(c)   Standard Operating Procedure did not include critical safety information from earlier startup procedures as part of its current startup procedure;
(d)   Training did not include previous Wickes Boiler startup steps in latest training; and
(e)   Lead Operators failed to provide expected guidance.

Rec. Tab 1, pp. 12-14.[7]   All parties were aware of these conclusions sixteen months prior to the non-suit of Wynnewood. Discussing fault for this incident without considering and comparing the role of Wynnewood is impossible.

Twenty-six days after Plaintiffs non-suited their claims against Wynnewood, Relators filed their motion to designate to ensure that Wynnewood's fault would be compared at trial. Rec. Tab 9. In support of their motion, Relators presented allegations from the Plaintiffs' Third Amended Original Petition,[8] which served as Plaintiffs' factual basis for suing Wynnewood. Relators simply adopted the allegations which Plaintiffs had directed against Wynnewood for nineteen months. *Id.*

The facts, evidence and issues concerning Wynnewood's potential responsibility are inseparable from Plaintiffs' allegations against Relators. Mandamus is appropriate to correct the unnatural and prejudicial severance that

---

[7]   This Report was produced to Plaintiffs prior to the filing of Plaintiffs' Notice of Non-Suit Without Prejudice As To Defendant Wynnewood Refining Company, LLC. Rec. Tab 14.

[8]   Since that time, the Real Parties in Interest revised their petition multiple times adding new parties and asserting and deleting allegations against Wynnewood. *See* Rec. Tabs 3, 8, 13.

currently exists. Asking the jury to put on blinders and attach a percentage of fault only to the Relators' involvement—viewed in isolation from Wynnewood's involvement—would skew the proceedings, potentially affect the outcome of the litigation, and compromise the presentation of Relators' defense in ways unlikely to be apparent in the appellate record. *Lewis Casing,* 2014 WL 1022329, at * 5 (citations omitted).

### D. Relators' motion for leave to designate a responsible third party was timely.

#### (1) Relators filed their motion more than 60 days before trial.

Relators' motion complies with the timeliness requirement of § 33.004(a), which states:

> A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.

TEX. CIV. PRAC. & REM. CODE § 33.004(a). This case is scheduled for trial on October 20, 2015. Relators filed their motion on May 18, 2015—181 days before trial. Hence, Relators' motion was timely. Any argument to the contrary is frivolous.

In the proceedings below, Plaintiffs argued that Relators' motion to designate was not timely. At the time of filing, trial was scheduled for June 16, 2015. The trial court subsequently continued the trial setting to September 22,

36

2015, and then to October 20, 2015. However, Relators' motion would have been timely even if the trial proceeded on June 16, 2015.

The 60 day window provided by §33.004(a) is clearly designed to allow plaintiffs to engage in discovery with, and/or join the designated responsible third party prior to trial. Such a provision prevents a defendant from sandbagging the plaintiff with a last minute designation; it provides a plaintiff with recourse through joinder. It also ensures that the plaintiff will have adequate time to address all responsible third party issues in advance of trial. None of these concerns apply here.

From commencement of suit on September 30, 2013 until April 22, 2015, the fault of Wynnewood was to be compared at trial. For 19 months it was totally unnecessary to designate Wynnewood as a responsible third party. Wynnewood was a defendant whose proportionate fault would be determined pursuant to section 33.003(a)(2) of the Texas Civil Practice and Remedies Code. The need to designate Wynnewood arose only after Wynnewood was jettisoned by Plaintiffs' notice of non-suit. The non-suit occurred when trial was less than 60 days away. The Texas Civil Practice and Remedies Code does not empower plaintiffs to unilaterally preclude designations by suing a potentially responsible party and then dismissing within the 60 day window. Such action would constitute plaintiffs' sandbagging. Neither plaintiffs nor defendants should be permitted to use the

37

responsible third party procedures to circumvent and distract Chapter 33's purpose of determining and allocating all potential fault in one action.

Relators filed their motion to designate within 26 days of Plaintiffs' non-suit notice. *See* Rec. Tab 9, 14. Any discovery (and related trial preparation) regarding Wynnewood's involvement had already been undertaken during the 19 months that Wynnewood was a defendant. During those 19 months, Wynnewood asserted it was an immune employer under Oklahoma's workers' compensation laws, which undoubtedly prompted Plaintiffs to non-suit their claims against Wynnewood. However, one may be designated as a responsible third party even if there exists a legal defense to liability, *Galbraith,* 290 S.W.3d at 868-69, and Defendants' timely designation of Wynnewood could not have surprised or ambushed Plaintiffs. Indeed, Relators utilized Plaintiffs' own allegations of negligence to support their motion. Plaintiffs cannot argue that they have been sandbagged or in any way prejudiced by the designation of Wynnewood as a responsible third party.

Plaintiffs filed a First Original Supplemental Petition on May 29, 2015—11 days *after* Relators moved to designate Wynnewood as a responsible third party. That Supplemental Petition added claims on behalf of a minor child, Rogan Smith, who had not yet been identified as a plaintiff. Thus, Relators' motion to designate a responsible third party *preceded* the joinder of a new plaintiff in this case. In short, Relators motion was timely, reasonable, and appropriate.

38

### (2) The statute of limitations did not bar Relators from designating Wynnewood as a responsible third party.

At the time that Plaintiffs' filed their Notice of Non-Suit, the statute of limitations had not, and has not, run on the claims of Plaintiff Rogan Smith, a minor. The limitations period on those claims will not expire until after Rogan Smith reaches the age of majority. TEX. CIV. PRAC. & REM. CODE §§ 16.001, 16.003; *see also Encisco v. Chmielewshi,* 16 S.W.3d 858, 860 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("The record demonstrates that at the time of her father's death, Christina was three years old. Thus, on the accrual date of the cause of action, Christina was under a legal disability. Therefore, section 16.001(b) operates to toll the two year statute of limitations until Christina reaches the age of eighteen."). Hence, subsection (d) of Section 33.004 did not bar or restrict Defendants' statutory right to designate Wynnewood. TEX. CIV. PRAC. & REM. CODE § 33.004(d) (emphasis added).[9]

---

[9] Following the hearing on the motion for leave to designate Wynnewood as a responsible third party, Rogan Smith's guardian ad litem filed a notice of non-suit of Rogan Smith's claims, seeking to dismiss Rogan Smith's claims without prejudice to refiling. Rec. Tab 15. However, that notice, which was not filed by Rogan Smith's attorney of record, is irrelevant because one cannot bring a claim under the Texas Wrongful Death Act piecemeal. All of a deceased individual's wrongful death beneficiaries are required to present their claims in a single lawsuit. *Avila v. St. Luke's Lutheran Hosp.*, 948 S.W.2d 841, 850 (Tex. App.—San Antonio 1997, writ denied). *Tex. Health Enters., Inc. v. Geisler*, 9 S.W.3d 163, 169 (Tex. App.—Fort Worth, pet. dism'd) (holding a judgment "cannot stand" where the record shows that all statutory beneficiaries are not parties to the lawsuit, or that the wrongful death claims have not been brought for the benefit of all the statutory beneficiaries). Relators have filed a plea in abatement addressing these issues in the trial court, which plea is currently pending.

### (3) Timely designation of Wynnewood avoided the restrictions of section 33.004(d).

Section 33.004(d) allows a defendant to designate a responsible third party after the statute of limitations has run, as long as the defendant timely discloses (if obligated) that said third party may be so designated:

> A defendant may not designate a person as a responsible third party with respect to a claimant's cause of action after the applicable limitations period on the cause of action has expired with respect to the responsible third party **if the defendant has failed to comply with its obligations, if any, to timely disclose that the person may be designated as a responsible third party under the Texas Rules of Civil Procedure.**

Tex. Civ. Prac. & Rem. Code § 33.004(d)(emphasis added). Courts construe the "timely disclosure" requirement of § 33.004(d) to require "a just and reasonable result." *Withers v. Schneider Nat'l. Carriers, Inc.,* 13 F.Supp.3d 686, 690 (E.D. Tex. 2014) (citing *City of Dallas v. Abbott,* 304 S.W.3d 380, 384 (Tex. 2010)) ("In construing the 'timely disclosure' requirement of § 33.004(d), however, this Court must presume that the Texas Legislature intended "'a just and reasonable result.'").[10]

---

[10] Parties commonly disclose such information through discovery. A party is under a duty to supplement its discovery responses if the party knows the responses are incomplete or are no longer true. Tex. R. Civ. P. 193.5; *Yeldell v. Holiday Hills Retirement & Nursing Ctr., Inc.*, 701 S.W.2d 243, 246 (Tex.1985) (applying predecessor rule); *Oscar Luis Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 860 (Tex. App.—Dallas 2006, no pet.). Tex. R. Civ. P. 193.6(a); *Oscar Luis Lopez*, 200 S.W.3d at 860.

40

The purpose of § 33.004(d) is to allow a plaintiff to join a designated responsible third party in time to recover damages associated with that party's fault. *See, e.g., Withers,* 13 F.Supp.3d at 691 ("[A] defendant has a duty to disclose the existence of any potential responsible third parties as soon as reasonably possible, so a plaintiff may have an opportunity to join such parties before they are time barred."). This ensures that the plaintiff has recourse if the defendant seeks to shift alleged liability to a third party. *Id.,* at 690-91.

Here, Plaintiffs never had recourse against Wynnewood. Wynnewood was immune during the 19 months it was a party, immune during the 26 days it was non-suited, and immune during the five months that Relators' motion to designate was pending. Relators' discovery responses did not require updating until Plaintiffs dismissed their claims against Wynnewood. Plaintiffs sued Wynnewood on September 30, 2013.[11] Wynnewood answered and actively participated in this litigation until Plaintiffs' dismissed their claims against Wynnewood on April 22, 2015—nearly seven months after the statute of limitations for those claims had expired.[12] Prior to April 22, Relators' disclosures were correct. Wynnewood was a defendant whose proportionate liability would be evaluated by the jury. Wynnewood could not also be designated as a responsible **third** party at that time.

---

[11] Plaintiff's Original Petition (Rec. Tab. 4).

[12] Again, Rogan Smith's claims for the wrongful death of Billy Smith, which must be tried in the underlying lawsuit, are not time barred

Wynnewood could not simultaneously be a joined party and an unjoined third party in the lawsuit.

Twenty-six days after non-suit, on May 18, 2015, Defendants provided Plaintiffs with supplemental disclosures, now designating Wynnewood as a potential responsible third party.[13] Relators filed their Motion for Leave to Designate Third Party on the same day so as to avoid any delay or misunderstanding following Plaintiffs' eleventh hour dismissal of claims.

Plaintiffs certainly cannot complain about the timing of this designation. It was Plaintiffs who decided to non-suit their Wynnewood claims after the statute of limitations had expired on the Mann claims.[14] By so doing, Plaintiffs eliminated the possibility of Relators filing a motion to for leave to designate Wynnewood as a responsible third party prior to the statute of limitations expiration. *See Spencer v. BMW Of North America, LLC,* 2015 WL 1529773 at * 2 n. 4 (W.D. Tex. April 2, 2015) (holding that designation after limitation period ran was timely where plaintiff filed suit eight days before the statute ran and explaining "If the purpose of the timeliness requirement is to afford the plaintiff an opportunity to name the responsible third party as a defendant in the suit, **Plaintiff eliminated such a**

---

[13] Exhibit A [Defendants' Joint Amended Response To 194.2(l) Of Plaintiffs' Requests For Disclosure].

[14] Although the statute of limitations had now expired, the statute obviously had no effect on the actual damages asserted against Wynnewood; Wynnewood was already under workers' compensation immunity.

**possibility by filing her case so close to the expiration of the statute of limitations.")**(Emphasis added).

Indeed, even after they non-suited their claims against Wynnewood, the Plaintiffs continue to allege that its acts and omissions caused the deaths at issue in the underlying lawsuit. On September 14, 2015, the Real Parties in Interest filed their Fourth Amended Original Petition. Rec. Tab 8. There, the Plaintiffs alleged, in four separate paragraphs (s*ee* Facts at ¶ 26) that "Wynnewood Refining Company, LLC willfully, deliberately and intentionally caused the deaths of Billy Smith and Russell Mann." Rec. Tab 8 at ¶ 38. The Real Parties in Interest alleged that Wynnewood Refining Company, LLC deliberately caused the deaths of Billy Smith and Russell Mann in a pleading filed one week prior to the second scheduled trial date in this matter. Rec. Tab 8. Again, the Plaintiffs/Real Parties in Interest can hardly complain that the motion for leave was not timely as it preceded their own allegations against Wynnewood by four months.

In sum, Relators complied with all applicable provisions of § 33.004. Relators' motion to designate Wynnewood as a responsible third party was timely pursuant to the language of § 33.004(a) and (d), and it provided a just and reasonable result under the circumstances -- the exact result contemplated by § 33.004(d).

**E.     Relators pleaded sufficient facts to designate Wynnewood as a responsible third party.**

Under § 33.004(g), it is the Plaintiffs' burden to prove that Relators failed to plead sufficient facts concerning Wynnewood's responsibility:

> If an objection to the motion for leave is timely filed, the court shall grant leave to designate the person as a responsible third party unless the objecting party establishes:
>
> (1)     the defendant did not plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirement of the Texas Rules of Civil Procedure; and
>
> (2)     after having been granted leave to replead, the defendant failed to plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirements of the Texas Rules of Civil Procedure.

TEX. CIV. PRAC. & REM. CODE § 33.004.

Texas imposes a "fair notice" standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). "A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982).

In support of their motion, Relators selected facts directly from Plaintiffs' Third Amended Petition.  This is a common and acceptable pleading practice. *See,*

44

*e.g., Andersen,* 121 S.W.3d at 482 ("Andersen has shown that the third-party defendants are implicated in the Plaintiffs' pleadings to such an extent that the Plaintiffs could have sued each third party, and that each third party 'may' be liable to the Plaintiffs for all or a part of the 'damages claimed' against Andersen and the other defendants."). Consequently, the Plaintiffs must prove that the very allegations the Plaintiffs themselves made against Wynnewood provide insufficient notice of Wynnewood's potential responsibility for the accident.

In their motion, Relators asserted:

> The plaintiffs allege that Mann and Smith were employees of Wynnewood Refining Company ("Wynnewood"), and that on the evening of September 28, 2012 Mann and Smith were assisting in a "re-start" of a Wickes boiler at the refinery.[15] The plaintiffs allege that Smith was tasked with the duty of watching the fire-eye of the boiler to check for ignition of the boiler's pilot light, and that Mann was charged with the duty of turning the gas valve connected to the boiler.[16] The personnel at the Wynnewood refinery who tasked Smith and charged Mann with those responsibilities were themselves employed by and acting for Wynnewood. The plaintiffs allege that as Mann and Smith were performing their tasks, the boiler exploded, killing them.[17]
>
> The plaintiffs allege that Wynnewood "was rife with dangerous practices and working conditions."[18] They allege that Wynnewood had actual knowledge of prior detonations occurring with the boiler

---

[15] Defendants' Motion for Leave To Designate Responsible Third Party Rec. Tab 9 at 2, which cites Plaintiff's Third Amended Original Petition at ¶ 16.

[16] *Id.* at ¶ 19-20).

[17] *Id.* at ¶ 21).

[18] *Id.* at ¶ 24).

but failed to properly repair, maintain, and update the boiler to ensure that such occurrences would be minimized.[19]   The plaintiffs allege that Wynnewood Refining Company's acts and omissions were negligent and grossly negligent and proximately caused Mann and Smith's injuries.[20]

By quoting the Plaintiffs' own language back to them, Relators have provided "fair notice" of the nature and basic issues of the litigation, as well as what testimony will be relevant. *Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 896. Plaintiffs sued Wynnewood based on the same allegations. Clearly, there is no heightened notice requirement for motions to designate a responsible third party. Relators pleaded sufficient facts to designate Wynnewood as a responsible third party. TEX. CIV. PRAC. & REM. CODE § 33.004(g).

If the denial was based on an insufficient pleading designation, the district court erred by failing to provide Relators with the opportunity to replead in order to supply sufficient facts, as mandated by § 33.004(g). *Id.* Failure to do so constitutes an abuse of discretion. *See, In re Oncor Elec. Delivery Co.*, 355 S.W.3d 304, 305(Tex. App. – Dallas 2011)("We conclude the trial court abused its discretion in [denying motion for leave to designate responsible third party] without granting leave to replead. . . ."). If this Court determines that Relators have not pleaded sufficient facts, then mandamus relief is appropriate to provide Relators with that statutorily mandated opportunity.

---

[19]  *Id.* ¶ 23).

[20]  *Id.* ¶ 33-39).

## III. CONCLUSION AND PRAYER.

Texas appellate courts hold that mandamus relief is appropriate when a district court abuses its discretion by denying a motion to designate a responsible third party. An appeal is not an adequate remedy because the court's denial of the motion skews the proceedings, affects the outcome, and compromises the defense in ways unlikely to be apparent in the appellate record.

Mandamus relief should be granted to allow the designation of Wynnewood as a responsible third party because Relators' motion complied with all of the requirements of § 33.004. The motion, filed more than 60 days before trial and promptly after the Plaintiffs non-suited their claims against Wynnewood, was timely.

The issues, facts, and evidence in support of Relators' motion are inseparable from Plaintiffs' allegations against Relators. Sufficient facts to support the designation were generated from Plaintiffs' Petitions. The allegations against the Relators spring directly from what was done or not done by Wynnewood.

WHEREFORE the Relators pray that this Court issue a Writ of Mandamus requiring the District Court of Fort Bend County, Texas to vacate its Order denying Relators' Motion for Leave to Designate Third Party and ordering that leave be granted for Wynnewood to be designated as a Responsible Third Party, that its fault might be compared at the time of trial.

47

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.


By: */s/ Phillip D. Sharp*
      Phillip D. Sharp
      Texas State Bar No. 18118680
808 Travis, 20th Floor
Houston, TX 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101
*sharp@mdjwlaw.com*

SMITHYMAN & ZAKOURA,
CHARTERED


By: */s/ Lee M. Smithyman*
      Lee M. Smithyman
      KS Supreme Court #09391
750 Commerce Plaza II
7400 West 110th Street
Overland Park, KS 66210-2362
Telephone: (913) 661-9800
Facsimile: (913) 661-9863
*lee@smizak-law.com*

*Application for admission pro hac vice pending*

ATTORNEYS FOR RELATORS

48

# CERTIFICATION

The undersigned has reviewed the petition and concluded that every factual statement in the petition is supported by evidence included in the record.


*/s/ Philip D. Sharp*
Philip D. Sharp


# CERTIFICATE OF COMPLIANCE

This is to certify that this computer-generated Petition for Writ of Mandamus contains 8,424 words and complies with rule 9.4 of the Texas Rules of Appellate Procedure.


*/s/ Philip D. Sharp*
Philip D. Sharp
Dated: October 14, 2015

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing instrument have been forwarded to all known counsel of record in accordance with the Texas Rules of Civil Procedure on this the14th day of October, 2015, via the method indicated below:

Gary M. Riebschlager
The Riebschlager Law Firm
801 Congress, Suite 250
Houston, TX 77002
*gary@riebschlagerlaw.com*
*cecilia@riebschlagerlaw.com*
*via e-mail and US Mail*

Richard L. Tate
Tate, Moerer & King, LLP
206 South Second Street
Richmond, TX 77469
*rltate@tate.law.com*
*via e-mail and US Mail*

Sidney F. Robert
Brent Coon & Associates
300 Fannin, Suite 200
Houston, TX 77002
*sidney.robert@bcoonlaw.com*
*belinda@bcoonlaw.com*
*via e-mail and US Mail*

David M. Medina
The Medina Law Firm
5800 Memorial Drive, Suite 890
Houston, TX 77007
*davidmedina@justicedavidmedina.com*
*via e-mail and US Mail*

The Honorable James H. Shoemake
434th JUDICIAL DISTRICT COURT
Fort Bend County Justice Center
1422 Eugene Heimann Circle
Courtroom: Room 3I
Telephone: 281-341-4409
*Via e-filing*

*/s/ Philip D. Sharp*
Philip D. Sharp
Dated:  October 14, 2015

# APPENDIX

## INDEX TO APPENDICES TO PETITION FOR WRIT OF MANDAMUS

Tab 1          Order, October 12, 2015
Tab 2          Transcript of September 22, 2015 Hearing
Tab 3          Formal Incident Investigation Report
Tab 4          Tex. Civ. Prac. & Rem § 33.004
Tab 5          Tex. Civ. Prac. & Rem § 33.003

# TAB 1

Filed
5/27/2015 4:44:04 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Noreyda Flores

CAUSE NO: 13-DCV-209679

| | | |
|---|---|---|
| LEEANNA MANN and KARI SMITH, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | |
| | § | |
| CVR ENERGY, INC.; CVR | § | FORT BEND COUNTY, TEXAS |
| PARTNERS, LP; CVR REFINING, LP; | § | |
| GARY-WILLIAMS ENERGY CORP.; | § | |
| WYNNEWOOD REFINING | § | |
| COMPANY, LLC, | § | |
| | § | |
| *Defendants.* | § | 434th JUDICIAL DISTRICT |

### ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO DESIGNATE RESPONSIBLE THIRD PARTY

On this day came on for consideration Plaintiffs' Objection to Defendants' Motion for Leave to Designate Responsible Third Party. The Court, having considered the motion, response thereto and hearing argument of counsel, is of the opinion that said motion should be DENIED. It is therefore

ORDERED, ADJUDGED and DECREED that Defendants' Motion for Leave to Designate Wynnewood Refining Company, LLC as a Responsible Third Party is hereby DENIED.

SIGNED this 12 day of October 2015.

THE HONORABLE JAMES H. SHOEMAKE
JUDGE PRESIDING

**APPROVED:**

**THE RIEBSCHLAGER LAW FIRM, PC**
801 Congress, Suite 250
Houston, TX   77002
Telephone:  (713) 980-5300
Facsimile:  (713) 228-2210

By:     /s/ Gary M. Riebschlager
        GARY M. RIEBSCHLAGER
        State Bar No. 16902200
        Email: gary@riebschlagerlaw.com

SIDNEY F. ROBERT
State Bar No. 24074968
Email: sidney.robert@bcoonlaw.com
**BRENT COON & ASSOCIATES**
300 Fannin, Suite 200
Houston, Texas 77002
Telephone: (713) 225-1682
Facsimile: (713) 225-1785

RICHARD L. TATE
State Bar No. 19664460
Email: rltate@tate-law.com
KRISTIN REIS
State Bar No. 24060478
Email: kreis@tate-law.com
TATE MOERER & KING, LLP
206 South 2nd Street
Richmond, Texas 77469
Telephone:    281-341-0077
Facsimile:    281-341-1003

**ATTORNEYS FOR PLAINTIFFS**
**LEEANNA MANN, KARI SMITH,**
**ANTHONY MANN AND TYLER MANN**

2

# TAB 2

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 13-DCV-209679

LEEANNA MANN and KARI SMITH   )   IN THE DISTRICT COURT
                            )
                            )
VS.                         )   FORT BEND COUNTY, TEXAS
                            )
CVR ENERGY, INC., CVR       )
PARTNERS, LP, CVR REFINING, )
LP, GARY-WILLIAMS ENERGY    )
COMPANY, LLC, WYNNEWOOD      )
REFINING COMPANY, LLC       )   434TH JUDICIAL DISTRICT
                            )
                            )

*****

***MOTIONS HEARING***

*****

On the 22nd day of September, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable James H. Shoemake, Judge presiding, held in Richmond, Fort Bend County, Texas;

Proceedings reported by machine shorthand.

APPEARANCES

Richard Tate
SBOT NO. 19664460
Tate Moerer & King, LLP
206 South 2nd Street
Richmond, Texas 77469
Telephone: (281)341-0077
Attorney for the Plaintiffs

Gary Riebschlager
SBOT NO. 16902200
Riebschlager Law Firm
801 Congress, Suite 250
Houston, Texas 77002
Telephone: (713)980-5300
Attorney for the Plaintiffs

Brent W. Coon
SBOT NO. 04769750
Brent Coon & Associates
3550 Fannin
Beaumont, Texas77701
Telephone: (409)835-2666
Attorney for the Plaintiffs

David M. Medina
SBOT NO. 00000088
The Medina Law Firm
5800 Memorial Drive, Suite 890
Houston, Texas 77007
Telephone: (713)
Attorney for the Plaintiffs

-AND-

Lee M. Smithyman
Smithyman & Zakoura
750 Commerce Plaza II
7400 West 110th Street
Overland Park, Kansas 66210-2362
Telephone: (913)661-9800
Counsel for the Defendants

Phillip D. Sharp
SBOT NO. 18118680
Martin, Disiere, Jefferson & Wisdom, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
Telephone: (713)632-1700
Counsel for the Defendants

Allen Jones
Associate General Counsel
CVR Energy, Inc.
10 E. Cambridge Circle Drive, Suite 250
Kansas City, Kansas 66103
Telephone: (620)251-4000
Counsel for the Defendants

VOLUME 1 OF 1

MOTIONS HEARING

September 22, 2015

Reporter's Certificate..............................60

EXHIBIT INDEX

VOLUME 1 OF 1

MOTIONS HEARING

PLAINTIFFS EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|-----|-------------|---------|----------|
| 1 | CVR Energy 2012 Annual Report | 21 | 22 |
| 2 | Services Agreement | 26 | 26 |
| 3 | Excerpts of Depositions and Annual Reports | 30 | 31 |
| 4 | Defendants CVR Energy, Inc., CVR Partners, LP and CVR Refining, LP's Response to Plaintiffs' Request For Disclosure | 51 | 51 |
| 5 | Defendants' Joint Amended Response To 194.2(1) of Plaintiffs' Request For Disclosure | 51 | 51 |

DEFENDANTS EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|-----|-------------|---------|----------|
| 1 | CVR Energy, Inc. & Subs Legal Organization & Ownership Updated As of June 10, 2013 (Chart) | | 22 |

5

(September 22, 2015)

THE COURT: All right. Civil docket 209679, Leeanna Mann, et al versus CVR Energy, Inc.

MR. TATE: Plaintiffs are here, Your Honor.

THE COURT: The usual suspects, okay.

MR. SMITHYMAN: And the defendants are here, Your Honor.

THE COURT: All right. How long do you think we're going to be spending?

MR. TATE: Well, Your Honor, I think we have two motions on the docket this morning and then it was our hope the Court would declare us in trial and set us for the appropriate date. We were told that the judicial conference is next week and therefore we can't go forward and that you would set us for the date of your choosing and -- but we'd be declared in trial so that -- and I think a date that was being kicked around was October 20th, which certainly works for us. And we were hopeful you'd declare us in trial, so that we would alleviate any conflicts.

THE COURT: Okay. All right. I will get back to y'all.

MR. SHARP: To answer your question, Your Honor, I think this may take a while in all candor.

THE COURT: Okay. All right. Thank you.

(Break in proceedings.)

THE COURT: Okay. All right. On Mann.

MR. SMITHYMAN: Your Honor, our amended notice of hearing provides at least three of the issues that would be resolved by you hopefully today or take under advisement, but perhaps decide these well in advance of trial.

THE COURT: Yeah.

MR. SMITHYMAN: Which would be helpful for, I think, everybody on here. They are not simple issues. I really think that the Court will be required to look at a couple of the cases that I'll talk about here to see the fine points of the legal point that has to be resolved by the Court today. And it really is going to be that -- that final point is -- is essentially a function of the motion to determine applicable state law. The pleadings that had been forwarded to you have been substantial and we listed, so that you'd have easy access to each of the various written pleadings, the numbers and dates that they were filed so that you could review it. What I would like to do is to give you a recap of those pleadings so that you have an understanding of what it is that will be resolved by this motion.

Back in March 19th, 2015, we filed what's marked as Document 63 to determine applicable state law. That -- that pleading, essentially, relied upon the allegations that were provided in the first original petition of the plaintiffs and that were agreed upon by the defendants. And basically it

established the contacts of the -- the actors in this drama in Oklahoma. It established that this was a workers' compensation accident in Oklahoma that -- where two Oklahoma residents were killed and they were killed in the employment of their Oklahoma-based employer. And they were killed at -- in Wynnewood, Oklahoma, as a result of an explosion of a boiler that occurred in a refinery.

The families of these -- of the workmen that were killed have filed the suit that's here. They too are Oklahoma residents, every one of them. The wives, the children, all from Oklahoma, all from Wynnewood or St. Paul's, which is right around the corner. Importantly we showed that at that time approximately a half million dollars was provided in workers' compensation benefits, or would be. That was the net value of payments that would be in the future to those families as a result of that accident. Those families elected the workers' compensation benefits and they were accepted.

What we then did was provide you with the Texas Supreme Court's analysis of what law should be applied to that situation. We went through the most significant relationship test, which is the test for conflicts of law by the Supreme Court of Kansas, and we, I think, established that Oklahoma law would apply to all aspects of this case, even though the -- several of the defendants have a corporate headquarters here in Sugar Land, Texas. The peoples -- the entities sued originally

were Wynnewood Refining Company, which is the refinery in Oklahoma. The others that were sued were in a fairly complex -- and I can just show you what the corporate organization chart looks like -- complex relationship of corporate subsidiaries and affiliates in the corporate family. CVR Energy being up here. Wynnewood Refining being down here in the bottom.

MR. TATE: Your Honor, if he's going to show something I would like for it to be marked and admitted in the record, please.

MR. SMITHYMAN: That's fine, I'll do it.

THE COURT: All right.

MR. SMITHYMAN: We'll mark it.

(Defendant's Exhibit 1 marked.)

THE COURT: I think it is in the materials that you attached with your pleadings.

MR. SMITHYMAN: It is and it was presented by Mr. Tate in the last hearing that we had -- actually Mr. Riebschlager presented that to you and marked it as well.

MR. TATE: I'm not arguing about the validity of it.

MR. SMITHYMAN: No, no.

MR. TATE: I just want it in the record, because I'm going to come back to it. It's important.

MR. SMITHYMAN: The response was provided on

April 13, 2015, that's Document 78, and essentially that argued that Mr. Walters, who was the general counsel of CVR and Mr. Morrow, who was the insurance risk person, essentially were not listed on initial disclosures; hence, this was not valid evidence; hence, the workers' compensation immunity should not exist. It was in a sense frivolous, because all parties agreed that the workmans' comp has been paid. In fact, we've had the work comp carrier now enter an appearance to establish their subrogation claim to that million dollars plus in overall benefits that will be paid.

Having said that, the -- the -- it also stated that there was no -- there was no -- we had not established the facts upon which to show this was Oklahoma based. We presented -- we came back and we argued before you on the 13th of April and we explained that the -- that Hughes Wood Products versus Wagner, which, Your Honor, is one of the two most important cases for you to look at. Hughes Wood Products versus Wagner. And we established that really anything that's taken from the pleadings and admitted can be established as a formal judicial admission; hence, it was valid. We provided that in our reply brief, and we provided that Hughes Wood Products versus Wagner case.

And there is a provision -- and essentially, Your Honor, what Hughes Wood Products versus Wagner said, to cut to the chase, is the Texas Supreme Court said that under

the most significant relationship test, when there's a workers' compensation accident for which benefits were paid in a -- in a state, you always, always, always apply the law of that state to the immunity of the defendants in that state. That industrial bargain was undertaken in that state. That state has the most significant interest in ensuring that it can regulate industrial accidents, and that the quid pro quo is given and all of the -- all of the legal intricacies associated with a work comp accident, where that's paid, is undertaken by the law of that state. In fact, in this case the -- the Supreme Court overruled some decisions to apply Louisiana law, because this particular Hughes Wood Products case occurred in Louisiana and that was going to be the applicable law.

Now, it also said the following -- and -- and the reason this is so important -- the reason it's so important that the Oklahoma law apply is I'll show you in a minute that the remaining defendants fall within the penumbra of the immunity that is granted by Oklahoma Workers' Compensation law. The statute, as interpreted, in Love versus Flour Milling, which is cited throughout our briefs, grants that the immunity of the employer, also to the employees --

MR. TATE: Excuse me, Your Honor, he's now arguing -- rearguing his motion for summary judgment, which you have already denied. If he's going -- he shouldn't be allowed this morning on what was to be the eve of trial now to reargue

summary judgment motions that this Court has considered, fully considered, read mountains of paper on, and denied. And that's all he's doing right now, is rearguing the motion for summary judgment. He's not talking about the most significant relationship test. He's going back to an argument that he's made from the outside and he cannot accept that the contra is true and that is that he didn't win this on summary judgment. So that's what he's doing this morning. He's not offering -- he's not arguing the most significant relationship test. He's arguing summary judgment.

THE COURT: We already had summary judgment argument and ruling, so I don't want to waste time.

MR. SMITHYMAN: Okay.

THE COURT: Okay. No disrespect.

MR. SMITHYMAN: You're ultimately -- you are ultimately, Your Honor, going to have to issue jury instructions, so you're going to have to pick whether it's Oklahoma law or Texas law and I'm just telling you what the Oklahoma law is. So I think you do need to know that in order to make the determinations you're going to make and in order to make the rulings you do, and the jury instructions are going to look different on one situation or another.

MR. TATE: Actually, the Court's already --

MR. SMITHYMAN: If I could, Your Honor, I'll finish my arguments and then Mr. Tate can address all those

issues at a later time.

MR. TATE: I need to interpose an objection, if I may, please.

THE COURT: You may.

MR. TATE: Actually the Court has already heard the motion for determination of applicable state law, and I believe the Court's decision was, indeed, to carry it along until the jury charge conference. But if the Court has not -- if he considers it or if you have not made a decision and that's the issue this morning, then so be it.

MR. SMITHYMAN: Your Honor --

MR. TATE: But I believe that's been argued, completely briefed, and you've already made that determination.

MR. SMITHYMAN: I have a very serious difference of opinion in memory of Mr. Tate. You never ruled on the motion to determine state law.

THE COURT: I said I was going to carry it forward. I just didn't say how far I was going to carry it forward.

MR. SMITHYMAN: Okay. Your Honor, if you could carry it -- if you could make that determination ahead of jury instructions, obviously it's quite helpful. That's it.

Plaintiffs essentially after the -- the one issue in Hughes Wood Products, Your Honor, and the one provision that I think is most important here is it said that

it's established unequivocally that recovery for tort or wrongful death will not be permitted in any state if the defendant is declared immune from such liability by the workers' compensation statute of the state under which the defendant is required to provide insurance.

THE COURT: I'm sorry, go ahead.

MR. SMITHYMAN: Essentially that particular provision, we believe that all of these entities fall within that, because what they did is a representative action of the subsidiary. Let me go back. I think I've established Hughes Wood Products says essentially we're immune from such liability by the workers' compensation statute under which the defendant is required to provide insurance. Oklahoma. Okay. Oklahoma statute now is going to govern the responsibility or liability, potential liability of the remaining defendants. And this is why this is important: Oklahoma provides tort immunity not just to the employees or the officers or the directors, it also provides immunity to the shareholders of the insured employer. And the Love versus Flour Milling case -- and, again, I am going to where the jury instructions will have to be on this issue.

MR. TATE: Objection, revisiting the summary judgment. He's not arguing the most significant relationship test. He's arguing the immunity under Oklahoma law, which this Court has already ruled against him on summary judgment.

THE COURT: Let's bring it in. You know I have some recollection of the things that I read, so it's not -- this is not foreign.

MR. SMITHYMAN: Okay. Essentially the distinction between what will occur with Oklahoma law in this matter and Texas law is the following. In that Love versus Flour Milling case, that's the key case from Oklahoma, it says the following: When the tortfeasor acts in a representative capacity, even though he or she may be the controlling shareholder of -- of the employer of the injured party, there is no independent tort liability for the act or omission.

So your jury instruction at applying Oklahoma law will be quite simply was -- what -- whatever is alleged against the CVR entities, was that being performed -- essentially is that an act of the employer. Is it essentially -- and let me take another spot. If such an assertion is held sufficient to hold a common law -- to sustain a common law action, it places upon shareholders an independent duty, which in reality is the nondelegable duty of the employer to provide a safe working environment for corporate employees. It goes on to say, such a holding would have the anomalous affect of treating shareholders as employers and refusing to grant them immunity under the Workers' Compensation Act.

So under Oklahoma law, if this is a nondelegable safety duty, then every equitable interest going up the

shareholder, equity holder, going up the line, is immune for any actions that were part of the nondelegable safety duty.

Texas is different. There's two cases in -- in Texas the two cases that I think address this issue are number one, Coastal versus Torrez, T-O-R-R-E-Z, and Morris versus Scotsman. And, Your Honor, in those cases essentially what they say is that a parent entity that is sort of working with a subsidiary, undertaking what is going on, it says, Texas will not provide immunity for that entity if there is, quote, specific control over the task or the -- or the unit or the issue or the area in which -- which caused the injury to the subsidiary workman. So the issue then is whether in Texas law what -- is there specific control that was undertaken by that corporate entity. If there was not specific control, if it was just general control, bulletins are issued or -- safety bulletins or I want to inspect your premises or all those kinds of general things, that's not sufficient. And there's a lot of law on that. It has to be a specific takeover, we are going to in this case run your Wickes boiler or run your burner management system, we are going to take this over so that you don't have that responsibility that you would otherwise have, Mr. Employer, because someone has taken that over for you. Essentially, that is the Texas law.

So if you decide -- and I think, again, the Hughes Wood Products versus Wood (sic) case mandates Oklahoma

law applies. We're going to have jury instructions that address essentially the nondelegable nature of the duty. If you have Texas instructions, we'll have something that is very different. I think it is better for that determination to be made in advance of trial. I know that the plaintiffs have argued that this should be held until trial and that you would make the determination at that time. Your Honor, I respectfully would -- would state that I see no factual basis upon which that determination should be delayed. In other words, there's not a set of facts that would convince the judge that Oklahoma law should apply rather than Texas law. This selection of law is -- of choice is really mandated not by the facts of who did what to whom, it's done by the legal situation. The legal situation is addressed by Hughes Wood Products versus Wagner. That says you have to apply Oklahoma law. And so it would seem to me that if you could make that determination, then it is that much easier for both parties to craft their jury instructions as they go forward on that issue.

Now, that is the -- that is the first motion that was -- that was scheduled. I'm sure you'd like to hear the siralease (phonetic) so that one person's not up here to long.

THE COURT: I would.

MR. TATE: May I respond, Your Honor?

THE COURT: Yes, sir.

MR. TATE: Ms. Ray is going to assist us. She's going to go over to the ELMO, if I may.

Your Honor, I'm Richard Tate along with Gary Riebschlager, Brent Coon and David Medina. We are here today for the plaintiffs.

THE COURT: Good morning.

MR. RIEBSCHLAGER: Good morning, Your Honor. Good to see you again.

MR. TATE: Your Honor, we're here, first of all, this morning on the defendants' motion for the determination of applicable state law. I believe that this Court has previously informed the parties it intends to carry the motion for determination along with the trial of the case, and I -- if the Court has not so decided, I submit to the Court that the best time to make that decision will be at the charge conference. And the reason is -- the reason I will -- I will explain that in a minute -- well, no, I will go ahead and explain it now.

Carrying the motion for determination of applicable state law will not vary, nor will it affect, Your Honor, the presentation of the evidence in the case. It just simply will not -- it will not vary it at all. So there's no economy associated with that determination. By carrying it along the Court will, at the time it makes its determination, have a complete presentation, Your Honor, of the relevant facts applicable to your determination of the most significant

relationship test and the other factors that apply to the determination of state law. And those facts will have been fully vetted and presented to you through the adversary process, the best process we know, rather than piecemeal affidavits.

And let me just explain to you why I make such a point of that. The bottom line is both at the previous hearing and today counsel for the defendants have the burden to bring forward to you evidence on the most significant relationship test. What they brought forward to you both at the hearing and today, months later, are simply two affidavits: An affidavit of their vice president and general counsel and an affidavit of their insurance man. And the vice president and general counsel, I'd like to show you his affidavit for a minute, Your Honor, which is the one of which they're so proud because they have none other.

Would you, first of all, just put up the first page?

Your Honor, is that on your screen there?

THE COURT: It is.

MR. TATE: It is the affidavit of John Walter. Your Honor, significantly the affidavit is signed and dated March the 18th of 2015 on page 3. Mr. Walter is the general counsel of and senior vice president of CVR. First of all, this affidavit, just as the affidavits in response to the -- in

their motion for summary judgment, is totally incompetent. Nowhere in this affidavit does he say he speaks from personal knowledge. In addition to that, Your Honor, this affidavit is just flat wrong. I wanted this Exhibit No. 1 marked.

Would you, Ms. Ray, put up what we will -- the exhibit that he just showed the Court?

Okay. Now, with that exhibit in front of you --

Ms. Ray, I'm going to ask you to flip back and forth on two things. Would you put page 2 of Mr. Walter's affidavit back up for the Court, please.

I just want you to look at paragraph 5 of page 2, Your Honor. Now, this is the general counsel and senior vice president of CVR. He says Gary-Williams Energy, LLC and Wynnewood Refining Company, LLC are current -- are presently indirect wholly owned subsidiaries of Wynnewood Refining, LLC.

Now, would you put the other exhibit back up, please.

I defy you -- well, I don't defy the Court, no, I'm sorry. I defy Mr. Wick and Mr. Smithyman to point out to the Court where Gary-Williams is even located --

MR. SMITHYMAN: I'll do that.

MR. TATE: -- on this chart.

MR. SMITHYMAN: I'll do that.

MR. TATE: Show us where it is located.

MR. SMITHYMAN: It's called Wynnewood Energy

Company, LLC.

MR. TATE: Okay.

MR. SMITHYMAN: It is in the bottom left of the bottom set. It has been renamed, and the renaming had nothing to do with liability issues, and it was omitted for the purpose of simplicity.

MR. TATE: All right.

MR. SMITHYMAN: That is the reason and that is why that is totally consistent with Exhibit 2.

MR. TATE: And that's unsworn testimony, Your Honor. That's unsworn arguments of counsel. And that's my point. The point is he comes in and he doesn't ever comply with our evidentiary or our procedural requirements, and yet he just has said from day one, Judge, you got to grant summary judgment, you just have to, there's no reason -- no way you can't. And so that's the point. He's got somebody right here saying today Gary-Williams is an indirect wholly owned subsidiary, and yet he has to get up and explain it. Now how many other inconsistencies are there in this affidavit and this chart? He needs to put that in front of a jury. That needs to be fully vetted to you. We need to hear from witnesses who say that and not from -- not from counsel. So that's just an example of why we need to be fully vetted in this thing.

Your Honor, the organization and the operation of CVR Energy and its affiliates present a particularly

compelling case for you to determine the applicable state law at the time of the charge conference. I'd like for you to take a short look at some facts about the organization of CVR. I'd like to offer as Exhibit No. 1 -- Your Honor, I'm going to hand to the court reporter.

MR. SMITHYMAN: Do you have a copy for counsel?

MR. TATE: Yes, I do Mr. Smithyman. Yes, I sure do. I wouldn't think of it otherwise. I'm going to hand your -- Your Honor, I'm going to ask that this be marked as Exhibit 1.

(Plaintiffs' Exhibit 1 marked.)

MR. TATE: Your Honor, Ms. Ray actually has the glossy of Exhibit 1. I'm going to offer Exhibit 1 as the glossy pages, the first 11 pages, from CVR Energy's 2012 annual report.

(Plaintiffs' Exhibit 1, offered.)

MR. SMITHYMAN: In a motion hearing, do we have to offer into evidence and acceptance? Is that how you -- I thought he just presented it. I don't know what this is. I saw -- I don't know what it is. So...

THE COURT: Is that your objection?

MR. SMITHYMAN: Do I need to object or do you just --

THE COURT: I don't think you need to, but if you want to lodge one, I'll certainly let you put it on the

record.

MR. SMITHYMAN: I have no reason to disagree with what this is.

THE COURT: All right.

MR. SMITHYMAN: I will not object.

THE COURT: If I didn't before on the Defendants' 1, for purposes of this hearing, it's admitted. And Plaintiffs' 1, for purposes of this hearing, is admitted.

(Plaintiffs' Exhibit 1, admitted.)

(Defendants' Exhibit 1, admitted.)

MR. TATE: Okay. Now, would you -- this is the glossy first 11 pages of the 2012 annual report.

Ms. Ray -- I mean Ms. Cope, would you please turn to page 2 and would you zoom in for the Court on the first paragraph of page 2 under Corporate Profile. "Headquartered in Sugar Land, Texas, CVR Energy, Inc. is a diversified holding company primarily engaged in petroleum refining and nitrogen fertilizer manufacturing industries primarily engage -- excuse me -- through the holdings in two limited partnerships, CVR Refining, LP and CVR Partners, LP, which own and operate facilities in the mid continent. CVR Energy, through its subsidiaries, serves as the general partner of and owns a majority interest in CVR Refining and CVR Partners."

So that shows the Court how -- how it is integrated into the day-to-day operations and management

through its ownership of the general partner and through its majority ownership of the limited partner.

Then if we drop down four paragraphs or three paragraphs to CVR Refining, LP, this is the limited partnership which operates -- owns and operates its refining subsidiary wing. "CVR Refining is an independent downstream energy limited partnership formed by CVR Energy to own, operate, and grow its refining and related logistics business." Both CVR Energy, Your Honor, and CVR partnership -- refining -- limited partnership are headquartered in Sugar Land, Texas.

Now, I'm going to ask you, Ms. Cope, if you will go to page 6 of this document and the first full paragraph on the page.

Our -- this is the 2012 annual report and, Your Honor, the significance of that is that Gary-Williams Refining was acquired by CVR in December of 2011. Gary-Williams Refining owned Wynnewood Refining. This accident occurred in September of 2012, and this is the year-end 2012 annual report. So I can put it in context for you. This annual report to shareholders says, "Our commitment to our newest refinery" -- that's the Wynnewood refinery -- "is impressive as well. We have invested approximately two hundred million to repair, upgrade and install new equipment and improve the environmental, health and safety performance of the Wynnewood refinery. Part of this investment includes a $102 million

major scheduled turnaround that was completed in the 2012 fourth quarter."

The evidence in this case, Your Honor, is going to show that it was during that turnaround that this boiler was shut down and then ordered, during the turnaround controlled by CVR Energy in Sugar Land, Texas, during that turnaround controlled by CVR, this -- these two men were ordered to fire that boiler back up, and, as a result, they are dead today. We see right here CVR controlled that turnaround and they brag about that turnaround. And those decisions, Your Honor, were made from right here in Sugar Land, Texas. I'm talking now about significant relationship to Texas.

Now, Your Honor, the facts will show that the relationship between CVR Energy and CVR Refining and its affiliates was anything but a typical parent subsidiary holding company relationship. Rather, the facts will show that CVR, Your Honor, beginning in 2007, four years before it acquired Gary-Williams Refinery and Wynnewood, beginning in 2007, CVR implemented an operating strategy, by which it controlled not only the financing of its subsidiaries, but it also served as the corporate executive of the affiliates, the safety environmental -- and environment planning and advisors of the affiliates. It managed the day-to-day operations of the affiliates. It established and maintained the accounting system and business records of the affiliates. It managed the

affiliates' property and assets in the ordinary course of business, and it controlled the payment of dividends or other distributions to the equity interest owners of the affiliates. And it managed or provided advice or recommendations for other projects of the affiliates, as was agreed upon from time to time.

Now, that same organizational strategy that was established in 2007 with respect to its nitrogen fertilizer side of the business was carried forward and applied to its refining side of the business following the acquisition of Gary-Williams and Wynnewood Refinery.

The pattern and practice -- Your Honor, that pattern and practice that I referred to that started in 2007 and was carried forward upon the acquisition of Gary-Williams was actually reduced to writing on December 31 of 2012 in the form of a document called the Services Agreement among CVR Energy, Inc. and it affiliates. I'd like to briefly show you that agreement, Your Honor. I'm going to ask that --

MR. SMITHYMAN: Could I object at this point, a limited objection, and you can make your determination. We're arguing the facts. We're arguing the facts that might be presented to a jury if the Texas law standard applied, but the facts don't determine the standard. You don't say these facts are so egregious, I'm going to use the Texas law standard.

THE COURT: I understand. I understand. Thank

you.  I appreciate it.

MR. SMITHYMAN:  So essentially this doesn't go to the question of law before you.

THE COURT:  I appreciate you reminding me of that and I -- you have to just understand and believe that I'm going to do just that.  You know, I don't really want either one of you standing up and arguing and objecting all the time during motions.  It's a -- we'd never get through the motion hearings and that's not going to happen today.  So move on, please.

MR. TATE:  Well, Your Honor, the facts are how you determine the most significant relationship.  I don't know of any way other than to show the Court facts.  So I'll offer now Exhibit 2, which is the services agreement.

(Plaintiffs' Exhibit 2 marked.)

MS. TATE:  And, Ms. Cope, would you place the first -- oh, I offer Exhibit 2 into evidence, Your Honor, for the purposes of this hearing.

(Plaintiffs' Exhibit 2, offered.)

MR. SMITHYMAN:  No objection, Your Honor.

THE COURT:  P2 is admitted for the hearing.

(Plaintiffs' Exhibit 2, admitted.)

MR. TATE:  Ms. Cope, would you put the first page of Exhibit 2 and would you zoom in on the second paragraph or the first paragraph under "Recitals."

Your Honor, you'll see that this is an agreement and -- between the master limited partnership or MLP, which is CVR Refining, LP as identified in the first paragraph and its refining subsidiaries and its agreement with CVR Energy. I'm sorry, if you go back up to the first paragraph, you'll *see the* agreement is with CVR Energy, Inc. That's the holding company in Sugar Land. CVR Refining is the limit partnership also located in Sugar Land. And you'll see, Your Honor, if you go down to the next -- the last complete sentence in the second paragraph, it says, "GP, in its capacity as the general partner of MLP" -- that's the defendant in this case, the refining limited partnership -- "desires to engage CVR" -- that's the other defendant in this case, the holding company -- "on its own behalf and for the benefit of the Refining Subs and MLP, to provide certain services necessary to operate the business conducted by the Refining Subs MLP and GP. And CVR is willing to undertake such engagement, subject to the terms and conditions of this Agreement."

Now, let's turn to page 2 of the agreement -- or page 3 of the agreement. And would you zoom in, Ms. Cope, on the definition of the word "services."

Your Honor, services, under this agreement, shall consist of those services performed for the services' recipients as described in Exhibit 1 hereto.

Now, Ms. Cope, could we go to Exhibit 1, which

is the last two pages of the exhibit? This is Exhibit 1 to the services agreement.

Your Honor, these are the things which CVR Energy and CVR Refining in Sugar Land have agreed -- actually CVR Energy in Sugar Land has agreed to provide to the refining subsidiaries. Services in capacities equivalent to the capacities of corporate executive officers; safety and environmental advice; administrative and professional services including legal, accounting, human resources, insurance, tax, credit, finance, government affairs, and regulatory affairs; manage the services recipients' day-to-day business and operations, including managing its liquidity and capital resources and compliance with applicable law; establishing and maintaining books and records of the services recipients in accordance with customary practice and GAAP; recommend to the services recipients' board of directors capital raising activities. The next one, recommend to the services recipients' board of directors the engagement of or approval of agents, consultants or third-party service providers; manage the services recipients' property and assets in the ordinary course of business; manage and oversee litigation in administrative or regulatory proceedings; establish and maintain appropriate insurance policies; recommend to the services recipients' board of directors the payment of dividends or other distributions.

Next page, attend to the timely calculation and payment of taxes and filing of tax returns; and then manage or provide advice or recommendations for other projects of the services recipients as may be agreed to.

Your Honor, the reason I point those services out is they allow you to see exactly the services provided by the two remaining defendant -- the three -- the two remaining Sugar Land defendants in this case, CVR Energy and CVR Refining Company, or it refining subs, including Gary-Williams Energy, one of the other remaining defendants, and at the time, the plaintiffs' employer, Wynnewood Refining Company.

Now, Your Honor, they weren't just a holding company just holding the shares of their subsidiaries. As you can see from this, Your Honor, they beginning in 2007 and then continuing through 2011 and formalizing in a written agreement in 2012, they actually ran the operations of their subs including the plaintiffs' employer. Now, it is in the running of those operations, Your Honor, that they committed the negligent acts that lead to the deaths of the two -- of the plaintiffs' husbands in this case, Russell Mann and Billy Smith.

And in addition to that, Your Honor, all of those items, there is significant deposition testimony that talk about the acts that are undertaken and committed here in Sugar Land that lead to the conditions that caused the accident

that killed Russell Mann and Billy Smith.  And those -- that deposition testimony, Your Honor, is actually summarized in what I'm going to put on the board now as a demonstrative exhibit, but it is contained in the exhibits that were previously admitted in the summary judgment hearing.  And I'm asking the Court to take judicial notice of the evidence to our response to motion for summary judgment, but in an abundance of caution, to make sure that these facts are in this record, because it is so essential that the facts upon which the most significant relationship test are determined be apart of this record, I'm going to offer Exhibits A through O, which were attached to our motion for summary judgment and were admitted in that motion for summary judgment.  And I will offer it as Exhibit 3 to this hearing.

(Plaintiffs' Exhibit No. 3 marked.)

(Plaintiffs' Exhibit 3, offered.)

MR. TATE:  Each of those separate exhibits are proven up, Your Honor, in the exhibit itself by appropriate affidavits and they -- they are either deposition excerpts or excerpts from the annual reports of CVR or excerpts -- excuse me, or the services agreement, which is already into evidence.  So I offer Exhibit No. 3 to ensure that these facts are in this record this morning.

MR. SMITHYMAN:  And for purposes of this hearing, I have no objection.

THE COURT: Plaintiffs' Exhibit 3 is admitted for purposes of the hearing.

(Plaintiffs' Exhibit 3, admitted.)

MR. TATE: Okay. So thank you, Your Honor.

If you will, Ms. Cope, put up this demonstrative summary of what the deposition testimony shows about the acts and omissions that occur in Sugar Land, Texas.

This is the deposition of Mr. Robert Haugen. He's an officer of CVR Energy, Inc., CVR Refining, LP, Wynnewood Refining, LLC, Coffeyville Refining and Marketing and all the refining subsidiaries. His position is vice president of operations. And we can see, Your Honor, in his deposition -- and we have the page numbers at the end of each bullet point, Your Honor. And those pages are -- are contained in the exhibit that we just showed you. You can see, Your Honor, the plethora of services and activities that are conducted right here in Sugar Land, Texas by CVR Refining and CVR Energy in running the day-to-day operations of its companies. I won't belabor the point by going through each of those, Your Honor, and especially since you've seen them before. But that demonstrates for the record, in addition to the management services agreement itself, there is an abundance of deposition testimony which supports the proposition or the fact that control of -- of the Wynnewood Refinery company was exercised right here from Sugar Land, Texas. Control

activities were exercised in various ways in Sugar Land.

Now, in making your decision on the law applicable to the facts of this case, certainly, Your Honor, it's important that the accident occurred in Oklahoma. Certainly it's important that Russell Mann and Billy Smith lived in Oklahoma at the time. But, Your Honor, what we're looking at now is the conduct of these two Texas corporations. And certainly great weight is to be given to the fact that virtually all of the culpable conduct of these corporations that led to the fatal attempt to ignite this boiler, all that culpable conduct occurred here in Sugar Land, Texas.

Your Honor, those corporations have chosen to locate in Texas no doubt because the law in Texas provides other favorable treatment for a corporation, such as, no state income tax. So they choose to come to Texas and they choose to take advantage of Texas law when it helps them. But when it hurts them, they want to run across the border to either Oklahoma or Kansas or somewhere else and say, wait a minute, you know, we're not -- we're not subject to Texas law. Your Honor, I believe that you can determine based upon the facts that are in this record, and based upon the fact, Your Honor, that they don't have any facts in this record, they have no facts as I get ready to sit down in this record, other than those two deficient affidavits, not even on personal knowledge. I believe you can determine Texas law applies, but I think the

33

better practice, Your Honor, would be for you to allow a complete vetting of the facts that will determine state law or the facts related to the most significant relationship through the full adversary process that will only occur through the trial of the case. And it's a very simple decision, Your Honor, at -- at the charge conference, once you make that decision, where it -- whether it gets submitted under Texas law or Oklahoma law. We're all capable of and we all have all ready in our files two potential different charges, so it won't be like it's going to be an enormous burden at the end of trial. We're ready to go either way. We believe you're going to find Texas law, but we believe that justice for our clients requires that you at least defer that position -- that decision until the close of the evidence after you've heard these witnesses examined under oath by capable lawyers.

Thank you, Your Honor. I ask that you either declare that Texas law applies, or that you defer the decision until the charge conference.

THE COURT: All right. I'm going to defer for the time being, so...

MR. SMITHYMAN: So you don't want to hear the response implied?

THE COURT: No. I listened on your side. I listened on his side. I certainly understand the issues. I do want to reread those cases. In the event I feel compelled to

make an election early, I will do so, but otherwise I'll carry it until the charge docket.

MR. SMITHYMAN: I understand if you are going to read the cases that I just have three minutes to reply to address these issues that he has ever so quickly.

THE COURT: Aren't they in your brief?

MR. SMITHYMAN: They were in the brief on the Hughes Wood case in terms of judicial admissions, pleadings being judicial admissions, they were. The one thing that was shown to you is I think that shareholder -- that shared services agreement that's presented to you as the mull work of the issues here is dated December 31, 2012. This accident occurred September 28, 2012. That agreement was never entered at the time that this accident occurred, so it would have no relevance to the -- to the jury. It would never go forward to the jury, the situation where it was not in existence at the time of the accident.

Having said all that, Your Honor, I think you do understand that everything that was argued by Mr. Tate in terms of the closeness of the two entities works against him if the parent entities were undertaking an inherent safety task of the subsidiary. It's an integral and inherent part of the safety duties of the subsidiary and being done by an equity interest, Oklahoma law finds there's immunity for that. And so the issue in your jury instructions is going to address that. And to the

extent that you decide it beforehand, you save about a week of jury time. Because a lot of these kinds of arguments really make no difference anymore. And a lot of the evidence that we're going to hear would make no difference anymore. So I think judicial efficiency and economy and the understanding of parties is greatly advanced if you simply make that decision a week before trial, two weeks before trial, to allow us to pair down our evidence and present the issues that are going to be pertinent to the jury instructions that you're ultimately going to give -- on the law you're ultimately going to give.

Thank you.

THE COURT: All right. Is that it on the motions?

MR. SMITHYMAN: Yes, sir.

MR. TATE: No, he's got a motion to designate a responsible third party that he has also set for this morning.

MR. SMITHYMAN: Well, I'm sorry, I thought I heard you say on the motion, not motions. We do have another motion, Your Honor. I apologize.

THE COURT: That's right.

All right. Go ahead on the motion for applicable -- I mean to designate responsible third parties.

MR. SMITHYMAN: This too, Your Honor, has -- is a matter that has been before you before that we have addressed at least through pleadings. These pleadings were -- existed at

the time of other motions, such as the motion for summary judgment and had some impact on them; hence, I think you are aware of this -- these issues.

Essentially, Wynnewood Refining Company, LLC, the direct employer of the workmen who were killed, Mr. Mann and Mr. Smith, was sued, as were the others in the original petition, which was filed in September of 2013. During that time, and through a series of petitions that were filed in this case, the Wynnewood Refining Company remained and allegations against Wynnewood Refining Company remained. Essentially out of the blue and for the first time -- if you remember it was during oral argument I think on a summary judgment motion, but it was before you -- that morning there was a filing where the plaintiffs nonsuited Wynnewood Refining Company and the argument at that time was, well, we've nonsuited Wynnewood Refining Company so workers' compensation immunity issues are no longer in the case, which we've already addressed in this motion for law. And essentially, Your Honor, that -- that nonsuit occurred on April 22nd, 2015, some 18 months after the lawsuit had been filed. That's Document 82.

Twenty-six days later the defendants named Wynnewood Refining Company as a responsibility third party. And in that -- on that 26th day, the same day that the motion was filed to designate the -- there was a supplemental or an updated Rule 194 disclosure that also addressed and named

Wynnewood Refining Company as a responsible third party. The plaintiffs -- that motion was objected to by the plaintiffs on -- nine days later, and that's Document 107. And they -- they -- essentially their argument was, gee, you should have named Wynnewood Refining Company as a responsible third party while they were already a party in the case. And so you -- you didn't do that; hence, we nonsuited them six months after the statute of limitations ran, a two-year statute of limitations that would have run in September 2014. So this six months have gone by and we're surprised that you didn't name them as a responsible third party, so we're, I guess, out of luck on that. They had them in the case. We conducted 18 months of discovery. Wynnewood Refining Company produced 16,000 documents or more, over a 104 requests, over 5 or 6 different requests, 104 categories. They responded with 13 depositions of their employees. They did quite a bit. They were very active and -- and when they were nonsuited, obviously because of the Hughes Wood Products versus Wagner case, which made them immune, they essentially -- the argument is they should not be named as a responsible third party. The only reasons provided were, well, the statute has run, and there's some cases that address the issue of naming a responsible third party after the statute has run.

First, I guess the basic issue is, well, the statute hasn't run. After the nonsuit and after we designated

Wynnewood as a responsible third party, Rogan Smith was brought into the case, the young son of Mr. Smith. He's three years old now, I think, or four. So the statute of limitations on him hasn't run. He's got until two years after he reaches majority, so he has many, many years left and the statute has not run.

They -- the defendants also I think had the -- argued that the defendants had failed to plead sufficient facts as to Wynnewood Refining Company. I find that to be almost -- I -- let's put it this way, I find that approach is ludicrous simply because the facts that were provided were the same ones that were being alleged by the plaintiffs throughout. In other words, the exact same sentences and paragraphs were repeated as the reasons why they should be the responsible third party. That's what had been in the pleadings of the plaintiffs for 18 months. Independent of that, and that -- I've looked at a pleading that was filed yesterday afternoon by the -- the plaintiffs. They continue in that argument, and that argument I think has really no merit. Because in any cases I can find that have addressed responsible third party issues where the plaintiff nonsuited somebody, the repetition of the allegations of the plaintiff was considered good enough. It's, I think, hard to argue that, gee, the stuff that we had argued for 18 months and had in our pleadings is no longer sufficient. You needed more. That really makes little sense.

The first position -- the first and obvious issue here -- and, Your Honor, there is no case law. I've not found any case law that would say an existing party should name another existing party as a responsible third party. I've not found any case law to that effect and it really is not surprising because it defies common sense. You're either a responsible third party or you're a party. If you're a party, you can't be a responsible third party. You really have no reason -- responsible third party means an entity that's not in the suit for whom fault is going to be alleged. Now, we did that 26 days after the nonsuit occurred. At that time there was an argument -- well, it's 55 days before trial has been scheduled. It was a June trial scheduling. A June trial setting at the time. Well, that has gone away. We obviously did it well in advance of trial. And we did it 26 short days after this had occurred. The really peculiar thing in this case -- and by the way, Your Honor, again, it's hard to prove a negative, but I cannot find a Texas case where an employer named as a responsible third party was -- that that designation was denied to a party. And if you think about it, it happens all the time and it -- it is agreed to all the time, because the immunity which the Texas Workers' Compensation statute grants just like the Oklahoma, albeit not as strong, but it does. That essentially exists and is something that a plaintiff must deal with when they are suing other entities

over a work comp case in which they receive money. Those entities will virtually always, because the employer is part and parcel of what occurred in the employee accident, name that employer as a responsible third party.

I defy -- the plaintiffs define cases where that has been denied. It simply has to be there. Everything that Mr. Tate talked about to you today, everything that would be talked about at trial, are issues that were undertaken by Wynnewood Refining Company. And the argument is that somehow by parental extension, by lack of direction, by lack of supervision, the parent entities are responsible for what Wynnewood Refining Company did or didn't do. How can you take that away and not compare Wynnewood Refining Company? It's really impossible. There's no way a jury could. And that's why there's no cases that say you don't need -- you know that you can deny that motion. That would be in -- in -- I would submit to you that would be an abuse of discretion, to take an employer who's immune, a part of an employment accident, and say you can't designate him as a responsible third party.

Now, the argument is, well, it took 26 days to designate, but that occurred back in April. Argument was it was not 60 days before trial. That's not true, because the trial is going to be well after that.

But what I find quite remarkable is we've had -- we've had seven -- I guess six petitions filed in this case

now. We've had an original, first amended, second amended, third amended, first supplemental, fourth amended. And, Your Honor, in the original and the first amended and in the second -- and the original was September 2013. The first amendment, September 2014. Wynnewood's named and negligence is attributed to it. Second amended, November 2014, that's Document 54, Wynnewood is named, negligence is attributed to it. Third amended is April 16 -- April 6th, 2015, which is really right about the time they nonsuited them, Wynnewood is named, negligence is attributed to them. In the first supplemental -- third -- the first supplemental was May 29, 2015, well after we had made the motion to designate and had changed our Rule 94 -- 194 designation. The first supplemental continued to -- to present Wynnewood Refining Company and say that -- and attribute negligence to it. Most remarkably, Your Honor, most amazingly on the 14th of September, a week and a half ago, the fourth amended petition was filed by the plaintiffs. And in that petition they said in paragraph 38 Wynnewood Refining Company, LLC willfully, deliberately and intentionally caused the deaths of Billy Smith and Russell Mann by willfully, and deliberately, and intentionally committing the following acts, and they list them.

They went on -- which is a series of facts. They go on to say the actions of Wynnewood Refining Company, LLC, as referenced above, evidence a willful, deliberate intent

to cause the deaths of Billy Smith and Russell Mann. And in the next paragraph they say the actions of Wynnewood Refining Company, LLC, as referenced above, evidence not only the intentional actions to cause injury, but Wynnewood Refining Company, LLC acted with knowledge that death or injury was substantially certain to result from these actions. That's less than ten days ago. And six months ago we asked that they be compared as a responsible third party just as every other employer is in an employer accident where other entities are sued.

You have not ruled upon that yet. I would suggest to you, Your Honor, that that one is not a difficult one. That is one that is easy to make on the basis of the allegations on the first, second, third, first supplemental and fourth petitions that were filed by the plaintiffs, on the basis of the history that has occurred, and on the basis of common sense of Texas law comparing the negligence of an employer with those of others that are sued on an industrial accident case.

Thank you.

MR. TATE: May it please the Court once again. Richard Tate, along with Gary Riebschlager, Brent Coon and David Medina for the plaintiffs' response.

Your Honor, I'd first like to put on the screen for the Court the applicable section of the Texas Civil

Practice and Remedies Code just so we can put it in front of you this morning and not -- and you won't need to go back and look it up later. We seem to be having a short technical difficulty here. There we go. It's 33.04, Your Honor, and it's Subsection D starting at the bottom of the page. A defendant may not designate a person as a responsible third party with respect to a claimant's cause of action after the applicable statute of limitation -- applicable limitations period on the cause of action has expired with respect to the responsible third party. If the defendant has failed to comply with its obligations, if any, to timely disclose -- timely disclose that a person may be designated as a responsible third party under the Texas Civil Practice and Remedies Code -- excuse me, Texas Rules of Civil Procedure. I'm sorry, that's a request for disclosure.

So, Your Honor, my reading wasn't very good, but you see the provision. So what we have here, Your Honor, is as of April the 17th of 2015 we nonsuited Wynnewood Refining Company. The statute of limitations had already run on this cause of action. The statute of limitations ran on September the 28th of 2014. So the statute of limitations had run for four or five months. As of the date that we nonsuited, and as of the date that the statute of limitations had run, despite the requirements of the -- the request for disclosure, Subsection G, the defendants had not designated each other as

responsible third parties. And they're going to say, oh, gosh, we didn't have to, because we were parties to the action.

Well, that's not the way it works, Your Honor. Their failure to designate before the statute of limitations ran makes their subsequent designation or attempt to designate in May of 2015 -- on May 19th of 2015 untimely and really of no effect and here's why. Can we put up -- I want you to look at a hypothetical, Your Honor, of -- the typical personal injury case.

You have plaintiffs who sue Defendants 1 and Defendants 2. Okay. Defendant 1, Defendant 2. Defendant 1 and Defendant 2 are not affiliates, they are represented by separate counsel, there is no cross action. In this hypothetical they decide not to cross act against each other. And as of the date of the running of the statute of limitations neither Defendant 1 or Defendant 2 has designated the other as a responsible third party. It is no question -- there is no question, Your Honor, under this scenario, under this scenario that if the plaintiff decided to nonsuit Defendant 1, Defendant 2 could not come back in and say, oh, wait a minute, I didn't designate them because they were a coparty at the time, I want to designate them now. You can't do it. The rule says specifically you can't do it. The statute of limitations has run and they did not timely designate Defendant 1 as a responsible third party. So in that scenario there's no

question that Defendant 2 would not be able to designate Defendant 1 as a responsible third party. Okay. Defendant 2 in this case would be CVR Energy, CVR -- actually that's two or three additional defendants, but of course they would all be -- they're all now wanting to come in and designate Defendant 1 Wynnewood.

Let's look at this case now, Your Honor. In this case you have the plaintiffs suing Defendant 1. Defendant 1 is Wynnewood and Defendant 2 CVR and Defendant 3 which is CVR Refining and Defendant 4 which is Gary Williams Energy. Okay. In this case, however, they are affiliates and they choose, Your Honor, they choose to be represented by the same counsel despite the fact that one of the defendants or actually all these three defendants that remain in the case are saying, wait a minute, we didn't do anything wrong, this bad guy you let out of the case, they did it all wrong, and because you let them out of the case after the statute of limitations runs, we ought to be able to bring them back in as a responsible third party even though we have consciously chosen not to file a cross action against them and we have not designated them as a potential responsible third party prior to the running of the statute of limitations as required by 194.2(g). Okay?

So in this case, all these defendants decided to have this man right here be their lawyer, despite the fact that

there was clearly a conflict between the defendants who say it's all Wynnewood and Wynnewood. But the reason they consciously chose that was, I don't know what, maybe to save on legal fees, maybe because until today -- until they got themselves in the desperate position of -- after we nonsuited Wynnewood after the statute of limitations runs, they say, oh, my gosh, we got to try to dump it all on Wynnewood now. Maybe it's that desperation. I don't know what it is. But now, Your Honor, they want to come in and, despite the fact that there was no cross action filed prior to the limitations and a cross action can't now be filed, and despite the fact that there was no RTP designation prior to limitations, they want to come in, and contrary to the language that I -- that we just read out of this statute, out of the Section 33 of the Civil Practice and Remedies Code, they want to come in and have you allow them to designate Wynnewood as a responsible third party. And the only difference, Your Honor, is that they had the same lawyer, who clearly had a conflict, and their affiliates.

Well, you know, the responsibility of corporations for torts committed by the various -- by those various corporations is not dependent upon whether they're affiliates or not if you're not alleging alterego. And in this case, we're alleging independent torts by each one as an additional basis of liability. So this is not a -- this is not liability based upon vicarious liability or alterego. We're

saying they're independent torts. And so it makes no sense, Your Honor, in this very simple comparison if -- again, put the first one up -- if they were not affiliates and they had separate lawyers and there was no cross action filed and no RTP designation, then the lawyer who chose not to file the cross action or the RTP designation presumably with the approval of his client has made a conscious decision, and the law will not let them, after the fact, after limitations has run, come in and basically remake that decision.

Go to the next one.

Here just simply because they're affiliates and they have the same lawyer, there's no basis to treat it any differently. Your Honor, one of the leading -- there isn't much case law on this statute, but one of the leading commentators on it is Professor Underwood up at the Baylor Law School. And -- and he has said, and we quoted this in our brief, that the responsible, the wise counsels will make sure that they designate codefendants as responsible third parties.

(Sotto voce discussion between Mr. Tate and Mr. Riebschlager.)

MR. TATE: Would -- would designate -- Professor Underwood has said the wise defendant would designate codefendants as responsible third parties. Going back to when I was a young lawyer, and that was a long time ago, we always said that if you go to trial or if you let the statute of

48

limitations run without -- without filing your cross action, you might as well get on the phone and call your malpractice carrier.

There's no difference in this situation, Your Honor. A conscious decision -- a strategic corporate decision was made to be represented by the same lawyer, to carry out through these depositions without admitting any liability on anybody's part, and just basically deny, deny, deny, deny, deny. And then all of a sudden, when we nonsuit, it's like, oh, my gosh, we are up a creek if we can't get them in as an RTP. And that's not the way our law and our procedure work.

Now, a good law review article on this, Your Honor, is found in the St. Mary's Law Review. I believe this is St. Mary's, yes. Is this St. Mary's Law Journal? St. Mary's Law Journal written by Justin C. Roberts who was a briefing attorney for Justice Paul Green. And, once again, it says that principals of statute -- keeping principals of statutory construction in mind, it should first be noted that the RTP statute does not expressly authorize the designation of a nonparty to be an RTP if that nonparty enjoys immunity as a responsible third party for reasons other than the statute of limitations.

Now let's think about what they're going to do here. You couple that, Your Honor, with the requirement of the statute that they must in their pleading, Your Honor, in their

pleading, their amended pleading, they must plead sufficient facts to state a viable claim against the defendant. Well, here again Mr. Smithyman wants to come back and say I can't believe they're requiring me to beat -- to meet the pleading or evidence requirements of Texas law. They said in some of their early petitions that Wynnewood did bad things, and I want to seize on those things.

But those things aren't in the record, number one, as we stand here today. And, number 2, he hasn't amended his answer to state those things. He doesn't need the leave of Court to designate an RTP. He hasn't even -- as we stand here today, he hasn't even designated the RTP, you know. And even if he does require leave of Court, he didn't do it until it was too late. And, most importantly, Your Honor, in neither his answer, nor his motion to -- for permission to -- to designate an RTP, he does not state sufficient facts to make a viable claim against Wynnewood.

And what do I mean by that? I mean he has to state a viable claim against Wynnewood under the law. And just as that law review article said, if Wynnewood has immunity, other than statute of limitations immunity, you have to state a viable claim that would get you around that immunity in order to bring them in as an RTP. The only way Wynnewood can be responsible if Oklahoma law applies, as he says, is if Wynnewood intended to injure these plaintiffs. That's what he

wants to say. The only way Wynnewood could be responsible under Texas law in this death situation is if Wynnewood was guilty of gross negligence.

So even if he was going to plead -- even if he was going to get leave of Court, he would have to plead to you the facts that would establish a claim against Wynnewood for either intentional tort or gross negligence, and he hasn't done that. And he hasn't doesn't that because he doesn't want to be forced to do that. It's -- it's -- again, he wants his cake and eats it too in every situation.

And let me see if I left something out because I think I'm finished otherwise.

(Sotto voce discussion between Mr. Tate and Mr. Riebschlager.)

MR. TATE: I want to offer into evidence, Your Honor, exhibits -- Exhibit 1, which is Defendants CVR Energy, CVR Partners and CVR Refining LP's response to plaintiffs request for disclosure, dated December 30, 2013.

MR. SMITHYMAN: I got it.

MR. TATE: All right. I offer that into evidence.

MR. SMITHYMAN: No objection.

MR. TATE: That will be our next exhibit, which is 4.

(Plaintiffs' Exhibit 4 marked.)

(Plaintiffs' Exhibit 4, offered.)

THE COURT: Exhibit 4 is admitted for the hearing.

(Plaintiffs' Exhibit 4, admitted.)

MR. TATE: And that is dated December 30, 2013 and those were the last responses to request for disclosure that were on file before we nonsuited and after the statute of limitations had already run, and they do not designate Wynnewood as a responsible third party.

I offer now Exhibit 5, which is defendants' joint amended response to 194.2(1) of plaintiffs request for disclosure. I think I said G a while ago. It's L.

MR. SMITHYMAN: I think it's Exhibit 2.

MR. TATE: It will be Exhibit 5. Exhibit 5 for purposes of this hearing.

(Plaintiffs' Exhibit 5 marked.)

(Plaintiffs' Exhibit 5, offered.)

MR. SMITHYMAN: No objection.

THE COURT: Admitted.

(Plaintiffs' Exhibit 5, admitted.)

MR. TATE: And, Your Honor, that's dated May the 19th. And those two exhibits are offered for the purpose of establishing the factual record for the purposes of this hearing, that they did not designate Wynnewood as an RTP prior to the running of the statute of limitations, they did not

designate Wynnewood until May 19th, which was timely because limitations had run.

(Sotto voce discussion between Mr. Tate and Mr. Riebschlager.)

MR. TATE: And the discovery cutoff, which they have affirmatively asserted in motions to quash depositions as late as July, Your Honor, the discovery cutoff was April 30th, so their designation on May 19th was untimely in view of the discovery cutoff that they continue to affirmatively assert to stop depositions that we wanted to take. So they can't affirmatively assert that discovery cut off in motions to compel and then file discovery after that discovery cut off and seek to rely on it today.

So, Your Honor, we respectfully deny that the motion to designate responsible third party be -- or excuse me, we respectfully request that the motion to designate responsible third party be denied. Thank you.

THE COURT: Brief rebuttal.

MR. SMITHYMAN: Brief rebuttal. First, it is quite obvious to the Court that the Wynnewood Refining Company was immune from Day 1, so nonsuiting them has different implications than it would. And the statute of limitations, the importance of the statute of limitations in other cases is different than it is here with an immune entity, first. That's I think fairly obvious to all.

Second, it's the plaintiffs that chose to nonsuit, and they did so six months after the statute, and very quickly after that we filed our motion to designate. I heard Mr. Tate say that we did not designate. Your Honor, in Document 96 we filed our motion for leave to designate on the 18th of May, 2015, and that was only 26 days after the nonsuit.

They said that there was no cross action and that's our fault somehow. In a situation where entities are -- it's comparative negligence for the tort that has occurred, the entities don't have to state it's other people's fault. All they have to say is it's not our fault, we didn't do anything wrong, and that's what was asserted on behalf of each of the entities. Believing it to be true then, as they believe it to true now. And all the arguments about conflicts and attorney and so on have nothing to do with this specific issue. I think Mr. Tate said that there was no alterego arguments that were made by them and that was not in this case.

Your Honor, I will draw your attention -- that is incorrect. I'll draw your attention to Paragraph 36 of plaintiffs' third amended original petition. This is in each of those, but this is the one I have handy. It's Document 68 and it says essentially CVR entities collectively own and control WRC. CVR are parent companies of WRC. CVR companies created a vast web of corporate greed and direction created for the sole purpose of maximizing profit and corporate greed,

failed legal attempts to protect themselves from their own negligence. They go on to say, CVR controls WRC in one of the following -- and then they list A through H, which comes from a case that addresses alterego issues in Texas. Then they say, CVR is the collective dominant corporation over WRC. Their wholly own subsidiary is, therefore, liable for torts. They are therefore -- they're a wholly owned subsidiary, and CVR is, therefore, liable for the torts of it wholly owned subsidiary.

So to say that they did not argue alterego, that was a part of the spaghetti that was thrown against the wall in the -- originally, and it was part of what was in this petition through every one of their -- the various amendments.

Lastly, four or five times I heard that the statute had run. Again, Your Honor, the statute has not run. The statute's not run.

THE COURT: Please tell me this, when he quoted 3.004(d), was that a misquote of the Civil Practice and Remedies Code? Was it a misquote?

MR. SMITHYMAN: Your Honor, he didn't state it well and I don't have it in front of me, so I will -- I will tell you -- can I address that issue -- I -- I'm not sure where you're going with it.

THE COURT: Well, he has said -- Mr. Tate read and put on the screen a statute from the Civil Practice and Remedies Code saying that you had to perform this by the time

or before the statute of limitations ran. And you've made eloquent arguments about lots of things, but you haven't addressed that. So tell me, was that a misquote --

MR. SMITHYMAN: That --

THE COURT: -- is there some -- is there some case law that says that it doesn't apply in certain circumstances and this is one of those circumstances?

MR. SMITHYMAN: There are no cases -- first, I've read that. I would argue that it -- for an immune plaintiff -- for an immune defendant, it makes no difference because the statute of limitations -- the reason it's important is because it creates a date upon which that defendant is immune. If you already have immunity, the statute of limitations makes no sense. The statute of limitations, Your Honor, has not run, because it has not run as to Rogan Smith who's three years old, who was named in the first supplemental.

So I -- I would submit, first, that the statute has not run because one of the plaintiffs has a valid cause of action if they want it. Number 2, the statute of limitations has really no application other than creation of immunity, and immunity was always there. And, finally, if you were to count this, a third -- a responsible third party not going in in a situation like this, what you're really doing is you're doing on the plaintiffs' side what the statute is designed to prevent on the defendants' side, which is trial by ambush, trial by

surprise. Ah-ha, I'll take care of this by dismissing this after the statutes run and now you have a problem. Essentially it's the exact counterbalance.

THE COURT: It could be argued by someone that your failure to do it during the statute of limitations was so that by doing it you wouldn't single out one of your codefendants and cause yourself grief, but by waiting till after the statute and after they dismissed and wanting to bring them back now, you can point to them and say all blame goes there, all blame goes there. I don't -- I mean I see that as an artifice on both sides, that both could engage in if one were to believe that that was their purpose. Okay.

MR. SMITHYMAN: If that were the situation, if that were the law, then in fact every time there are multiple defendants that are part of a tort suit, each would designate every one of the other defendants just as a matter of a policy just to have it in the pleadings. It would -- and it would make no sense, because they're already parties. They don't need to be responsible third parties. They're parties.

THE COURT: So if they don't need to be responsible -- well, I understand.

MR. SMITHYMAN: They're parties.

THE COURT: I understand your -- the logic that you just put forth there. I'm not sure I agree with it, but I understand what you're postulating.

MR. SMITHYMAN: Finally, the argument was made by Mr. Tate that -- that the motion to -- actually in the motion, which was filed in May of 2015, we provided all of the allegations that were essentially repeats of the allegations that were provided.

THE COURT: I heard that.

MR. SMITHYMAN: Failure to state a viable claim, I just remind the Court that that is --

THE COURT: I heard all that when you argued it the first time.

MR. SMITHYMAN: Okay. Essentially, Your Honor, just it -- the -- the approved remedy, if there's a failure to state a viable claim, is to provide leave to state a viable claim. And to deny responsible third party motion on the basis of failing to state a viable claim has been held in other cases to be an abuse of discretion because you didn't give the entity a chance to do that. I just point that out so that, Your Honor, is --

THE COURT: Well, I'm not worried about that one way or the other.

MR. SMITHYMAN: Thank you.

THE COURT: If they put a statute in there that says you're supposed to do something, and you rule in accordance with that statute, it's hard to believe that they're going to consider that to be outside of the authority. I

haven't ruled yet. I will rule on that by the end of the week. Thank you, gentleman. The case is called to trial.

MR. SMITHYMAN: Your Honor, can we address the issue with the date of trial?

THE COURT: The date of -- why?

MR. SMITHYMAN: Because I thought we were going to at least address whether -- whether the -- what date would be appropriate.

THE COURT: Well, I looked for a date I could fit into my schedule. Okay. I have trials every week now through January and getting into February. Every week. A multiplicity of trials. And I found a day -- a week that I could sandwich it in.

Now, I'll give you two minutes to tell me when you could have it heard. I, unfortunately, feel as though my schedule trumps anybody else's schedule, particularly when I'm calling you to trial now.

MR. SMITHYMAN: You're the judge.

THE COURT: And that's part of it, because I don't want to spend a bunch of time arguing about everybody's schedule.

MR. SMITHYMAN: I understand. I just --

THE COURT: Now, if you're in trial already somewhere else, you know I'll have to think about that. But absent that --

MR. SMITHYMAN: I am not in trial.

THE COURT: We're going to be in trial here.

MR. SMITHYMAN: I am not in trial that week.

THE COURT: All right. October 20th, 2015. Thank you, gentleman.

MR. COON: Thank you, Your Honor.

MR. RIEBSCHLAGER: Thank you, Your Honor.

(Proceeding adjourned for the day.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF FORT BEND )

I, Marisol Ramos, Official Deputy Court Reporter in and for the 434th District Court of Fort Bend County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $491.00 and was paid by Mr. Lee Smithyman.

WITNESS MY OFFICIAL HAND this the 22nd day of September, 2015.


/s/Marisol Ramos

Marisol Ramos, Texas CSR 8140
Expiration Date:  12/31/2016
Official Deputy Court Reporter
434th District Court
Fort Bend County, Texas
301 Jackson
Richmond, Texas 77469

**$**

$102 [1] - 23:25

**/**

/s/Marisol [1] - 60:21

**0**

00000088 [1] - 2:15
04769750 [1] - 2:11

**1**

1 [35] - 1:1, 4:1, 4:6, 4:10, 4:23, 8:14, 19:4, 21:4, 21:10, 21:11, 21:13, 21:16, 22:7, 22:8, 22:9, 22:10, 27:24, 27:25, 28:1, 44:10, 44:11, 44:16, 44:19, 44:24, 45:2, 45:5, 45:8, 45:9, 50:16, 52:21
10 [2] - 3:6, 4:25
104 [2] - 37:14, 37:15
107 [1] - 37:3
11 [2] - 21:14, 22:12
110th [1] - 2:21
12/31/2016 [1] - 60:22
13 [2] - 9:1, 37:15
13-DCV-209679 [1] - 1:2
13th [1] - 9:14
14th [1] - 41:16
16 [1] - 41:8
16,000 [1] - 37:13
16902200 [1] - 2:7
17th [1] - 43:18
18 [4] - 36:19, 37:12, 38:15, 38:23
18118680 [1] - 3:1
18th [2] - 18:23, 53:6
194 [2] - 36:25, 41:13
194.2(1 [1] - 4:19
194.2(g) [1] - 45:23
194.2(l [1] - 51:11
19664460 [1] - 2:3
19th [5] - 6:21, 44:6, 51:22, 52:1, 52:8

**2**

2 [24] - 4:11, 19:9, 19:12, 20:9, 22:14, 22:15, 26:14, 26:15, 26:17, 26:19, 26:22, 26:24, 27:19, 44:11,

44:12, 44:16, 44:20, 45:1, 45:2, 45:9, 49:9, 51:13, 55:19
2007 [5] - 24:17, 24:18, 25:8, 25:13, 29:14
2011 [2] - 23:16, 29:15
2012 [11] - 4:10, 21:14, 22:12, 23:14, 23:18, 24:1, 25:15, 29:16, 34:12, 34:13
2013 [5] - 4:25, 36:7, 41:4, 50:18, 51:5
2014 [4] - 37:9, 41:5, 41:6, 43:21
2015 [16] - 1:19, 4:3, 5:1, 6:21, 9:1, 18:23, 36:19, 41:8, 41:12, 43:18, 44:6, 53:6, 57:3, 59:4, 60:20
206 [1] - 2:4
209679 [1] - 5:2
20th [3] - 3:2, 5:17, 59:4
21 [1] - 4:10
22 [4] - 4:3, 4:10, 4:25, 5:1
22nd [3] - 1:19, 36:19, 60:19
250 [2] - 2:8, 3:6
26 [6] - 4:11, 39:11, 39:15, 40:20, 53:6
26th [1] - 36:23
28 [1] - 34:13
281)341-0077 [1] - 2:5
28th [1] - 43:21
29 [1] - 41:11
2nd [1] - 2:4

**3**

3 [10] - 4:12, 18:23, 27:20, 30:14, 30:15, 30:16, 30:22, 31:1, 31:3, 45:9
3.004(d [1] - 54:17
30 [3] - 4:13, 50:18, 51:5
301 [1] - 60:24
30th [1] - 52:7
31 [3] - 4:13, 25:15, 34:12
33 [1] - 46:14
33.04 [1] - 43:4
3550 [1] - 2:12
36 [1] - 53:19
38 [1] - 41:18

**4**

4 [7] - 4:14, 45:10, 50:24, 50:25, 51:1, 51:2, 51:4
409)835-2666 [1] - 2:13
434TH [1] - 1:9
434th [2] - 60:6, 60:23

**5**

5 [9] - 4:18, 19:11, 37:14, 51:10, 51:14, 51:16, 51:17, 51:20
50 [1] - 4:17
51 [3] - 4:17, 4:20
54 [1] - 41:7
55 [1] - 39:12
5800 [1] - 2:16

**6**

6 [2] - 23:12, 37:14
60 [1] - 40:22
620)251-4000 [1] - 3:7
63 [1] - 6:22
66103 [1] - 3:7
66210-2362 [1] - 2:21
68 [1] - 53:21
6th [1] - 41:8

**7**

713 [1] - 2:17
713)632-1700 [1] - 3:3
713)980-5300 [1] - 2:9
7400 [1] - 2:21
750 [1] - 2:20
77002 [2] - 2:8, 3:3
77007 [1] - 2:16
77469 [2] - 2:4, 60:25
78 [1] - 9:1

**8**

801 [1] - 2:8
808 [1] - 3:2
8140 [1] - 60:22
82 [1] - 36:20
890 [1] - 2:16

**9**

913)661-9800 [1] - 2:22

94 [1] - 41:13
96 [1] - 53:5

**A**

able [2] - 45:1, 45:18
above-entitled [1] - 1:20
above-styled [1] - 60:11
absent [1] - 58:25
abundance [2] - 30:7, 31:22
abuse [2] - 40:17, 57:16
accept [1] - 11:6
acceptance [1] - 21:18
accepted [1] - 7:17
access [1] - 6:16
accident [14] - 7:3, 7:16, 10:2, 10:9, 23:17, 29:25, 32:4, 34:12, 34:14, 34:17, 40:3, 40:18, 42:9, 42:19
accidents [1] - 10:7
accordance [2] - 28:15, 57:24
accounting [2] - 24:24, 28:9
acquired [2] - 23:16, 24:17
acquisition [2] - 25:10, 25:14
act [3] - 14:11, 14:15, 44:14
Act [1] - 14:23
acted [1] - 42:5
action [15] - 13:9, 14:18, 43:7, 43:9, 43:20, 44:2, 44:13, 45:20, 46:10, 46:11, 47:4, 47:6, 48:1, 53:7, 55:19
actions [5] - 15:2, 41:24, 42:2, 42:4, 42:6
active [1] - 37:17
activities [3] - 28:17, 31:16, 32:1
actors [1] - 7:1
acts [5] - 14:8, 29:19, 29:24, 31:6, 41:22
addition [3] - 19:3, 29:22, 31:21
additional [2] - 45:4, 46:24
address [9] - 11:25, 15:4, 16:2, 34:5,

34:25, 37:22, 54:21, 58:3, 58:7
addressed [6] - 16:14, 35:24, 36:17, 36:25, 38:20, 55:3
addresses [1] - 54:4
adjourned [1] - 59:8
administrative [2] - 28:8, 28:22
admission [1] - 9:20
admissions [2] - 34:8, 34:9
ADMITTED [2] - 4:9, 4:22
admitted [17] - 8:9, 9:19, 22:7, 22:8, 22:9, 22:10, 26:21, 26:22, 30:5, 30:12, 31:1, 31:3, 51:2, 51:4, 51:19, 51:20, 60:15
admitting [1] - 48:7
advance [3] - 6:5, 16:5, 39:15
advanced [1] - 35:6
advantage [1] - 32:16
adversary [2] - 18:3, 33:4
advice [3] - 25:4, 28:8, 29:3
advisement [1] - 6:4
advisors [1] - 24:22
affairs [2] - 28:10
affect [2] - 14:22, 17:19
affidavit [10] - 18:11, 18:12, 18:14, 18:21, 18:22, 18:25, 19:2, 19:3, 19:10, 20:19
affidavits [5] - 18:5, 18:11, 18:25, 30:19, 32:24
affiliates [16] - 8:5, 20:25, 24:15, 24:21, 24:23, 24:24, 24:25, 25:3, 25:5, 25:17, 44:12, 45:11, 46:18, 46:22, 47:3, 47:11
affiliates' [1] - 25:1
affirmatively [3] - 52:6, 52:9, 52:11
afternoon [1] - 38:17
agents [1] - 28:19
ago [5] - 41:17, 42:7, 47:24, 51:12
agree [1] - 56:24
agreed [7] - 6:25, 9:6, 25:5, 28:4, 28:5, 29:4, 39:21
agreement [14] -

25:18, 26:14, 27:1, 27:4, 27:6, 27:19, 27:20, 27:22, 28:2, 29:15, 30:21, 31:22, 34:11, 34:13

**Agreement** [3] - 4:11, 25:16, 27:18

**ah-ha** [1] - 56:1

**ahead** [4] - 12:21, 13:6, 17:17, 35:21

**al** [1] - 5:3

**albeit** [1] - 39:23

**allegations** [6] - 6:23, 36:9, 38:21, 42:14, 57:4

**alleged** [3] - 14:13, 38:12, 39:10

**alleging** [2] - 46:22, 46:23

**Allen** [1] - 3:5

**alleviate** [1] - 5:18

**allow** [4] - 29:6, 33:1, 35:7, 46:15

**allowed** [1] - 10:24

**almost** [1] - 38:9

**alterego** [5] - 46:22, 46:25, 53:16, 54:4, 54:9

**amazingly** [1] - 41:16

**ambush** [1] - 55:25

**amended** [13] - 6:2, 41:1, 41:2, 41:3, 41:6, 41:8, 41:17, 49:1, 49:9, 51:11, 53:20

**Amended** [1] - 4:18

**amendment** [1] - 41:5

**amendments** [1] - 54:12

**analysis** [1] - 7:19

**AND** [1] - 2:18

**Annual** [2] - 4:10, 4:13

**annual** [6] - 21:14, 22:12, 23:14, 23:18, 23:19, 30:20

**anomalous** [1] - 14:21

**answer** [3] - 5:22, 49:10, 49:15

**apart** [1] - 30:10

**apologize** [1] - 35:19

**appearance** [1] - 9:8

**applicable** [14] - 6:14, 6:22, 10:13, 12:6, 17:11, 17:19, 17:25, 21:1, 28:13, 32:3, 35:22, 42:25, 43:8

**application** [1] - 55:20

**applied** [3] - 7:19, 25:9, 25:22

**applies** [4] - 16:1, 32:25, 33:17, 49:24

**apply** [8] - 7:23, 10:3, 10:11, 10:16, 16:11, 16:15, 18:1, 55:6

**applying** [1] - 14:12

**appreciate** [2] - 26:1, 26:4

**approach** [1] - 38:10

**appropriate** [4] - 5:12, 28:23, 30:18, 58:8

**approval** [2] - 28:18, 47:6

**approved** [1] - 57:12

**April** [8] - 9:1, 9:15, 36:19, 40:21, 41:8, 43:18, 52:7

**area** [1] - 15:11

**argue** [3] - 38:23, 54:9, 55:9

**argued** [9] - 9:1, 9:14, 12:12, 16:6, 34:19, 38:8, 38:23, 56:4, 57:9

**arguing** [10] - 8:20, 10:23, 11:9, 11:10, 13:23, 13:24, 25:21, 26:7, 58:20

**argument** [13] - 11:5, 11:12, 36:12, 36:15, 37:4, 37:19, 38:18, 39:12, 40:9, 40:20, 40:21, 57:1

**arguments** [6] - 11:25, 20:11, 35:2, 53:14, 53:16, 55:2

**article** [2] - 48:12, 49:20

**artifice** [1] - 56:11

**aspects** [1] - 7:23

**assert** [2] - 52:9, 52:11

**asserted** [2] - 52:6, 53:12

**assertion** [1] - 14:17

**assets** [2] - 25:1, 28:20

**assist** [1] - 17:1

**Associate** [1] - 3:5

**associated** [2] - 10:8, 17:22

**Associates** [1] - 2:11

**attached** [2] - 8:16, 30:12

**attempt** [2] - 32:10, 44:5

**attempts** [1] - 54:1

**attend** [1] - 29:1

**attention** [2] - 53:18, 53:19

**attorney** [3] - 2:5, 48:16, 53:14

**Attorney** [3] - 2:9, 2:13, 2:17

**attribute** [1] - 41:15

**attributed** [3] - 41:6, 41:7, 41:10

**authority** [1] - 57:25

**authorize** [1] - 48:19

**aware** [1] - 36:3

## B

**bad** [2] - 45:15, 49:6

**bargain** [1] - 10:5

**based** [5] - 7:5, 9:13, 32:20, 32:21, 46:25

**basic** [1] - 37:24

**basis** [7] - 16:8, 42:13, 42:16, 46:24, 47:12, 57:14

**Baylor** [1] - 47:15

**beat** [1] - 49:4

**Beaumont** [1] - 2:12

**beforehand** [1] - 35:1

**beginning** [3] - 24:17, 24:18, 29:14

**behalf** [2] - 27:14, 53:12

**belabor** [1] - 31:19

**BEND** [2] - 1:5, 60:3

**Bend** [3] - 1:22, 60:6, 60:24

**benefit** [1] - 27:14

**benefits** [4] - 7:14, 7:17, 9:10, 10:2

**best** [2] - 17:14, 18:4

**better** [2] - 16:4, 33:1

**between** [7] - 14:5, 24:14, 27:2, 46:1, 47:19, 50:13, 52:3

**Billy** [5] - 29:20, 30:1, 32:5, 41:20, 42:1

**bit** [1] - 37:16

**blame** [2] - 56:9, 56:10

**blue** [1] - 36:11

**board** [4] - 28:16, 28:18, 28:24, 30:3

**boiler** [5] - 7:6, 15:19, 24:4, 24:8, 32:10

**books** [1] - 28:14

**border** [1] - 32:17

**bottom** [5] - 8:7, 18:7, 20:3, 20:4, 43:5

**brag** [1] - 24:9

**Break** [1] - 5:25

**Brent** [3] - 2:10, 17:4, 42:22

**brent** [1] - 2:11

**brief** [6] - 9:21, 34:6, 34:7, 47:17, 52:18, 52:19

**briefed** [1] - 12:13

**briefing** [1] - 48:16

**briefly** [1] - 25:17

**briefs** [1] - 10:20

**bring** [5] - 14:1, 18:8, 45:18, 49:23, 56:8

**brought** [2] - 18:10, 38:1

**bullet** [1] - 31:14

**bulletins** [2] - 15:15, 15:16

**bunch** [1] - 58:20

**burden** [2] - 18:8, 33:10

**burner** [1] - 15:19

**business** [8] - 23:8, 24:25, 25:2, 25:9, 25:10, 27:15, 28:11, 28:21

## C

**cake** [1] - 50:9

**calculation** [1] - 29:1

**Cambridge** [1] - 3:6

**candor** [1] - 5:23

**cannot** [2] - 11:6, 39:18

**capable** [2] - 33:8, 33:15

**capacities** [2] - 28:6, 28:7

**capacity** [2] - 14:9, 27:10

**capital** [2] - 28:12, 28:16

**care** [1] - 56:1

**carried** [2] - 25:9, 25:14

**carrier** [2] - 9:8, 48:3

**carry** [7] - 12:7, 12:17, 12:18, 12:21, 17:12, 34:1, 48:6

**carrying** [2] - 17:18, 17:22

**case** [49] - 7:23, 9:22, 10:10, 10:12, 13:19, 14:7, 15:19,

15:25, 17:13, 17:20, 21:1, 24:3, 27:11, 27:13, 29:8, 29:20, 32:3, 33:5, 34:8, 36:9, 36:17, 37:6, 37:12, 37:18, 38:2, 39:2, 39:3, 39:5, 39:17, 39:18, 40:1, 40:25, 42:19, 44:9, 45:3, 45:7, 45:8, 45:11, 45:14, 45:16, 45:17, 45:24, 46:23, 47:14, 53:17, 54:4, 55:6, 58:2

**cases** [14] - 6:10, 9:17, 15:3, 15:4, 15:6, 33:25, 34:4, 37:21, 38:19, 40:5, 40:15, 52:23, 55:8, 57:15

**categories** [1] - 37:15

**CAUSE** [1] - 1:2

**caused** [3] - 15:11, 29:25, 41:20

**caution** [1] - 30:8

**certain** [3] - 27:15, 42:6, 55:6

**certainly** [6] - 5:17, 21:25, 32:3, 32:5, 32:8, 33:24

**CERTIFICATE** [1] - 60:2

**Certificate**.............. ................60 [1] - 4:4

**certify** [3] - 60:7, 60:13, 60:16

**chambers** [1] - 60:12

**chance** [1] - 57:17

**changed** [1] - 41:13

**charge** [6] - 12:8, 17:15, 21:2, 33:6, 33:18, 34:2

**charges** [1] - 33:9

**Chart** [1] - 4:25

**chart** [3] - 8:4, 19:22, 20:20

**chase** [1] - 9:25

**children** [1] - 7:11

**choice** [1] - 16:12

**choose** [4] - 32:15, 45:12

**choosing** [1] - 5:15

**chose** [3] - 46:3, 47:5, 53:1

**chosen** [2] - 32:12, 45:19

**Circle** [1] - 3:6

**circumstances** [2] - 55:7

**cited** [1] - 10:20

City [1] - 3:7
Civil [6] - 42:25, 43:13, 43:14, 46:14, 54:17, 54:24
civil [1] - 5:2
claim [10] - 9:9, 49:2, 49:17, 49:19, 49:22, 50:6, 57:7, 57:13, 57:14, 57:15
claimant's [1] - 43:7
clearly [2] - 46:1, 46:18
client [1] - 47:7
clients [1] - 33:12
close [1] - 33:14
closeness [1] - 34:20
Coastal [1] - 15:5
Code [5] - 43:1, 43:13, 46:15, 54:18, 54:25
codefendants [3] - 47:18, 47:23, 56:7
Coffeyville [1] - 31:10
collective [1] - 54:5
collectively [1] - 53:22
commentators [1] - 47:15
Commerce [1] - 2:20
commitment [1] - 23:20
committed [3] - 29:18, 29:24, 46:20
committing [1] - 41:21
common [4] - 14:17, 14:18, 39:6, 42:17
comp [4] - 9:7, 9:8, 10:9, 40:1
companies [3] - 31:19, 53:23
company [6] - 22:17, 24:16, 27:6, 27:13, 29:13, 31:24
COMPANY [2] - 1:8, 1:9
Company [25] - 8:1, 19:14, 20:1, 29:9, 29:11, 36:4, 36:9, 36:10, 36:14, 36:16, 36:22, 37:1, 37:5, 37:13, 38:9, 40:9, 40:12, 40:13, 41:14, 41:19, 41:24, 42:3, 42:5, 43:19, 52:20
comparative [1] - 53:9
compare [1] - 40:13

compared [1] - 42:8
comparing [1] - 42:17
comparison [1] - 47:2
compel [1] - 52:12
compelled [1] - 33:25
compelling [1] - 21:1
Compensation [3] - 10:18, 14:23, 39:22
compensation [8] - 7:2, 7:14, 7:17, 9:5, 10:2, 13:4, 13:12, 36:16
complete [3] - 17:24, 27:9, 33:2
completed [1] - 24:1
completely [1] - 12:13
complex [2] - 8:3, 8:4
compliance [1] - 28:13
comply [2] - 20:12, 43:10
conditions [2] - 27:18, 29:25
conduct [3] - 32:7, 32:9, 32:11
conducted [3] - 27:16, 31:17, 37:12
conference [6] - 5:13, 12:8, 17:15, 21:2, 33:6, 33:18
conflict [2] - 46:1, 46:18
conflicts [3] - 5:19, 7:21, 53:14
Congress [1] - 2:8
conscious [2] - 47:7, 48:5
consciously [2] - 45:19, 46:3
consider [1] - 57:25
considered [3] - 11:1, 11:2, 38:22
considers [1] - 12:9
consist [1] - 27:23
consistent [1] - 20:9
construction [1] - 48:18
consultants [1] - 28:19
contacts [1] - 7:1
contained [2] - 30:4, 31:14
contains [1] - 60:7
context [1] - 23:19
continent [1] - 22:21

continue [2] - 38:18, 52:9
continued [1] - 41:14
continuing [1] - 29:15
contra [1] - 11:6
contrary [1] - 46:13
control [7] - 15:10, 15:13, 15:14, 15:15, 31:24, 31:25, 53:23
controlled [5] - 24:5, 24:7, 24:9, 24:19, 25:2
controlling [1] - 14:9
controls [1] - 54:2
convince [1] - 16:10
Coon [4] - 2:10, 2:11, 17:4, 42:22
COON [1] - 59:6
coparty [1] - 44:21
cope [7] - 22:13, 23:11, 26:16, 26:23, 27:20, 27:25, 31:5
copy [1] - 21:6
corner [1] - 7:12
Corporate [1] - 22:15
corporate [11] - 7:24, 8:3, 8:5, 14:20, 15:14, 24:21, 28:7, 48:5, 53:24, 53:25
corporation [2] - 32:14, 54:5
corporations [5] - 32:7, 32:9, 32:12, 46:20, 46:21
correct [1] - 60:8
correctly [1] - 60:14
cost [1] - 60:16
counsel [12] - 9:2, 18:8, 18:12, 18:14, 18:24, 19:12, 20:11, 20:22, 21:6, 44:13, 45:13, 60:9
Counsel [4] - 2:22, 3:4, 3:5, 3:8
counsels [1] - 47:17
count [1] - 55:21
counterbalance [1] - 56:3
COUNTY [2] - 1:5, 60:3
County [3] - 1:22, 60:6, 60:24
couple [2] - 6:10, 48:24
course [3] - 25:1, 28:21, 45:4
COURT [53] - 1:2, 1:3, 5:2, 5:5, 5:8, 5:20, 5:24, 6:1, 6:6,

8:12, 8:15, 11:11, 11:14, 12:4, 12:17, 13:6, 14:1, 16:23, 16:25, 17:6, 18:20, 21:21, 21:24, 22:4, 22:6, 25:25, 26:4, 26:21, 31:1, 33:19, 33:23, 34:6, 35:12, 35:20, 51:2, 51:19, 52:18, 54:16, 54:23, 55:5, 56:4, 56:20, 56:23, 57:6, 57:9, 57:19, 57:22, 58:5, 58:9, 58:19, 58:23, 59:2, 59:4
Court [33] - 5:12, 6:9, 6:11, 7:22, 9:25, 10:11, 11:1, 12:5, 12:8, 13:25, 17:11, 17:14, 17:23, 19:6, 19:10, 19:18, 19:20, 22:14, 22:24, 26:13, 30:6, 42:21, 42:25, 49:11, 49:13, 50:5, 52:20, 57:8, 60:5, 60:6, 60:23, 60:23
court [2] - 21:5, 60:12
Court's [3] - 7:19, 11:23, 12:7
craft [1] - 16:18
created [2] - 53:24
creates [1] - 55:12
creation [1] - 55:20
credit [1] - 28:10
creek [1] - 48:10
cross [9] - 44:13, 44:14, 45:20, 46:10, 47:4, 47:5, 48:1, 53:7
CSR [1] - 60:22
culpable [2] - 32:9, 32:11
current [1] - 19:14
customary [1] - 28:15
cut [3] - 9:25, 52:11, 52:12
cutoff [3] - 52:5, 52:7, 52:9
CVR [67] - 1:7, 1:7, 3:6, 4:10, 4:14, 4:15, 4:23, 5:3, 8:6, 9:2, 14:14, 18:24, 19:13, 20:25, 21:3, 21:14, 22:16, 22:19, 22:20, 22:21, 22:23, 23:4, 23:6, 23:7, 23:8, 23:9, 23:16, 24:6, 24:7, 24:9, 24:14, 24:16, 24:18, 25:16, 27:3,

27:4, 27:6, 27:7, 27:12, 27:16, 28:3, 28:4, 28:5, 29:8, 30:20, 31:9, 31:17, 31:18, 45:3, 45:9, 45:10, 50:16, 50:17, 53:22, 53:23, 54:2, 54:5, 54:7

**D**

Date [1] - 60:22
date [11] - 5:13, 5:15, 5:16, 43:22, 43:23, 44:15, 55:12, 58:4, 58:5, 58:7, 58:9
dated [5] - 18:22, 34:12, 50:18, 51:5, 51:21
dates [1] - 6:17
David [3] - 2:14, 17:4, 42:23
day-to-day [4] - 22:25, 24:23, 28:11, 31:18
days [9] - 36:21, 37:3, 39:11, 39:12, 39:15, 40:20, 40:22, 42:7, 53:6
dead [1] - 24:8
deal [1] - 39:25
death [3] - 13:2, 42:5, 50:2
deaths [3] - 29:19, 41:20, 42:1
December [5] - 23:16, 25:15, 34:12, 50:18, 51:5
decide [4] - 6:5, 15:24, 35:1, 44:14
decided [3] - 17:14, 44:19, 45:24
decision [13] - 12:7, 12:9, 17:15, 32:2, 33:5, 33:7, 33:13, 33:17, 35:6, 47:7, 47:9, 48:5
decisions [2] - 10:11, 24:10
declare [3] - 5:12, 5:18, 33:17
declared [2] - 5:15, 13:3
Defendant [14] - 44:11, 44:12, 44:16, 44:19, 44:20, 44:24, 45:1, 45:2, 45:5, 45:8, 45:9, 45:10
defendant [16] - 13:3, 13:5, 13:12,

27:11, 27:13, 29:7, 43:6, 43:10, 44:11, 45:2, 45:9, 47:22, 49:2, 55:10, 55:12

Defendant's [1] - 8:14

DEFENDANTS [1] - 4:21

Defendants [7] - 2:22, 3:4, 3:8, 4:14, 44:10, 44:11, 50:16

defendants [20] - 5:6, 6:25, 7:24, 10:4, 10:17, 13:15, 18:8, 29:8, 29:10, 36:21, 38:7, 38:8, 43:25, 45:4, 45:13, 45:14, 45:24, 46:1, 56:15, 56:16

Defendants' [3] - 4:18, 22:7, 22:10

defendants' [3] - 17:10, 51:10, 55:25

defer [3] - 33:13, 33:17, 33:19

deficient [1] - 32:24

defies [1] - 39:6

define [1] - 40:5

definition [1] - 27:21

defy [4] - 19:18, 19:19, 40:5

delayed [1] - 16:9

deliberate [1] - 41:25

deliberately [2] - 41:19, 41:21

demonstrates [1] - 31:21

demonstrative [2] - 30:3, 31:5

denied [5] - 10:24, 11:2, 39:20, 40:6, 52:17

deny [8] - 40:16, 48:8, 48:9, 52:14, 57:14

dependent [1] - 46:21

deposition [7] - 29:23, 30:2, 30:19, 31:6, 31:8, 31:13, 31:23

depositions [4] - 37:15, 48:7, 52:6, 52:10

Depositions [1] - 4:12

Deputy [2] - 60:5, 60:23

described [1] - 27:24

DESCRIPTION [2] -

4:9, 4:22

designate [29] - 35:15, 35:22, 36:24, 40:19, 40:21, 41:12, 43:6, 44:4, 44:5, 44:21, 44:22, 44:24, 45:1, 45:5, 46:16, 47:18, 47:21, 47:22, 49:11, 49:15, 51:8, 51:24, 52:1, 52:15, 52:16, 53:3, 53:4, 53:5, 56:15

designated [6] - 37:25, 43:12, 43:25, 44:16, 45:21, 49:12

designation [8] - 39:19, 41:13, 44:5, 46:12, 47:5, 47:6, 48:19, 52:8

designed [1] - 55:24

desires [1] - 27:12

desperate [1] - 46:5

desperation [1] - 46:8

despite [5] - 43:23, 45:13, 45:25, 46:9, 46:11

determination [15] - 12:6, 12:13, 12:21, 16:4, 16:7, 16:9, 16:17, 17:10, 17:13, 17:18, 17:22, 17:23, 17:25, 18:2, 25:20

determinations [1] - 11:20

determine [9] - 6:13, 6:22, 12:16, 21:1, 25:23, 26:12, 32:20, 32:25, 33:2

determined [1] - 30:10

difference [6] - 12:14, 35:3, 35:4, 46:17, 48:4, 55:10

different [7] - 11:22, 15:3, 16:4, 33:9, 37:14, 52:21, 52:24

differently [1] - 47:13

difficult [1] - 42:12

difficulty [1] - 43:4

direct [1] - 36:5

direction [2] - 40:10, 53:24

directors [4] - 13:17, 28:16, 28:18, 28:24

disagree [1] - 22:2

disclose [2] - 43:11, 43:12

Disclosure [2] -

4:17, 4:20

disclosure [6] - 36:25, 43:15, 43:24, 50:18, 51:6, 51:12

disclosures [1] - 9:4

discovery [7] - 37:13, 52:5, 52:7, 52:9, 52:11, 52:12

discretion [2] - 40:17, 57:16

discussion [3] - 47:19, 50:13, 52:3

Dislere [1] - 3:2

dismissed [1] - 56:8

dismissing [1] - 56:1

disrespect [1] - 11:14

distinction [1] - 14:5

distributions [2] - 25:3, 28:25

DISTRICT [2] - 1:3, 1:9

District [2] - 60:6, 60:23

diversified [1] - 22:16

dividends [2] - 25:2, 28:25

docket [3] - 5:2, 5:11, 34:2

Document [7] - 6:22, 9:1, 36:20, 37:3, 41:7, 53:5, 53:21

document [2] - 23:12, 25:16

documents [1] - 37:14

dollars [2] - 7:13, 9:9

dominant [1] - 54:5

done [3] - 16:13, 34:23, 50:7

doubt [1] - 32:13

down [6] - 8:6, 23:3, 24:5, 27:9, 32:23, 35:8

downstream [1] - 23:6

drama [1] - 7:1

draw [2] - 53:18, 53:19

Drive [2] - 2:16, 3:6

drop [1] - 23:3

dump [1] - 46:7

during [7] - 24:4, 24:5, 24:6, 26:8, 36:7, 36:12, 56:5

duties [1] - 34:23

duty [5] - 14:19, 14:25, 15:2, 16:2

**E**

early [2] - 34:1, 49:6

easier [1] - 16:17

easy [2] - 6:16, 42:13

eats [1] - 50:10

economy [2] - 17:22, 35:5

effect [2] - 39:5, 44:7

efficiency [1] - 35:5

egregious [1] - 25:24

either [7] - 26:6, 30:19, 32:17, 33:11, 33:16, 39:6, 50:7

elected [1] - 7:16

election [1] - 34:1

ELMO [1] - 17:2

eloquent [1] - 55:2

employee [1] - 40:3

employees [4] - 10:21, 13:17, 14:20, 37:16

employer [16] - 7:5, 10:21, 13:18, 14:10, 14:15, 14:19, 29:11, 29:17, 36:5, 39:18, 40:2, 40:4, 40:18, 42:9, 42:18

Employer [1] - 15:22

employers [1] - 14:22

employment [2] - 7:4, 40:18

end [4] - 23:18, 31:13, 33:10, 58:1

energy [1] - 23:6

Energy [27] - 3:6, 4:10, 4:14, 4:23, 5:3, 8:6, 19:13, 19:25, 20:25, 22:16, 22:21, 23:7, 23:9, 24:6, 24:14, 25:17, 27:4, 27:6, 28:4, 28:5, 29:8, 29:9, 31:9, 31:18, 45:3, 45:11, 50:16

ENERGY [2] - 1:7, 1:8

Energy's [1] - 21:14

engage [3] - 22:18, 27:12, 56:11

engaged [1] - 22:17

engagement [2] - 27:17, 28:18

enjoys [1] - 48:20

enormous [1] - 33:10

ensure [1] - 30:22

ensuring [1] - 10:6

enter [1] - 9:8

entered [1] - 34:13

entities [13] - 7:25, 13:8, 14:14, 34:20, 34:21, 39:25, 40:2, 40:11, 42:9, 53:8, 53:10, 53:13, 53:22

entitled [1] - 1:20

entity [6] - 15:7, 15:9, 15:14, 39:9, 52:24, 57:16

environment [2] - 14:20, 24:22

environmental [3] - 23:24, 24:22, 28:8

equipment [1] - 23:23

equitable [1] - 14:25

equity [3] - 15:1, 25:3, 34:23

equivalent [1] - 28:6

especially [1] - 31:20

essential [1] - 30:9

essentially [25] - 6:13, 6:23, 9:1, 9:3, 9:23, 12:23, 13:7, 13:11, 14:4, 14:15, 14:16, 15:6, 15:23, 16:2, 26:2, 36:4, 36:10, 36:18, 37:4, 37:19, 39:24, 53:22, 56:2, 57:4, 57:11

establish [3] - 9:8, 28:22, 50:6

established [10] - 7:1, 7:2, 7:22, 9:12, 9:18, 9:19, 13:1, 13:10, 24:24, 25:8

establishing [2] - 28:13, 51:23

et [1] - 5:3

eve [1] - 10:25

event [1] - 33:25

evidence [17] - 9:5, 17:20, 18:9, 21:18, 24:3, 26:17, 30:6, 30:21, 33:14, 35:3, 35:8, 41:25, 42:3, 49:5, 50:15, 50:21, 60:8

evidentiary [1] - 20:13

exact [2] - 38:13, 56:3

exactly [1] - 29:6

examined [1] - 33:15

example [1] - 20:23

excerpts [3] - 30:19, 30:20

Excerpts [1] - 4:12

excuse [5] - 10:22, 22:18, 30:20, 43:14,

52:15
executive [2] - 24:21, 28:7
exercised [2] - 31:25, 32:1
Exhibit [38] - 8:14, 19:4, 20:9, 21:4, 21:10, 21:11, 21:13, 21:16, 22:9, 22:10, 26:14, 26:15, 26:17, 26:19, 26:22, 26:24, 27:24, 27:25, 28:1, 30:14, 30:15, 30:16, 30:22, 31:1, 31:3, 50:16, 50:25, 51:1, 51:2, 51:4, 51:10, 51:13, 51:14, 51:16, 51:17, 51:20
EXHIBIT [1] - 4:5
exhibit [8] - 19:6, 19:7, 19:16, 28:1, 30:4, 30:18, 31:15, 50:23
Exhibits [1] - 30:11
EXHIBITS [2] - 4:8, 4:21
exhibits [5] - 30:4, 30:17, 50:16, 51:22, 60:14
exist [1] - 9:6
existed [1] - 35:25
existence [1] - 34:16
existing [2] - 39:3, 39:4
exists [1] - 39:24
Expiration [1] - 60:22
expired [1] - 43:9
explain [4] - 17:16, 17:17, 18:6, 20:18
explained [1] - 9:15
explosion [1] - 7:6
expressly [1] - 48:19
extension [1] - 40:10
extent [1] - 35:1

**F**

facilities [1] - 22:21
fact [11] - 9:7, 10:10, 31:24, 32:8, 32:21, 45:13, 45:25, 46:9, 46:11, 47:8, 56:14
factors [1] - 18:1
facts [29] - 9:13, 16:10, 16:13, 17:24, 18:2, 21:3, 24:13, 24:16, 25:21, 25:23, 26:11, 26:13, 30:8, 30:9, 30:22, 32:3,

32:20, 32:22, 32:23, 33:2, 33:3, 38:8, 38:11, 41:23, 49:2, 49:16, 50:6
factual [2] - 16:8, 51:23
failed [3] - 38:8, 43:10, 54:1
failing [1] - 57:15
failure [4] - 44:4, 56:5, 57:7, 57:12
fairly [2] - 8:2, 52:25
fall [2] - 10:17, 13:8
families [3] - 7:8, 7:16
family [1] - 8:5
Fannin [1] - 2:12
far [1] - 12:18
fatal [1] - 32:10
fault [4] - 39:10, 53:8, 53:10, 53:11
favorable [1] - 32:14
February [1] - 58:11
fees [1] - 46:4
fertilizer [2] - 22:18, 25:8
file [4] - 45:20, 47:5, 51:7, 52:12
filed [17] - 6:17, 6:21, 7:9, 36:7, 36:8, 36:20, 36:24, 38:17, 40:25, 41:17, 42:15, 46:10, 46:11, 47:4, 53:3, 53:5, 57:3
files [1] - 33:9
filing [3] - 29:2, 36:13, 48:1
final [1] - 6:12
finally [2] - 55:21, 57:1
finance [1] - 28:10
financing [1] - 24:20
fine [2] - 6:10, 8:11
finish [1] - 11:25
finished [1] - 50:12
fire [1] - 24:7
Firm [2] - 2:7, 2:15
first [37] - 6:24, 16:19, 17:9, 18:17, 18:24, 21:14, 22:12, 22:14, 23:12, 26:17, 26:23, 26:25, 27:3, 27:5, 36:11, 37:24, 39:1, 41:1, 41:2, 41:3, 41:4, 41:10, 41:11, 41:13, 42:14, 42:24, 47:3, 48:18, 52:19, 52:24, 55:8, 55:16, 55:17, 57:10
fit [1] - 58:10

five [2] - 43:22, 54:13
flat [1] - 19:4
flip [1] - 19:8
Floor [1] - 3:2
Flour [3] - 10:19, 13:19, 14:7
following [7] - 1:19, 10:14, 14:6, 14:8, 25:10, 41:22, 54:3
forced [1] - 50:9
foregoing [1] - 60:7
foreign [1] - 14:3
form [1] - 25:16
formal [1] - 9:20
formalizing [1] - 29:15
formed [1] - 23:7
FORT [2] - 1:5, 60:3
Fort [3] - 1:22, 60:6, 60:24
forth [2] - 19:9, 56:24
forward [9] - 5:14, 12:18, 12:19, 16:18, 18:9, 18:10, 25:9, 25:14, 34:15
forwarded [1] - 6:14
four [5] - 23:3, 24:17, 38:3, 43:22, 54:13
fourth [4] - 24:2, 41:2, 41:17, 42:15
frivolous [1] - 9:6
front [4] - 19:7, 20:20, 43:1, 54:20
full [2] - 23:12, 33:4
fully [4] - 11:1, 18:3, 20:21, 20:23
function [1] - 6:13
future [1] - 7:15

**G**

GAAP [1] - 28:15
Gary [13] - 2:6, 17:3, 19:13, 19:20, 20:17, 23:15, 23:16, 24:18, 25:11, 25:14, 29:9, 42:22, 45:10
GARY [1] - 1:8
Gary-Williams [9] - 19:13, 19:20, 20:17, 23:15, 23:16, 24:18, 25:11, 25:14, 29:9
GARY-WILLIAMS [1] - 1:8
gee [2] - 37:4, 38:23
general [10] - 9:2, 15:15, 15:17, 18:12, 18:13, 18:23, 19:12, 22:22, 23:1, 27:10
General [1] - 3:5

gentleman [2] - 58:2, 59:5
given [2] - 10:8, 32:8
glossy [3] - 21:13, 21:14, 22:12
gosh [3] - 44:1, 46:7, 48:10
govern [1] - 13:14
government [1] - 28:10
GP [2] - 27:10, 27:16
grant [2] - 14:23, 20:14
granted [1] - 10:18
grants [2] - 10:20, 39:23
great [1] - 32:8
greatly [1] - 35:6
greed [2] - 53:24, 53:25
Green [1] - 48:16
grief [1] - 56:7
gross [2] - 50:3, 50:7
grow [1] - 23:8
guess [3] - 37:11, 37:24, 40:25
guilty [1] - 50:3
guy [1] - 45:16

**H**

half [2] - 7:13, 41:17
hand [2] - 21:4, 21:8
HAND [1] - 60:19
handy [1] - 53:21
hard [3] - 38:23, 39:17, 57:24
Haugen [1] - 31:8
Headquartered [1] - 22:15
headquartered [1] - 23:10
headquarters [1] - 7:24
health [1] - 23:24
hear [4] - 16:20, 20:21, 33:21, 35:4
heard [9] - 1:20, 12:5, 33:14, 35:18, 53:3, 54:13, 57:6, 57:9, 58:15
hearing [16] - 6:3, 8:18, 18:7, 18:10, 21:17, 22:7, 22:8, 26:18, 26:21, 30:5, 30:14, 30:25, 31:2, 51:3, 51:15, 51:24
HEARING [3] - 1:14, 4:2, 4:7
hearings [1] - 26:9

held [4] - 1:22, 14:17, 16:6, 57:15
helpful [2] - 6:7, 12:22
helps [1] - 32:16
hence [5] - 9:4, 9:5, 9:20, 36:2, 37:7
hereby [1] - 60:7
hereto [1] - 27:24
history [1] - 42:16
hold [1] - 14:17
holder [1] - 15:1
holding [7] - 14:21, 22:16, 24:15, 27:6, 27:13, 29:12, 29:13
holdings [1] - 22:19
Honor [108] - 5:4, 5:7, 5:10, 5:22, 6:2, 8:8, 9:16, 9:24, 10:22, 11:16, 11:24, 12:11, 12:20, 12:24, 15:6, 16:7, 16:24, 17:3, 17:7, 17:9, 17:20, 17:24, 18:15, 18:19, 18:22, 19:3, 19:12, 20:11, 20:24, 21:4, 21:9, 21:12, 23:9, 23:15, 24:3, 24:10, 24:13, 24:17, 25:12, 25:18, 26:11, 26:17, 26:20, 27:1, 27:8, 27:22, 28:3, 29:5, 29:12, 29:14, 29:18, 29:22, 30:2, 30:18, 31:4, 31:12, 31:14, 31:16, 31:20, 32:3, 32:6, 32:12, 32:20, 32:21, 33:1, 33:6, 33:16, 34:18, 35:19, 35:23, 36:18, 39:2, 39:17, 41:3, 41:16, 42:12, 42:24, 43:4, 43:16, 43:17, 44:3, 44:8, 44:18, 45:7, 45:12, 46:9, 46:17, 47:2, 47:13, 48:5, 48:13, 48:24, 48:25, 49:14, 50:16, 51:21, 52:7, 52:14, 53:4, 53:18, 54:14, 54:19, 55:15, 57:11, 57:18, 58:3, 59:6, 59:7
Honorable [1] - 1:21
hope [1] - 5:11
hopeful [1] - 5:18
hopefully [1] - 6:4
Houston [3] - 2:8, 2:16, 3:3
Hughes [11] - 9:15, 9:17, 9:21, 9:24,

10:12, 12:24, 13:10, 15:25, 16:14, 34:8, 37:18
  human [1] - 28:9
  hundred [1] - 23:22
  hurts [1] - 32:17
  husbands [1] - 29:20
  hypothetical [2] - 44:8, 44:14

## I

  identified [1] - 27:3
  ignite [1] - 32:10
  II [1] - 2:20
  immune [10] - 13:3, 13:11, 15:1, 37:19, 40:18, 52:21, 52:24, 55:9, 55:10, 55:13
  immunity [19] - 9:5, 10:4, 10:18, 10:20, 13:16, 13:18, 13:24, 14:23, 15:9, 34:24, 36:16, 39:22, 48:20, 49:20, 49:21, 49:22, 55:13, 55:20, 55:21
  impact [1] - 36:2
  implemented [1] - 24:19
  implications [1] - 52:22
  implied [1] - 33:22
  importance [1] - 52:23
  important [9] - 8:24, 9:17, 10:15, 12:25, 13:16, 32:4, 32:5, 55:11
  importantly [2] - 7:12, 49:14
  impossible [1] - 40:14
  impressive [1] - 23:21
  improve [1] - 23:23
  IN [1] - 1:3
  Inc [8] - 3:6, 4:14, 4:23, 5:3, 22:16, 25:17, 27:6, 31:9
  INC [1] - 1:7
  included [1] - 60:10
  includes [1] - 23:25
  including [4] - 28:9, 28:12, 29:9, 29:17
  income [1] - 32:15
  incompetent [1] - 19:1
  inconsistencies [1] - 20:19
  incorrect [1] - 53:19

  indeed [1] - 12:7
  independent [6] - 14:11, 14:18, 23:6, 38:16, 46:23, 47:1
  INDEX [1] - 4:5
  indirect [2] - 19:15, 20:17
  industrial [3] - 10:5, 10:7, 42:18
  industries [1] - 22:18
  informed [1] - 17:12
  inherent [2] - 34:21, 34:22
  initial [1] - 9:4
  injure [1] - 49:25
  injured [1] - 14:10
  injury [4] - 15:11, 42:4, 42:5, 44:8
  inspect [1] - 15:16
  install [1] - 23:23
  instruction [1] - 14:12
  instructions [9] - 11:17, 11:21, 12:22, 13:20, 16:1, 16:3, 16:18, 34:25, 35:9
  insurance [6] - 9:3, 13:5, 13:13, 18:13, 28:9, 28:23
  insured [1] - 13:18
  integral [1] - 34:22
  integrated [1] - 22:25
  intended [1] - 49:25
  intends [1] - 17:12
  intent [1] - 41:25
  intentional [2] - 42:4, 50:7
  intentionally [2] - 41:20, 41:21
  interest [5] - 10:6, 14:25, 22:23, 25:3, 34:23
  interpose [1] - 12:2
  interpreted [1] - 10:19
  intricacies [1] - 10:8
  invested [1] - 23:22
  investment [1] - 23:25
  issue [15] - 11:16, 12:10, 12:24, 13:21, 15:4, 15:11, 15:12, 16:18, 34:24, 37:22, 37:24, 39:2, 53:15, 54:21, 58:4
  issued [1] - 15:15
  issues [13] - 6:3, 6:8, 12:1, 20:5, 33:24, 34:5, 34:12, 35:8,

36:3, 36:16, 38:20, 40:8, 54:4
  items [1] - 29:23
  itself [2] - 30:18, 31:22

## J

  Jackson [1] - 60:24
  James [1] - 1:21
  January [1] - 58:11
  Jefferson [1] - 3:2
  John [1] - 18:21
  joint [1] - 51:11
  Joint [1] - 4:18
  Jones [1] - 3:5
  Journal [2] - 48:14, 48:15
  Judge [2] - 1:21, 20:14
  judge [2] - 16:10, 58:18
  judgment [16] - 10:23, 11:1, 11:4, 11:7, 11:10, 11:11, 13:23, 13:25, 19:1, 20:15, 30:5, 30:7, 30:12, 30:13, 36:2, 36:12
  judicial [6] - 5:13, 9:20, 30:6, 34:8, 34:9, 35:5
  JUDICIAL [1] - 1:9
  July [1] - 52:7
  June [3] - 4:25, 39:13
  jury [16] - 11:16, 11:21, 12:8, 12:21, 13:20, 14:12, 16:1, 16:18, 20:20, 25:22, 34:15, 34:16, 34:25, 35:2, 35:9, 40:14
  justice [1] - 33:12
  Justice [1] - 48:16
  Justin [1] - 48:15

## K

  Kansas [5] - 2:21, 3:7, 7:22, 32:18
  KARI [1] - 1:3
  keeping [1] - 48:17
  key [1] - 14:7
  kicked [1] - 5:16
  killed [6] - 7:4, 7:5, 7:9, 30:1, 36:5
  kinds [2] - 15:16, 35:2
  King [1] - 2:3
  knowledge [3] -

19:3, 32:24, 42:5

## L

  L.L.P [1] - 3:2
  lack [2] - 40:10
  Land [16] - 7:25, 22:16, 23:10, 24:6, 24:11, 27:7, 27:8, 28:4, 28:5, 29:8, 29:25, 31:7, 31:17, 31:25, 32:1, 32:11
  language [1] - 46:13
  last [4] - 8:18, 27:9, 28:1, 51:6
  lastly [1] - 54:13
  late [2] - 49:14, 52:7
  law [67] - 6:14, 6:22, 7:19, 7:21, 7:22, 10:3, 10:10, 10:11, 10:13, 10:16, 10:18, 11:18, 11:19, 12:6, 12:16, 13:24, 14:5, 14:6, 14:13, 14:17, 14:18, 14:24, 15:12, 15:18, 15:23, 16:1, 16:11, 16:12, 16:16, 17:11, 17:19, 18:2, 21:1, 25:22, 25:24, 26:3, 28:13, 32:2, 32:13, 32:16, 32:19, 32:25, 33:2, 33:7, 33:8, 33:12, 33:17, 34:24, 35:10, 36:18, 39:2, 39:3, 39:5, 42:17, 47:7, 47:14, 48:11, 48:12, 49:5, 49:19, 49:20, 49:24, 50:2, 55:6, 56:14
  Law [6] - 2:7, 2:15, 47:15, 48:13, 48:14, 48:15
  lawsuit [1] - 36:20
  lawyer [6] - 45:25, 46:17, 47:5, 47:12, 47:24, 48:6
  lawyers [2] - 33:15, 47:4
  lead [2] - 29:19, 29:25
  leading [2] - 47:13, 47:14
  least [4] - 6:3, 33:13, 35:25, 58:7
  leave [5] - 49:10, 49:13, 50:5, 53:5, 57:13
  led [1] - 32:10
  Lee [2] - 2:19, 60:17
  LEEANNA [1] - 1:3

  Leeanna [1] - 5:3
  left [3] - 20:3, 38:5, 50:11
  legal [7] - 6:11, 10:8, 16:13, 16:14, 28:9, 46:4, 54:1
  Legal [1] - 4:23
  less [1] - 42:7
  liability [10] - 13:3, 13:11, 13:14, 13:15, 14:11, 20:5, 46:24, 46:25, 48:7
  liable [2] - 54:6, 54:8
  limit [1] - 27:7
  limitation [1] - 43:8
  limitations [31] - 37:8, 38:3, 43:8, 43:19, 43:20, 43:21, 43:23, 44:4, 44:15, 44:23, 45:17, 45:22, 46:6, 46:10, 46:12, 47:8, 48:1, 48:22, 49:21, 51:8, 51:25, 52:2, 52:22, 52:23, 55:1, 55:11, 55:14, 55:19, 56:5
  limited [8] - 22:19, 23:2, 23:4, 23:7, 23:9, 25:20, 27:2, 27:12
  line [2] - 15:1, 18:7
  liquidity [1] - 28:12
  list [2] - 41:22, 54:3
  listed [2] - 6:15, 9:4
  listened [2] - 33:23, 33:24
  litigation [1] - 28:21
  lived [1] - 32:6
  LLC [12] - 1:8, 1:9, 19:13, 19:14, 19:15, 20:1, 31:10, 36:4, 41:19, 41:25, 42:3, 42:5
  LLP [1] - 2:3
  locate [1] - 32:13
  located [3] - 19:20, 19:24, 27:8
  lodge [1] - 21:25
  logic [1] - 56:23
  logistics [1] - 23:8
  look [8] - 6:9, 9:17, 11:22, 19:11, 21:3, 43:3, 44:7, 45:7
  looked [2] - 38:16, 58:9
  looking [1] - 32:7
  looks [1] - 8:4
  Louisiana [2] - 10:11, 10:13
  Love [3] - 10:19, 13:19, 14:6

6

LP [8] - 1:7, 1:8, 4:15, 22:20, 23:4, 27:3, 31:9
LP's [2] - 4:16, 50:17
luck [1] - 37:11
ludicrous [1] - 38:10

**M**

machine [1] - 1:24
maintain [1] - 28:23
maintained [1] - 24:24
maintaining [1] - 28:14
major [1] - 24:1
majority [3] - 22:23, 23:2, 38:5
malpractice [1] - 48:2
man [2] - 18:13, 45:25
manage [4] - 28:11, 28:19, 28:21, 29:2
managed [3] - 24:23, 24:25, 25:4
management [3] - 15:20, 22:25, 31:22
managing [1] - 28:12
mandated [1] - 16:12
mandates [1] - 15:25
Mann [8] - 5:3, 6:1, 29:20, 30:1, 32:5, 36:5, 41:20, 42:1
MANN [1] - 1:3
manufacturing [1] - 22:18
March [2] - 6:21, 18:23
Marisol [2] - 60:5, 60:22
mark [1] - 8:13
marked [11] - 6:21, 8:9, 8:14, 8:19, 19:4, 21:9, 21:11, 26:15, 30:15, 50:25, 51:16
Marketing [1] - 31:10
Martin [1] - 3:2
Mary's [4] - 48:13, 48:14, 48:15
master [1] - 27:2
materials [1] - 8:15
matter [3] - 14:6, 35:24, 56:16
maximizing [1] - 53:25
mean [5] - 22:13, 35:22, 49:18, 56:10
means [1] - 39:9
Medina [4] - 2:14,

2:15, 17:4, 42:23
meet [1] - 49:4
Memorial [1] - 2:16
memory [1] - 12:15
men [1] - 24:7
merit [1] - 38:19
mid [1] - 22:21
might [2] - 25:21, 48:2
Milling [3] - 10:19, 13:19, 14:7
million [4] - 7:13, 9:9, 23:22, 23:25
mind [1] - 48:18
minute [6] - 10:16, 17:17, 18:14, 32:18, 44:20, 45:15
minutes [2] - 34:4, 58:14
misquote [3] - 54:17, 54:18, 55:3
MLP [4] - 27:2, 27:11, 27:14, 27:16
Moerer [1] - 2:3
money [1] - 40:1
months [10] - 18:11, 36:19, 37:7, 37:9, 37:12, 38:16, 38:24, 42:7, 43:22, 53:2
morning [11] - 5:11, 10:25, 11:8, 12:10, 17:6, 17:7, 17:10, 30:23, 35:16, 36:13, 43:2
Morris [1] - 15:5
Morrow [1] - 9:3
most [16] - 7:20, 9:16, 10:1, 10:6, 11:4, 11:9, 12:25, 13:23, 17:25, 18:9, 26:12, 30:9, 33:3, 41:15, 41:16, 49:14
motion [35] - 6:13, 6:20, 10:23, 11:3, 12:6, 12:16, 16:19, 17:10, 17:12, 17:18, 19:1, 21:17, 26:8, 30:7, 30:12, 30:13, 35:15, 35:18, 35:19, 35:21, 36:1, 36:12, 36:18, 36:23, 37:2, 40:16, 41:12, 49:15, 52:15, 52:16, 53:3, 53:5, 57:2, 57:3, 57:14
motions [8] - 5:11, 11:1, 26:8, 35:13, 35:18, 36:1, 52:6, 52:11
MOTIONS [3] - 1:14,

4:2, 4:7
mountains [1] - 11:2
move [1] - 26:9
MR [97] - 5:4, 5:6, 5:10, 5:22, 6:2, 6:7, 8:8, 8:11, 8:13, 8:17, 8:20, 8:22, 8:23, 8:25, 10:22, 11:13, 11:15, 11:23, 11:24, 12:2, 12:5, 12:11, 12:12, 12:14, 12:20, 13:7, 13:22, 14:4, 16:24, 17:1, 17:7, 17:9, 18:21, 19:21, 19:22, 19:23, 19:24, 19:25, 20:2, 20:3, 20:7, 20:8, 20:10, 21:6, 21:7, 21:12, 21:17, 21:22, 22:2, 22:5, 22:11, 25:19, 26:2, 26:11, 26:20, 26:23, 30:17, 30:24, 31:4, 33:21, 34:3, 34:7, 35:14, 35:15, 35:17, 35:23, 42:21, 47:21, 50:15, 50:19, 50:20, 50:22, 50:23, 51:5, 51:13, 51:14, 51:18, 51:21, 52:5, 52:19, 54:19, 55:4, 55:8, 56:13, 56:22, 57:1, 57:7, 57:11, 57:21, 58:3, 58:6, 58:18, 58:22, 59:1, 59:3, 59:6, 59:7
MS [1] - 26:16
mull [1] - 34:11
multiple [1] - 56:14
multiplicity [1] - 58:12
must [3] - 39:25, 48:25, 49:1
MY [1] - 60:19

**N**

name [3] - 37:10, 39:3, 40:3
named [9] - 36:21, 36:25, 37:5, 37:20, 39:19, 41:5, 41:7, 41:10, 55:16
naming [1] - 37:22
nature [1] - 16:2
necessary [1] - 27:15
need [11] - 11:19, 12:2, 20:21, 20:23, 21:22, 21:24, 40:15, 43:2, 49:10, 56:19, 56:20

needed [1] - 38:25
needs [2] - 20:20
negative [1] - 39:18
negligence [9] - 41:5, 41:7, 41:10, 41:15, 42:17, 50:3, 50:7, 53:9, 54:2
negligent [1] - 29:19
net [1] - 7:15
never [4] - 12:15, 26:8, 34:13, 34:15
new [1] - 23:23
newest [1] - 23:20
next [7] - 5:13, 27:9, 28:17, 29:1, 42:2, 47:10, 50:23
nine [1] - 37:3
nitrogen [2] - 22:17, 25:8
NO [8] - 1:2, 2:3, 2:7, 2:11, 2:15, 3:1, 4:9, 4:22
nondelegable [4] - 14:19, 14:24, 15:2, 16:2
none [1] - 18:16
nonparty [2] - 48:20
nonsuit [7] - 36:19, 37:25, 39:11, 44:19, 48:9, 53:2, 53:6
nonsuited [10] - 36:14, 36:15, 37:7, 37:17, 38:21, 41:9, 43:18, 43:22, 46:5, 51:7
nonsuiting [1] - 52:21
noted [1] - 48:18
nothing [2] - 20:4, 53:15
notice [2] - 6:2, 30:6
November [1] - 41:6
nowhere [1] - 19:2
number [4] - 15:4, 49:8, 49:9, 55:19
numbered [2] - 1:21, 60:11
numbers [2] - 6:17, 31:13

**O**

oath [1] - 33:15
object [3] - 21:22, 22:5, 25:19
objected [1] - 37:2
objecting [1] - 26:7
objection [8] - 12:2, 13:22, 21:21, 25:20, 26:20, 30:25, 50:22,

51:18
obligations [1] - 43:11
obvious [3] - 39:1, 52:20, 52:25
obviously [3] - 12:22, 37:17, 39:14
occur [3] - 14:5, 31:7, 33:4
occurred [15] - 7:7, 10:12, 23:17, 32:4, 32:11, 34:13, 34:14, 36:19, 39:11, 39:16, 40:3, 40:21, 42:16, 53:9, 60:11
October [2] - 5:17, 59:4
OF [5] - 1:1, 4:1, 4:6, 60:3, 60:3
offer [11] - 21:4, 21:13, 21:18, 26:13, 26:17, 30:11, 30:13, 30:22, 50:15, 50:20, 51:10
OFFERED [2] - 4:9, 4:22
offered [6] - 21:16, 26:19, 30:16, 51:1, 51:17, 51:22
offering [1] - 11:8
officer [1] - 31:9
officers [2] - 13:17, 28:7
Official [2] - 60:5, 60:23
OFFICIAL [1] - 60:19
Oklahoma [32] - 7:2, 7:3, 7:5, 7:6, 7:10, 7:11, 7:22, 8:2, 9:13, 10:16, 10:18, 11:18, 11:19, 13:13, 13:16, 13:24, 14:5, 14:7, 14:12, 14:24, 15:25, 16:11, 16:15, 32:4, 32:6, 32:18, 33:8, 34:24, 39:23, 49:24
Oklahoma-based [1] - 7:5
old [2] - 38:3, 55:16
omission [1] - 14:11
omissions [1] - 31:7
omitted [1] - 20:5
once [3] - 33:6, 42:21, 48:16
one [33] - 7:10, 9:16, 11:22, 12:23, 12:24, 15:5, 16:21, 18:15, 20:14, 21:25, 26:7, 28:17, 29:10, 34:9, 42:12, 42:13, 45:13,

46:23, 47:3, 47:10, 47:13, 47:14, 49:9, 53:21, 54:2, 54:12, 55:7, 55:18, 56:6, 56:11, 56:16, 57:19

ones [1] - 38:11
open [1] - 60:11
operate [3] - 22:20, 23:7, 27:15
operates [2] - 23:5
operating [1] - 24:19
operation [1] - 20:24
operations [7] - 22:25, 24:23, 28:12, 29:16, 29:18, 31:12, 31:18
opinion [1] - 12:15
oral [1] - 36:12
order [3] - 11:19, 11:20, 49:22
ordered [2] - 24:5, 24:7
ordinary [2] - 25:1, 28:20
organization [3] - 8:4, 20:24, 21:3
Organization [1] - 4:24
organizational [1] - 25:7
original [6] - 6:24, 36:6, 41:1, 41:3, 41:4, 53:20
originally [2] - 7:25, 54:11
otherwise [4] - 15:21, 21:8, 34:1, 50:12
ought [1] - 45:18
outside [2] - 11:6, 57:25
overall [1] - 9:9
Overland [1] - 2:21
overruled [1] - 10:11
oversee [1] - 28:21
own [6] - 22:20, 23:7, 27:14, 53:22, 54:1, 54:6
owned [5] - 19:15, 20:17, 23:17, 54:7, 54:8
owners [1] - 25:3
ownership [2] - 23:1, 23:2
Ownership [1] - 4:24
owns [2] - 22:22, 23:5

**P**

p2 [1] - 26:21
page [14] - 18:18, 18:23, 19:9, 19:11, 22:14, 22:15, 23:12, 23:13, 26:24, 27:19, 27:20, 29:1, 31:13, 43:5
pages [5] - 21:14, 22:12, 28:1, 31:14
paid [5] - 9:7, 9:10, 10:2, 10:9, 60:17
pair [1] - 35:7
paper [1] - 11:2
paragraph [10] - 19:11, 22:15, 23:12, 26:24, 26:25, 27:3, 27:5, 27:10, 41:18, 42:2
Paragraph [1] - 53:19
paragraphs [3] - 23:3, 23:4, 38:13
parcel [1] - 40:3
parent [5] - 15:7, 24:15, 34:21, 40:11, 53:23
parental [1] - 40:10
Park [1] - 2:21
part [10] - 15:2, 23:25, 34:22, 40:2, 40:18, 48:8, 54:10, 54:11, 56:15, 58:19
particular [2] - 10:12, 13:7
particularly [2] - 20:25, 58:16
parties [15] - 9:6, 16:17, 17:12, 35:6, 35:22, 44:1, 44:2, 47:18, 47:23, 56:18, 56:19, 56:22, 60:9, 60:15
partner [4] - 22:22, 23:1, 23:2, 27:10
Partners [4] - 4:15, 22:20, 22:23, 50:17
PARTNERS [1] - 1:7
partnership [7] - 23:4, 23:7, 23:9, 23:10, 27:2, 27:7, 27:12
partnerships [1] - 22:19
party [41] - 14:10, 28:19, 35:16, 36:22, 37:1, 37:5, 37:6, 37:11, 37:20, 37:22, 38:1, 38:14, 38:20,

39:3, 39:4, 39:7, 39:8, 39:9, 39:19, 39:20, 40:4, 40:19, 42:8, 43:7, 43:10, 43:13, 44:17, 44:25, 45:2, 45:19, 45:21, 46:16, 48:21, 51:9, 52:15, 52:17, 55:22, 57:14
pattern [2] - 25:12, 25:13
Paul [1] - 48:16
Paul's [1] - 7:11
payment [3] - 25:2, 28:24, 29:2
payments [1] - 7:15
peculiar [1] - 39:16
penumbra [1] - 10:17
people's [1] - 53:10
peoples [1] - 7:25
perform [1] - 54:25
performance [1] - 23:24
performed [2] - 14:14, 27:23
perhaps [1] - 6:5
period [1] - 43:9
permission [1] - 49:15
permitted [1] - 13:2
person [3] - 9:3, 43:6, 43:12
person's [1] - 16:21
personal [3] - 19:2, 32:24, 44:8
pertinent [1] - 35:9
petition [6] - 6:24, 36:7, 41:17, 41:18, 53:20, 54:11
petitions [4] - 36:8, 40:25, 42:15, 49:6
petroleum [1] - 22:17
Phillip [1] - 3:1
phone [1] - 48:2
phonetic [1] - 16:21
pick [1] - 11:17
piecemeal [1] - 18:4
place [1] - 26:16
places [1] - 14:18
plaintiff [5] - 38:21, 38:22, 39:25, 44:19, 55:10
PLAINTIFFS [1] - 4:8
Plaintiffs [4] - 2:5, 2:9, 2:13, 2:17
plaintiffs [21] - 5:4, 6:24, 12:23, 16:5, 17:5, 36:14, 37:2, 38:12, 38:15, 38:18,

40:5, 41:18, 42:15, 44:10, 45:8, 49:25, 50:17, 51:11, 53:1, 55:18
plaintiffs' [7] - 29:11, 29:17, 29:20, 31:1, 42:23, 53:20, 55:24
Plaintiffs' [18] - 4:16, 4:19, 21:11, 21:16, 22:8, 22:9, 26:15, 26:19, 26:22, 30:15, 30:16, 31:3, 50:25, 51:1, 51:4, 51:16, 51:17, 51:20
planning [1] - 24:22
Plaza [1] - 2:20
plead [4] - 38:8, 49:1, 50:4, 50:5
pleading [6] - 6:23, 38:17, 48:25, 49:1, 49:4
pleadings [11] - 6:14, 6:16, 6:19, 8:16, 9:19, 34:8, 35:25, 38:15, 38:24, 56:17
plethora [1] - 31:16
plus [1] - 9:9
point [13] - 6:11, 6:12, 18:7, 19:19, 20:12, 20:16, 25:19, 29:5, 31:14, 31:19, 56:9, 57:17
points [1] - 6:11
policies [1] - 28:23
policy [1] - 56:16
portions [1] - 60:8
position [4] - 31:11, 33:13, 39:1, 46:5
postulating [1] - 56:25
potential [3] - 13:15, 33:9, 45:21
practice [4] - 25:12, 25:13, 28:15, 33:1
Practice [5] - 43:1, 43:13, 46:14, 54:17, 54:24
premises [1] - 15:16
preparation [1] - 60:16
present [3] - 20:25, 35:8, 41:14
presentation [2] - 17:20, 17:24
presented [7] - 8:17, 8:19, 9:14, 18:3, 21:19, 25:22, 34:11
presently [1] - 19:14
president [5] - 18:12, 18:13, 18:24, 19:13,

31:11
presiding [1] - 1:22
presumably [1] - 47:6
prevent [1] - 55:24
previous [1] - 18:7
previously [2] - 17:11, 30:5
primarily [2] - 22:17, 22:18
principals [2] - 48:17
pro [1] - 10:7
problem [1] - 56:2
procedural [1] - 20:13
Procedure [1] - 43:14
procedure [1] - 48:11
Proceeding [1] - 59:8
proceedings [5] - 1:20, 5:25, 28:22, 60:9, 60:14
Proceedings [1] - 1:24
process [3] - 18:4, 33:4
produced [1] - 37:13
Products [10] - 9:15, 9:17, 9:22, 9:24, 10:12, 12:24, 13:11, 15:25, 16:15, 37:18
professional [1] - 28:8
Professor [2] - 47:15, 47:21
Profile [1] - 22:15
profit [1] - 53:25
projects [2] - 25:5, 29:3
property [2] - 25:1, 28:20
proposition [1] - 31:23
protect [1] - 54:1
proud [1] - 18:15
prove [1] - 39:17
proven [1] - 30:18
provide [9] - 7:18, 13:5, 13:13, 14:20, 15:9, 27:15, 28:5, 29:3, 57:13
provided [11] - 6:24, 7:13, 8:25, 9:20, 9:21, 25:4, 29:6, 37:20, 38:11, 57:3, 57:5
providers [1] - 28:19
provides [4] - 6:3, 13:16, 13:18, 32:13

provision [4] - 9:23, 12:25, 13:8, 43:17
purpose [4] - 20:5, 51:22, 53:25, 56:12
purposes [7] - 22:7, 22:8, 26:18, 30:24, 31:2, 51:15, 51:23
put [18] - 18:17, 19:5, 19:9, 19:16, 20:20, 21:25, 23:19, 26:23, 30:3, 31:5, 38:10, 42:24, 43:1, 44:7, 47:2, 54:24, 56:24, 57:22

**Q**

quarter [1] - 24:2
quash [1] - 52:6
quickly [2] - 34:5, 53:3
quid [1] - 10:7
quite [5] - 12:22, 14:13, 37:16, 40:24, 52:20
quo [1] - 10:7
quote [1] - 15:9
quoted [2] - 47:16, 54:16

**R**

raising [1] - 28:16
Ramos [3] - 60:5, 60:21, 60:22
ran [5] - 29:16, 37:8, 43:20, 44:5, 55:1
rather [3] - 16:11, 18:4, 24:16
Ray [5] - 17:1, 19:5, 19:8, 21:12, 22:13
reaches [1] - 38:4
read [6] - 11:2, 14:2, 34:4, 46:13, 54:23, 55:9
reading [1] - 43:16
ready [3] - 32:23, 33:9, 33:11
reality [1] - 14:19
really [16] - 6:9, 6:12, 9:18, 16:12, 26:6, 35:2, 38:19, 38:25, 39:5, 39:8, 39:16, 40:14, 41:9, 44:6, 55:20, 55:23
reargue [1] - 10:25
rearguing [2] - 10:23, 11:3
reason [11] - 10:15, 17:16, 20:8, 20:15,

22:2, 29:5, 39:9, 46:2, 55:11
reasons [3] - 37:20, 38:14, 48:21
rebuttal [2] - 52:18, 52:19
recap [1] - 6:18
receive [1] - 40:1
recipients [3] - 27:24, 28:14, 29:4
recipients' [5] - 28:11, 28:16, 28:18, 28:20, 28:24
Recitals [1] - 26:25
recollection [1] - 14:2
recommend [3] - 28:15, 28:17, 28:23
recommendations [2] - 25:4, 29:3
record [12] - 8:10, 8:23, 22:1, 30:8, 30:11, 30:23, 31:21, 32:21, 32:22, 32:23, 49:8, 51:23
RECORD [1] - 1:1
Record [3] - 60:10, 60:13, 60:17
records [2] - 24:25, 28:14
recovery [1] - 13:1
reduced [1] - 25:15
referenced [2] - 41:25, 42:3
referred [1] - 25:13
refinery [5] - 7:7, 8:1, 23:20, 23:21, 23:25
Refinery [3] - 24:18, 25:11, 31:24
Refining [46] - 4:15, 8:1, 8:6, 19:14, 19:15, 22:20, 22:23, 23:4, 23:6, 23:15, 23:17, 24:14, 27:3, 27:7, 27:14, 27:16, 28:4, 29:8, 29:11, 31:9, 31:10, 31:17, 36:4, 36:9, 36:10, 36:14, 36:16, 36:22, 37:1, 37:5, 37:13, 38:9, 40:9, 40:12, 40:13, 41:14, 41:19, 41:24, 42:2, 42:4, 43:18, 45:10, 50:17, 52:20
refining [10] - 22:17, 23:5, 23:8, 23:9, 25:10, 27:4, 27:11, 28:5, 29:9, 31:11
REFINING [2] - 1:7, 1:9

reflects [1] - 60:14
refusing [1] - 14:22
regulate [1] - 10:7
regulatory [2] - 28:10, 28:22
related [2] - 23:8, 33:3
relationship [14] - 7:20, 8:4, 10:1, 11:5, 11:9, 13:23, 18:1, 18:9, 24:12, 24:14, 24:16, 26:12, 30:10, 33:3
relevance [1] - 34:15
relevant [1] - 17:24
relied [1] - 6:23
rely [1] - 52:13
remain [1] - 45:14
remained [2] - 36:9, 36:10
remaining [5] - 10:17, 13:15, 29:7, 29:10
remake [1] - 47:9
remarkable [1] - 40:24
remarkably [1] - 41:15
Remedies [5] - 43:1, 43:13, 46:15, 54:18, 54:25
remedy [1] - 57:12
remember [1] - 36:11
remind [1] - 57:8
reminding [1] - 26:4
renamed [1] - 20:4
renaming [1] - 20:4
repair [1] - 23:22
repeated [1] - 38:13
repeats [1] - 57:4
repetition [1] - 38:21
reply [2] - 9:21, 34:4
report [5] - 21:15, 22:12, 23:14, 23:18, 23:19
Report [1] - 4:10
reported [2] - 1:24, 60:12
reporter [1] - 21:5
Reporter [2] - 60:5, 60:23
Reporter's [4] - 4:4, 60:10, 60:13, 60:17
REPORTER'S [2] - 1:1, 60:2
Reports [1] - 4:13
reports [1] - 30:20
representative [2] - 13:9, 14:8
represented [3] -

44:12, 45:12, 48:6
Request [2] - 4:16, 4:19
request [6] - 43:15, 43:24, 50:18, 51:6, 51:11, 52:16
requested [1] - 60:9
requests [2] - 37:14, 37:15
require [1] - 49:13
required [4] - 6:9, 13:5, 13:13, 45:22
requirement [1] - 48:24
requirements [3] - 20:13, 43:24, 49:5
requires [1] - 33:13
requiring [1] - 49:4
reread [1] - 33:25
residents [2] - 7:3, 7:10
resolved [3] - 6:4, 6:11, 6:20
resources [2] - 28:9, 28:13
respect [3] - 25:8, 43:7, 43:9
respectfully [3] - 16:8, 52:14, 52:16
respective [1] - 60:15
respond [1] - 16:24
responded [1] - 37:15
Response [2] - 4:16, 4:18
response [7] - 8:25, 18:25, 30:7, 33:22, 42:23, 50:17, 51:11
responses [1] - 51:6
responsibility [4] - 13:14, 15:21, 36:22, 46:19
responsible [42] - 35:16, 35:22, 37:1, 37:5, 37:11, 37:20, 37:22, 38:1, 38:14, 38:20, 39:4, 39:7, 39:8, 39:9, 39:19, 40:4, 40:11, 40:19, 42:8, 43:6, 43:10, 43:12, 44:1, 44:17, 44:25, 45:2, 45:19, 45:21, 46:16, 47:17, 47:18, 47:23, 48:21, 49:24, 50:1, 51:9, 52:15, 52:17, 55:22, 56:19, 56:21, 57:14
result [4] - 7:6, 7:16, 24:8, 42:6

returns [1] - 29:2
Review [1] - 48:13
review [3] - 6:17, 48:12, 49:20
revisiting [1] - 13:22
Richard [3] - 2:2, 17:3, 42:22
Richmond [3] - 1:22, 2:4, 60:25
Riebschlager [8] - 2:6, 2:7, 8:19, 17:4, 42:22, 47:20, 50:14, 52:4
RIEBSCHLAGER [2] - 17:7, 59:7
risk [1] - 9:3
Robert [1] - 31:8
Roberts [1] - 48:15
Rogan [2] - 38:1, 55:15
RTP [11] - 46:12, 47:4, 47:6, 48:11, 48:19, 48:20, 49:11, 49:12, 49:16, 49:23, 51:24
Rule [2] - 36:25, 41:13
rule [3] - 44:22, 57:23, 58:1
ruled [4] - 12:15, 13:25, 42:11, 58:1
Rules [1] - 43:14
ruling [1] - 11:12
rulings [1] - 11:21
run [24] - 15:19, 32:17, 37:9, 37:21, 37:23, 37:25, 38:4, 38:6, 43:19, 43:21, 43:23, 44:24, 47:8, 48:1, 51:8, 52:2, 54:14, 54:15, 55:15, 55:18, 56:2
running [5] - 29:17, 31:18, 44:15, 45:22, 51:25
runs [2] - 45:18, 46:6
Russell [5] - 29:20, 30:1, 32:5, 41:20, 42:1

**S**

safe [1] - 14:20
safety [8] - 14:25, 15:2, 15:15, 23:24, 24:21, 28:7, 34:21, 34:22
sandwich [1] - 58:13
save [2] - 35:1, 46:3
saw [1] - 21:20

SBOT [5] - 2:3, 2:7, 2:11, 2:15, 3:1
scenario [3] - 44:18, 44:25
schedule [4] - 58:10, 58:16, 58:21
scheduled [3] - 16:20, 24:1, 39:13
scheduling [1] - 39:13
School [1] - 47:16
Scotsman [1] - 15:6
screen [3] - 18:19, 42:24, 54:24
second [7] - 26:24, 27:9, 41:1, 41:4, 41:6, 42:14, 53:1
section [1] - 42:25
Section [1] - 46:14
see [14] - 6:10, 16:8, 17:8, 24:9, 27:1, 27:5, 27:8, 29:6, 29:14, 31:12, 31:15, 43:17, 50:11, 56:10
seek [1] - 52:13
seem [2] - 16:16, 43:3
seize [1] - 49:7
selection [1] - 16:12
senior [2] - 18:24, 19:12
sense [7] - 9:6, 38:25, 39:6, 42:17, 47:1, 55:14, 56:18
sentence [1] - 27:9
sentences [1] - 38:13
separate [3] - 30:17, 44:13, 47:4
September [12] - 1:19, 4:3, 5:1, 23:18, 34:13, 36:7, 37:9, 41:4, 41:5, 41:16, 43:20, 60:19
series [2] - 36:8, 41:23
serious [1] - 12:14
served [1] - 24:20
serves [1] - 22:22
service [1] - 28:19
Services [2] - 4:11, 25:16
services [21] - 26:14, 27:15, 27:21, 27:22, 27:23, 28:2, 28:6, 28:8, 28:11, 28:14, 28:16, 28:17, 28:20, 28:24, 29:4, 29:5, 29:6, 30:21, 31:16, 31:22, 34:11

services' [1] - 27:23
set [5] - 5:12, 5:14, 16:10, 20:4, 35:16
setting [1] - 39:14
seven [1] - 40:25
several [1] - 7:24
shall [1] - 27:23
shared [1] - 34:10
shareholder [3] - 14:10, 15:1, 34:10
shareholders [4] - 13:18, 14:18, 14:22, 23:20
shares [1] - 29:13
SHARP [1] - 5:22
Sharp [1] - 3:1
Shoemake [1] - 1:21
short [3] - 21:3, 39:15, 43:3
shorthand [1] - 1:24
show [11] - 8:3, 8:8, 9:13, 10:16, 18:14, 19:24, 24:4, 24:13, 24:16, 25:17, 26:13
showed [3] - 7:12, 19:6, 31:15
shown [1] - 34:10
shows [2] - 22:24, 31:6
shut [1] - 24:5
sic [1] - 15:25
side [6] - 25:9, 25:10, 33:23, 33:24, 55:24, 55:25
sides [1] - 56:11
signed [1] - 18:22
significance [1] - 23:15
significant [13] - 7:20, 10:1, 10:6, 11:4, 11:9, 13:23, 17:25, 18:9, 24:12, 26:12, 29:23, 30:10, 33:3
significantly [1] - 18:22
simple [3] - 6:8, 33:5, 47:2
simplicity [1] - 20:6
simply [7] - 14:13, 17:21, 18:11, 35:6, 38:11, 40:6, 47:11
single [1] - 56:6
siralease [1] - 16:21
sit [1] - 32:23
situation [11] - 7:20, 11:22, 16:14, 34:16, 48:4, 50:2, 50:10, 53:8, 55:23, 56:13
six [6] - 36:21, 37:7, 37:9, 40:25, 42:7,

53:2
SMITH [1] - 1:3
Smith [9] - 29:21, 30:1, 32:5, 36:6, 38:1, 38:2, 41:20, 42:1, 55:15
Smithyman [6] - 2:19, 2:20, 19:19, 21:7, 49:3, 60:18
SMITHYMAN [56] - 5:6, 6:2, 6:7, 8:11, 8:13, 8:17, 8:22, 8:25, 11:13, 11:15, 11:24, 12:11, 12:14, 12:20, 13:7, 14:4, 19:21, 19:23, 19:25, 20:3, 20:8, 21:6, 21:17, 21:22, 22:2, 22:5, 25:19, 26:2, 26:20, 30:24, 33:21, 34:3, 34:7, 35:14, 35:17, 35:23, 50:19, 50:22, 51:13, 51:18, 52:19, 54:19, 55:4, 55:8, 56:13, 56:22, 57:1, 57:7, 57:11, 57:21, 58:3, 58:6, 58:18, 58:22, 59:1, 59:3
so.. [2] - 21:20, 33:20
sole [1] - 53:25
someone [2] - 15:22, 56:4
somewhere [2] - 32:18, 58:24
son [1] - 38:2
sorry [5] - 13:6, 19:19, 27:5, 35:17, 43:14
sort [1] - 15:7
Sotto [2] - 47:19, 50:13
sotto [1] - 52:3
South [1] - 2:4
spaghetti [1] - 54:10
speaks [1] - 19:2
specific [5] - 15:10, 15:13, 15:14, 15:18, 53:15
specifically [1] - 44:23
spend [1] - 58:20
spending [1] - 5:9
spot [1] - 14:16
St [5] - 7:11, 48:13, 48:14, 48:15
stand [2] - 49:9, 49:11
standard [3] - 25:22, 25:23, 25:24
standing [1] - 26:7

started [1] - 25:13
starting [1] - 43:5
State [1] - 60:6
STATE [1] - 60:3
state [30] - 6:14, 6:22, 10:3, 10:4, 10:5, 10:10, 12:6, 12:16, 13:2, 13:4, 16:8, 17:11, 17:19, 18:2, 21:1, 32:14, 33:2, 49:2, 49:10, 49:16, 49:19, 49:21, 53:10, 54:19, 57:7, 57:13, 57:15
statute [50] - 10:19, 13:4, 13:12, 13:14, 37:8, 37:21, 37:23, 37:25, 38:3, 38:5, 39:22, 43:8, 43:19, 43:20, 43:21, 43:23, 44:4, 44:15, 44:23, 45:17, 45:22, 46:6, 46:14, 47:14, 47:25, 48:17, 48:19, 48:21, 48:25, 49:21, 51:7, 51:25, 52:22, 52:23, 53:2, 54:14, 54:24, 55:1, 55:11, 55:13, 55:14, 55:17, 55:19, 55:24, 56:5, 56:8, 57:22, 57:24
statute's [1] - 54:15
statutes [1] - 56:2
statutory [1] - 48:18
stop [1] - 52:10
strategic [1] - 48:5
strategy [2] - 24:19, 25:7
Street [2] - 2:4, 2:21
strong [1] - 39:23
stuff [1] - 38:23
styled [1] - 60:11
subject [2] - 27:17, 32:19
submit [3] - 17:14, 40:17, 55:17
submitted [1] - 33:7
subrogation [1] - 9:9
subs [2] - 29:9, 29:16
Subs [3] - 4:23, 27:14, 27:16
Subsection [2] - 43:5, 43:25
subsequent [1] - 44:5
subsidiaries [8] - 8:5, 19:15, 22:22, 24:20, 27:4, 28:6, 29:13, 31:11

subsidiary [11] - 13:10, 15:8, 15:12, 20:18, 23:5, 24:15, 34:22, 34:23, 54:6, 54:7, 54:8
substantial [1] - 6:15
substantially [1] - 42:6
sudden [1] - 48:9
sue [1] - 44:10
sued [5] - 7:25, 8:2, 36:6, 42:10, 42:18
sufficient [6] - 14:17, 15:17, 38:8, 38:24, 49:1, 49:16
Sugar [16] - 7:25, 22:16, 23:10, 24:6, 24:11, 27:7, 27:8, 28:4, 28:5, 29:8, 29:25, 31:7, 31:17, 31:25, 32:1, 32:11
suggest [1] - 42:12
suing [2] - 39:25, 45:8
suit [3] - 7:9, 39:10, 56:15
Suite [3] - 2:8, 2:16, 3:6
summarized [1] - 30:2
summary [17] - 10:23, 11:1, 11:3, 11:7, 11:10, 11:11, 13:22, 13:25, 19:1, 20:14, 30:5, 30:7, 30:12, 30:13, 31:6, 36:1, 36:12
supervision [1] - 40:11
supplemental [7] - 36:24, 41:2, 41:11, 41:13, 42:14, 55:16
supports [1] - 31:23
supposed [1] - 57:23
Supreme [4] - 7:19, 7:21, 9:25, 10:11
surprise [1] - 56:1
surprised [1] - 37:10
surprising [1] - 39:6
suspects [1] - 5:5
sustain [1] - 14:17
system [2] - 15:20, 24:25

**T**

takeover [1] - 15:18
task [2] - 15:10, 34:21
TATE [38] - 5:4, 5:10,

8:8, 8:20, 8:23, 10:22, 11:23, 12:2, 12:5, 12:12, 13:22, 16:24, 17:1, 17:9, 18:21, 19:22, 19:24, 20:2, 20:7, 20:10, 21:7, 21:12, 22:11, 26:11, 26:16, 26:23, 30:17, 31:4, 35:15, 42:21, 47:21, 50:15, 50:20, 50:23, 51:5, 51:14, 51:21, 52:5

Tate [16] - 2:2, 2:3, 8:18, 11:25, 12:15, 17:3, 34:19, 40:7, 42:22, 47:19, 50:13, 52:3, 53:4, 53:16, 54:23, 57:2

tax [3] - 28:9, 29:2, 32:15

taxes [1] - 29:2

technical [1] - 43:3

Telephone [7] - 2:5, 2:9, 2:13, 2:17, 2:22, 3:3, 3:7

ten [1] - 42:7

terms [3] - 27:17, 34:8, 34:19

test [9] - 7:21, 10:1, 11:5, 11:9, 13:24, 18:1, 18:10, 30:10

testimony [5] - 20:10, 29:23, 30:2, 31:6, 31:23

TEXAS [2] - 1:5, 60:3

Texas [51] - 1:22, 2:4, 2:8, 2:16, 3:3, 7:18, 7:25, 9:25, 11:18, 14:6, 15:3, 15:4, 15:8, 15:12, 15:23, 16:3, 16:11, 22:16, 23:10, 24:6, 24:11, 24:12, 25:22, 25:24, 31:7, 31:17, 31:25, 32:7, 32:11, 32:13, 32:15, 32:16, 32:19, 32:25, 33:7, 33:12, 33:17, 39:18, 39:22, 42:17, 42:25, 43:13, 43:14, 49:5, 50:2, 54:4, 60:6, 60:22, 60:24, 60:25

Texas77701 [1] - 2:12

THE [53] - 1:3, 5:2, 5:5, 5:8, 5:20, 5:24, 6:1, 6:6, 8:12, 8:15, 11:11, 11:14, 12:4, 12:17, 13:6, 14:1, 16:23, 16:25, 17:6,

18:20, 21:21, 21:24, 22:4, 22:6, 25:25, 26:4, 26:21, 31:1, 33:19, 33:23, 34:6, 35:12, 35:20, 51:2, 51:19, 52:18, 54:16, 54:23, 55:5, 56:4, 56:20, 56:23, 57:6, 57:9, 57:19, 57:22, 58:5, 58:9, 58:19, 58:23, 59:2, 59:4, 60:3

themselves [2] - 46:5, 54:1

therefore [4] - 5:14, 54:6, 54:7, 54:8

third [45] - 28:19, 35:16, 35:22, 36:22, 37:1, 37:5, 37:11, 37:20, 37:22, 38:1, 38:14, 38:20, 39:4, 39:7, 39:8, 39:9, 39:19, 40:4, 40:19, 41:2, 41:8, 41:11, 42:8, 42:14, 43:6, 43:10, 43:12, 44:1, 44:17, 44:25, 45:2, 45:19, 45:21, 46:16, 47:18, 47:23, 48:21, 51:9, 52:15, 52:17, 53:20, 55:22, 56:19, 57:14

third-party [1] - 28:19

three [8] - 6:3, 23:3, 29:7, 34:4, 38:2, 45:4, 45:14, 55:16

throughout [2] - 10:20, 38:12

thrown [1] - 54:10

timely [5] - 29:1, 43:11, 44:24, 52:1

today [13] - 6:4, 6:12, 17:4, 18:8, 18:11, 20:17, 24:8, 26:9, 40:7, 46:4, 49:9, 49:12, 52:13

took [1] - 40:20

Torrez [1] - 15:5

TORREZ [1] - 15:5

tort [6] - 13:1, 13:16, 14:11, 50:7, 53:9, 56:15

tortfeasor [1] - 14:8

torts [5] - 46:20, 46:23, 47:1, 54:6, 54:8

total [1] - 60:16

totally [2] - 19:1, 20:9

transcription [1] - 60:8

Travis [1] - 3:2

treat [1] - 47:12

treating [1] - 14:22

treatment [1] - 32:14

TRIAL [1] - 1:2

trial [29] - 5:12, 5:15, 5:18, 6:5, 10:25, 16:5, 16:6, 17:13, 33:5, 33:11, 35:7, 39:12, 39:13, 39:15, 40:8, 40:22, 40:23, 47:25, 55:25, 58:2, 58:4, 58:17, 58:23, 59:1, 59:2, 59:3

trials [2] - 58:10, 58:12

true [5] - 11:7, 40:22, 53:13, 53:14, 60:7

truly [1] - 60:14

trumps [1] - 58:16

try [1] - 46:7

turn [2] - 22:14, 27:19

turnaround [8] - 24:1, 24:4, 24:5, 24:6, 24:9, 24:10

twenty [1] - 36:21

twenty-six [1] - 36:21

two [24] - 5:10, 7:3, 9:16, 15:3, 15:4, 18:11, 19:9, 22:19, 23:22, 24:7, 28:1, 29:7, 29:19, 32:7, 32:24, 33:9, 34:20, 35:7, 37:8, 38:4, 45:3, 51:22, 58:14

two-year [1] - 37:8

typical [2] - 24:15, 44:8

## U

ultimately [4] - 11:15, 11:16, 35:9, 35:10

under [17] - 6:4, 9:25, 13:4, 13:12, 13:24, 14:23, 14:24, 22:15, 26:25, 27:22, 33:7, 33:15, 43:13, 44:18, 49:19, 50:2

undertake [1] - 27:17

undertaken [5] - 10:5, 10:9, 15:13, 29:24, 40:8

undertaking [2] - 15:8, 34:21

Underwood [2] - 47:15, 47:22

unequivocally [1] - 13:1

unfortunately [1] - 58:15

unit [1] - 15:10

unsworn [2] - 20:10, 20:11

untimely [2] - 44:6, 52:8

up [19] - 8:6, 14:25, 15:1, 16:21, 18:17, 19:5, 19:10, 19:16, 20:18, 24:8, 26:7, 27:5, 30:18, 31:5, 43:3, 44:7, 47:3, 47:15, 48:10

Updated [1] - 4:24

updated [1] - 36:25

upgrade [1] - 23:23

usual [1] - 5:5

## V

valid [3] - 9:4, 9:20, 55:18

validity [1] - 8:20

value [1] - 7:15

various [5] - 6:16, 32:1, 46:20, 46:21, 54:12

vary [2] - 17:19, 17:21

vast [1] - 53:24

versus [13] - 5:3, 9:16, 9:18, 9:22, 9:24, 10:19, 13:19, 14:6, 15:5, 15:25, 16:15, 37:18

vetted [3] - 18:3, 20:21, 20:23

vetting [1] - 33:2

viable [8] - 49:2, 49:16, 49:19, 49:22, 57:7, 57:13, 57:15

vicarious [1] - 46:25

vice [5] - 18:12, 18:13, 18:24, 19:13, 31:11

view [1] - 52:8

virtually [2] - 32:9, 40:2

voce [3] - 47:19, 50:13, 52:3

volume [1] - 60:10

VOLUME [3] - 1:1, 4:1, 4:6

VOLUMES [1] - 1:1

VS [1] - 1:5

## W

Wagner [6] - 9:16, 9:18, 9:22, 9:24, 16:15, 37:18

wait [3] - 32:18, 44:20, 45:15

waiting [1] - 56:7

wall [1] - 54:10

Walter [2] - 18:21, 18:23

Walter's [1] - 19:9

Walters [1] - 9:2

wants [3] - 49:3, 50:1, 50:9

waste [1] - 11:12

ways [1] - 32:1

web [1] - 53:24

week [9] - 5:13, 35:1, 35:7, 41:16, 58:1, 58:10, 58:11, 58:12, 59:3

weeks [1] - 35:7

weight [1] - 32:8

West [1] - 2:21

wholly [5] - 19:15, 20:17, 54:6, 54:7, 54:8

Wick [1] - 19:19

Wickes [1] - 15:19

willful [1] - 41:25

willfully [2] - 41:19, 41:21

WILLIAMS [1] - 1:8

Williams [10] - 19:13, 19:20, 20:17, 23:15, 23:16, 24:18, 25:11, 25:14, 29:9, 45:10

willing [1] - 27:16

win [1] - 11:7

wing [1] - 23:6

Wisdom [1] - 3:2

wise [2] - 47:17, 47:22

WITNESS [1] - 60:19

witnesses [2] - 20:21, 33:15

wives [1] - 7:10

Wood [12] - 9:15, 9:17, 9:21, 9:24, 10:12, 12:24, 13:11, 15:25, 16:14, 34:8, 37:18

word [1] - 27:21

words [2] - 16:10, 38:13

workers' [8] - 7:2, 7:14, 7:17, 9:5, 10:1, 13:4, 13:12, 36:16

Workers' [3] - 10:18,

14:23, 39:22

**workman** [1] - 15:12
**workmans'** [1] - 9:7
**workmen** [2] - 7:8, 36:5
**works** [3] - 5:17, 34:20, 44:3
**worried** [1] - 57:19
**WRC** [4] - 53:23, 54:2, 54:5
**writing** [2] - 25:15, 60:9
**written** [3] - 6:16, 29:15, 48:15
**wrongful** [1] - 13:2
**Wynnewood** [57] - 7:6, 7:11, 8:1, 8:6, 19:14, 19:15, 19:25, 23:17, 23:21, 23:24, 24:18, 25:11, 29:11, 31:10, 31:24, 36:4, 36:9, 36:10, 36:14, 36:15, 36:22, 37:1, 37:5, 37:13, 38:1, 38:9, 40:9, 40:12, 40:13, 41:7, 41:9, 41:14, 41:19, 41:24, 42:2, 42:4, 43:18, 45:6, 45:9, 46:2, 46:6, 46:7, 46:16, 49:6, 49:17, 49:19, 49:20, 49:23, 49:25, 50:1, 50:2, 50:6, 51:9, 51:24, 52:1, 52:20
**WYNNEWOOD** [1] - 1:8
**wynnewood's** [1] - 41:5

## Y

**y'all** [1] - 5:21
**year** [2] - 23:18, 37:8
**year-end** [1] - 23:18
**years** [5] - 24:17, 38:2, 38:4, 38:5, 55:16
**yesterday** [1] - 38:17
**young** [2] - 38:2, 47:24
**yourself** [1] - 56:7

## Z

**Zakoura** [1] - 2:20
**zoom** [3] - 22:14, 26:24, 27:20

# TAB 3


## FORMAL INCIDENT INVESTIGATION REPORT

**Report Date:** 12/5/2012

**Investigation Started:** 09/28/2012

### I.    Problem Definition

**What:** Explosion of the Wickes Boiler

**When:** 09/28/2012 @ 18:16 hours

**Where:** Wickes Boiler, FCC Unit, Zone 2, Wynnewood Refinery, Wynnewood,

Oklahoma

**Significance:** Fatal Injury

**Safety:** (2) Fatality Injuries

**Environmental:** None

### II.    Investigation Summary

At approximately 18:17 hours on September 28, 2012, the Wickes Boiler at Wynnewood Refinery Co. (WRC) detonated during start-up. One employee was pronounced dead at the scene and another employee was critically injured and died twenty eight days later. The incident investigation was initiated in the evening hours of September 28, 2012. The investigation activities included gathering written statements from workers involved in the process of bringing the boiler on-line, maintenance personnel who worked on the boiler earlier in the day, and personnel who responded to the emergency. The investigation team has also interviewed several Zone #2 workers to obtain information on startup activities related to the Wickes Boiler and common work practices. Additionally, the process control database records were obtained to provide information on the operating conditions of the boiler at the time of the incident. Maintenance, training, and procedural records were reviewed for relevance to the incident and potential causative factors.

1



The investigation determined that the boiler exploded during the process of attempting to light the main burner as the result of two issues: 1) the fuel bypass valve feeding the main burner being opened too far resulting in a velocity of natural gas above its flame speed, which did not allow the burner to light off, and 2) the length of time that the fuel/air mixture was introduced into the boiler firebox during the lighting sequence. After receiving a radio call from a control room console operator that the boiler was flooded with fuel, the lead operator signaled the operator of the fuel bypass valve to shut the valve. When the operator was closing the valve, it appears that the fuel decreased to a velocity that allowed the burner tip to be lit from the pilot light. Due to the boiler firebox being full of a fuel/air mixture and the presence of an ignition source, when the fuel/air mixture ignited, it resulted in a detonation that breached the east and west ends of the boiler firebox section. Two employees involved in the lighting of the boiler, Billy Smith and Russell Mann, were positioned at the west end of the boiler and were likely impacted by the air register and pilot light section of the boiler, which was found approximately 5 feet from the steel face of the boiler where this equipment was mounted.

Contributing factors to the root causes include: 1) the current Wynnewood startup standard operating procedure (SOP) did not define a gas flow to light the burner, 2) the SOP did not define, in the case of a failed start, how long the bypass fuel valve should be left open before aborting the activity, 3) the console operator deviated from the SOP for air flow used to start the boiler, and 4) outside operators deviated from common work practices and the SOP used to start up the boiler.

## III.    Investigation Details

### Investigation Team Activities

The Investigation Team was formed during the evening hours on September 28, 2012 following the incident, and began work at the Wynnewood site the morning of September 29, 2012. The area around the Wickes boiler was secured from unauthorized access once the accident scene was determined to be safe on the evening of September 28, 2012. The uninjured operators involved in the incident were subsequently given the option to leave work on September 28, 2012 after being checked for injuries and providing written statements.

Examination of the accident scene was conducted the morning of September 29, 2012. Photographs of the scene and associated equipment including piping and instrumentation of the Wickes Boiler (22-1B8) were taken. (Exhibit 1.) The written statements prepared by the operators involved in the incident were given to the investigation team for review. (Exhibits 2-11.) Process control information was collected for the failed lighting attempt of the boiler on September 28, 2012 and was collected for previously successful lightings of the boiler. (Exhibits 12-15.)

2



Interviews were conducted with Operations personnel involved in the incident to gain further information related to the actions and conditions present when the accident occurred. (Exhibits 16-23.) Operations management and zone supervision responsible for operation of the Wickes boiler were interviewed for their initial response to the incident, work practices and training relevant to startup of the boiler, and any historical issues with the boiler. (Exhibits 24-29.)

Interviews were also conducted with plant Safety staff involved in the initial response to the incident scene to determine if any had first-hand knowledge of conditions and/or actions of the involved operators that might add to understanding the causes of the incident. (Exhibits 30 and 31.) Finally, interviews were conducted with other Zone 2 operators who were not involved in the incident, but who have experience in lighting the boiler to assess specific work practices and procedures involved. (Exhibits 32-35.)

**Incident Sequence of Events**

A review of operating procedures, operator training records, maintenance records, and safety documentation concerning the Wickes boiler was completed to ensure that all relevant information would be considered in the investigation.

The following is a description of relevant events in chronological order for the September 28, 2012 incident. This information was compiled from process control data, anecdotal information, and facts obtained from witness statements and interviews:

Earlier in the day on September 28, 2012, the Wickes Boiler had taken an outage to make a switch on the electrical supply circuits. (Exhibit 36.) Upon completion of the electrical work, the boiler was released to Operations for startup to supply steam to support planned turnaround work. The outage was scheduled for 3 hours, and was extended due to a delay with confirmation of proper operation of the forced draft (FD) air louvers on the burner assembly. Operations worked with Maintenance personnel to resolve these issues, and the work was not completed in time for the day shift to restart the Wickes Boiler. The day shift Operations crew was relieved by the night shift Operations crew shortly after 17:30 hrs. Once shift turnover was completed, the air louvers were then tested and confirmed to be working properly by the night shift console operator ("CT") and the outside operators at the boiler. The outside operators checked the fuel gas supply line to ensure that natural gas was lined up to the boiler so it could be started up on natural gas in lieu of refinery fuel gas due to the refinery fuel gas system needing to be taken out of service during turnaround. The startup of the boiler was needed to supply steam to support the shutdown operations of process units for turnaround.

As a note, the Operations hierarchy consists of a Console Technician ("CT") being the most senior operator who is located at the control board in the central control room. The CT is assisted by a CT qualified outside Lead Operator, referred to as a "CT –

3


"or "Roving A." The Roving A provides guidance and assistance to the outside operator group made up of A qualified operators and lesser experienced B operators. Newer operators who have yet to be unit qualified are designated as "relief operators". Further, the plant is broken up into separate unit areas that each group of operators is responsible for, which is called a Zone. The Wickes Boiler is located in Zone 2, which consists of the Fluid Catalytic Cracking Unit (FCCU) and the HF Alkylation Unit (Alky). (Exhibit 37.)

At 18:02 hrs the night shift operations crew began preparations for re-starting the boiler by having the CT (Jeff "J.D." Sutton) start an air purge cycle of the boiler firebox by increasing the volume of air in the forced draft system. (*See* Exhibits 16-23.) The air purge cycle was continued for 6 minutes until 18:08 hrs. Upon ending the purge cycle, the forced draft air flow was lowered to enable the lighting of the boiler pilot light. At 18:08 hrs, in preparation for lighting the boiler, A qualified operators John Koesler and James Willson, who were both Roving A operators, were positioned near the northwest corner of the boiler. (*See* Exhibits 19 and 22.) A qualified operator Russell Mann was positioned at the fuel bypass valve on the ground surface at the west end of the boiler. (*See* Exhibit 16.) A qualified operator Billy Smith was on the platform at the west end of the boiler positioned to light the pilot light and to later visually confirm the lighting of the main burner. (*See* Exhibit 19.) B qualified operator Steve Graves was positioned near the west end of the boiler. (*See* Exhibit 23.) A qualified operator Justin Sutton was positioned to the south and west of the east end of the boiler near the operator shelter. (*See* Exhibit 21.) A qualified operator Greg Kellerhall and Relief Operator qualified Brad Hill had walked up on the west end of the boiler after finishing another task in the area and assumed a position by James Willson near the northwest corner of the boiler shortly after the lighting sequence began. (*See* Exhibits 16 and 20.)

Upon ending the air purge cycle at 18:08 hrs the pilot was lit, but went out. The data historian system readings for the boiler, attached as Exhibit 15, were FD (Forced Draft) Fan flow @ 22,450 Standard Cubic Feet per Minute (scfm), Fuel flow @ 0 scfm, Burner Pressure @ 0 Pounds per Square Inch Gauge (psig). The outside operators requested that the air flow be decreased. The CT operator decreased the air flow, and the pilot was relit and was visually verified as stable by Billy Smith. (Exhibit 17.) The Digital Control System ("DCS") system data for 18:12 hrs was: FD Fan Flow @ 14,960 scfm, Fuel Flow @ 0 scfm, Burner Pressure @ 0 psig. (Exhibit 15.) *id.* The pilot lighting process occurred between 18:09 hrs and 18:12 hrs. At 18:12 hours the DCS indicated that fuel gas flow was initiated to the burner of the boiler. *id.* The fuel flow rapidly increased from known zero to approximately 1,900 Thousand Standard Cubic Feet per Day ("MSCFD") within one minute, which is 2 - 3 times the typical rate for lighting the boiler. (Exhibits 14 and 15.) The burner pressure followed a similar trend increasing to over 2 times the typical value of 1.5 - 2 psig. *id.* (Exhibit 14.) The DCS system readings for the next 4 minutes were:

4



- 18:13 hrs. FD Fan flow @ 15,670 scfm, Fuel flow @ 1,976 MSCFD, Burner Pressure @ 5.26 psig
- 18:14 hrs. FD Fan Flow @ 15,840 scfm, Fuel flow @ 1,483 MSCFD, Burner Pressure @ 3.00 psig
- 18:15 hrs. FD Fan flow @ 15,640 scfm, Fuel flow @ 1,788 MSCFD, Burner Pressure @ 4.32 psig.
- 18:16 hrs. FD Fan flow @ 14,410 scfm, Fuel flow @ 1,790 MSCFD, Burner Pressure @ 4.33 psig.
- At approximately 18:17:00 detonation occurs as indicated by the loss of Burner Pressure signal.

*See* Exhibit 15 for more detailed and graphical representations of data.

During the time period above, witnesses stated that the operator of the bypass fuel valve, Russell Mann, was instructed by the Roving A's to make adjustments to the fuel flow in an attempt to obtain the correct mixture of fuel to ignite the main burner. (Exhibits 16-23.) Additionally, witnesses reported that the fuel valve operator was given conflicting instructions on the valve position during this time period by Roving A's, James Willson and John Koesler, who apparently argued their points with one another. *Id.* The witnesses indicated that John Koesler disengaged himself from the conflict by walking away and stating that James Willson was in the lead. *Id.* It was reported that Russell Mann did begin to close the fuel valve once he received an instruction to close it by James Willson after the CT radioed the operators that the boiler was flooded with fuel. *Id.* It was at this point that the boiler detonated. *Id.* The process data in Exhibit 15 corroborates the witness statements.

It appears that the explosion occurred at approximately 18:17 hrs. This conclusion is supported by the fact that the Burner pressure indicator was damaged during the explosion, and at 18:17 hours the pressure indicator shows a reading of Not A Number ("NAN"). (Exhibits 12 and 15.) This indication normally indicates a signal loss between the transmitter and the DCS system.

Differences in the flame speed and flammable range of natural gas versus hydrogen (which is a significant component of refinery fuel gas) coupled with the high velocity of fuel and air flowing through the burner ring would prevent the fuel/air mixture from being lit by the pilot. Natural gas has a flammable range of 5% to 15% and a flame speed of approximately 1.0 feet/sec. Hydrogen has a flammable range of 4% to 75% and a flame speed of approximately 10 feet/sec. The velocity of the fuel moving through the burner tip along with the air flow is crucial to enable the fuel/air mixture to ignite with a stable flame at the burner tip. The lower flame speed of natural gas and the higher than normal velocity of both the fuel and air prevented the mixture from contacting the pilot flame until the fuel flow velocity was reduced to a point at which the fuel/air mixture could establish a stable flame from contact with the pilot, resulting in ignition of the

5


contents of the firebox. Based upon witness interviews, immediately after the explosion, there was a thick cloud of dust, and in their efforts to account for their co-workers, they found Billy Smith in a prone position and unresponsive, and Russell Mann in a kneeling position, leaning against pipes at the control value station and showing some signs of responsiveness. (*See* Exhibits 16-31.) Calls for help were made by the operators at the scene to the CT who initiated further notifications for plant Safety and Emergency Medical Services (EMS). *Id.* Personnel at the scene following the explosion reported smelling and detecting gas, and actions were taken to shut off the gas supply to the boiler. *Id.* Authorities from the Garvin County Sheriff's Office responded to the scene shortly thereafter. (*See* Exhibit 38.)

A graphical representation of the incident actions, conditions, root causes and causative factors was developed using the Apollo Reality Chart application provided as Exhibit 39.

**Incident Analysis**

    **(a.)**    **Wickes Boiler History**

The Wickes Boiler appears to have been originally constructed in 1965 for the Kerr-McGee Wynnewood Refinery as a Carbon Monoxide Boiler with heat recovery in the Fluidized Catalytic Cracking Unit (FCCU). The boiler was then converted in or around 1979 to a combination fuel oil and gas furnace as the FCCU was modified from a partial burn unit to a full burn unit. The design change was managed by Brown & Root and may have included a larger economizer section for heat recovery and higher steam make. It is our understanding that Kerr-McGee did not accept a Supervisory Flame Management Safeguard System from the burner manufacturer, John Zink, and no information regarding the design of the proposed system exists in the documentation. The burner is designed for natural gas, refinery fuel gas and fuel oil. The boiler has not operated on fuel oil. The documentation indicates that the boiler had no real changes from the 1979 revamp, except for a replacement steam turbine that was installed in 2010. (*See* Exhibit 40.)

The Wickes Boiler was initially constructed and revamped prior to industry standards for instrumentation, including Burner Management Systems (BMS), which became effective for new and modified single burner boilers in the mid-1990's. The startup is manual with no flame scanning or other interlocks or permissive instrumentation, consistent with other equipment of this vintage. WRC has a longer term program in place to upgrade grandfathered heaters and boilers to industry standard BMS systems. According to WRC management, the Wickes Boiler was coming up for a Process Hazard Analysis ("PHA") revalidation in 2013 that would have possibly identified the need for a BMS upgrade. There is a basic fuel safety system in place to safeguard loss of air flow

6



**Wickes Boiler Explosion**                                              **12/5/2012**

and loss of boiler feed water during normal operation, as required by state boiler code.

Boiler maintenance records did not indicate any unusual issues with the boiler. Records indicated that it was subjected to its annual boiler inspection and certification by the Oklahoma State DOL Safety Standards Division, and had passed the annual inspection in August 2012 with no noticed deficiencies or violations. (Exhibit 41.)

### (b.) Boiler Incident History

According to interview statements and document searches, the Wickes Boiler had a "hard start" event in September 2008 during startup that led to refractory damage and movement of the west end cover that resulted in an operator, James Willson, receiving a swollen lip when the sight glass assembly pushed out into his face. (*See* Exhibits 16-31, 42.) In response, the startup procedure was modified to provide more specifics around safe operating parameters to include the bypass fuel valve position, gas flow to the burner and air flow to the burner. (*See* Exhibit 43.)

Operator interviews indicated that the boiler would occasionally have a "hard start" that would blow dust off the unit when the boiler ring lit. (*See* Exhibits 16-23, 32-35.) There was no indication in a file search that, other than for the noted 2008 incident, operators notified management of any concerns with the boiler operations.

### (c.) Startup Procedures/Training

The current SOP with startup procedures for the Wickes Boiler became effective on December 30, 2009. (*See* Exhibit 44.) In response to OSHA settlement agreements, the prior owner of the facility was required to develop and implement Process Safety Management programs around operating procedures and operator training. It appears that the Wynnewood refinery also used general guides as operating procedures training aids when the facility transitioned into its current training program. The Investigation Team was able to obtain a copy of a general guide operating procedure involving the Wickes Boiler that was used as the startup SOP prior to the revised December 30, 2009 SOP. (Exhibit 43.) After the September 2008 "hard start" incident the general guide operating procedure was modified to be more specific on the amount of fuel gas flow used to startup the boiler.

A review of the startup procedure indicates that the updated 2009 procedure did not continue to: 1) specify the opening position of the fuel bypass valve at 1 spoke, 2) contain warnings to not exceed 1,000 MSCFD of gas (approximately 10% of the CV or valve capacity), nor 3) did it continue to contain the earlier instructions that if the burner does not light off to close the valve and begin the process again. (Exhibit 44.)

Interviewees indicated that the operator training continued to stress the importance of opening the fuel bypass valve to 1 spoke or less and to close the valve if

7


light off didn't occur in a short time period. (*See* Exhibits 16-31.) The Investigation Team was able to verify that each of the "A" Operators present during the incident had been trained and tested with the general guideline. The Investigation Team was able to retrieve process historian data from two past startups (both cold restarts), one in September 2011 and another in August 2012 after its annual inspection, and reviewed differences from procedure as well as work practices from the successful startups to this incident. (Exhibits 14 and 15.) In the successful startups the air flow appeared to be in the 13,500-14,000 scfm range, with gas flow in the 400-750 MSCFD range. *Id.* Additionally, the August 2012 startup included a failed start, which indicated that operators tried lighting the burner, couldn't get it lit and closed the valve for a purge cycle and then went back through the lighting sequence. *Id.*

The Investigation Team was able to identify other similar equipment SOPs in Zone 2 that had more specific instructions on how long a lighting procedure was to be performed until aborting the task, and contained specific hazard warnings about the consequence of not aborting the task if light-off failed in a short time period. (Exhibit 45.) All area operators have been trained on these procedures and signed off on them.

### (d.) Fuel Bypass Valve Position

A review of the previous and current startup procedures as well as operator interviews indicated that current training is to slowly crack the valve, and move it slowly not to exceed 1 spoke open. (*See* Exhibits 16-31, 43 and 44.) If the gas flow reaches 1,000 MSCFD and the burner is not lit, operators are instructed to close the gas bypass valve completely and repurge the boiler. (*See* Exhibit 43.) The Investigation Team reviewed process data historian records and the post-incident valve position, and was able to determine that the final valve position showed approximately 1.5 spokes, which is inconsistent with the guidance in the SOP and operator training with respect to the final position for startup. Interviews of personnel at the scene during the incident and response personnel to the incident claim that the fuel bypass valve was not touched after the detonation. (*See* Exhibits 16-28, 30 and 31.)

The Investigation Team determined that Russell Mann appeared to have opened the valve from the closed position to approximately 1,900 MSCFD in his initial move (approximately 20% of the Cv). Because the DCS system monitors instrument points every 60 seconds, the slope of the line is almost vertical, which would indicate that the valve was not opened slowly as indicated in the procedure, nor was it opened to 1 spoke as is trained on and is the normal work practice for operators. The high velocity of the gas at the burner tip, the fact that it was a cold start with natural gas as the fuel, and the higher than normal air flow to the burner ring precluded lighting the burner ring from the pilot flame. It is questionable whether the burner would have lit off for this startup, even if fuel gas was being fed to the burner ring due to the high fuel flow and high air flow. Because of the high volume of hydrogen normally found in refinery fuel gas as well as

8



some of the heavier hydrocarbons, the Investigation Team assumed that the flame speed necessary for a stable flame for natural gas at the burner tip would be 10%-20% below that of refinery fuel gas. Operators were aware that natural gas was being supplied to the boiler, and WRC would not utilize a Management of Change ("MOC") for the use of fuel as plant Safety personnel indicated: 1) the boiler is designed to use either fuel, 2) the refinery fuel gas composition can vary due to the amount of hydrogen being put into the fuel gas system, and 3) operators are aware of these facts as part of their training. The refinery fuel system runs at 60 psig.

The Investigation Team has requested that the fuel bypass valve undergo flow testing to: 1) ensure that the valve is operable, 2) that a 1 spoke position flows less than 1,000 MSCFD, and 3) determine how far the valve had to be opened to achieve a 1,900 MSCFD flow rate. The Investigation Team also intends to test the natural gas regulator to ensure that it is operating properly.

### (e.) Burner Air Flow

The Investigation Team reviewed DCS data and determined that the CT had exceeded SOP air flow recommendation of 13,500 scfm. (*See* Exhibits 12-15.) The CT indicated that he felt more comfortable with around 15,500 scfm. (Exhibit 17.) The air flow rate was adjusted during startup from 15,500 scfm to approximately 14,200 scfm at the time of the incident. (*See* Exhibits 12 and 15.)

The earlier successful starts involved a lower volume of air, and were made with refinery fuel gas. (*See* Exhibit 15.) As outlined above, the higher air flow than identified by the SOP resulted in its being listed as a causative factor in the accident.

### (f.) Extended Time of Fuel to Boiler

Normal work practice is to attempt to light the burner, and if unsuccessful, close the fuel bypass valve and repeat the sequence. This incident took almost 5 minutes with fuel going to the boiler. During this time, J.D. Sutton, the CT, lost track of the process due to his focus on other alarms and the long duration of the lighting sequence. Sutton reported in his interview that he had thought the boiler had been lit. (Exhibit 17.)

It was reported by witnesses to the incident that Lead Operators John Koesler and James Willson gave conflicting instructions to Russell Mann who had opened the fuel bypass valve too far. (Exhibits 16-23.) It was reported that when the burner did not ignite early on in the first minute of the attempt, Billy Smith said that he could smell gas at the sight glass and Russell Mann was instructed by John Koesler to pinch down on the valve, which can be confirmed by the trend line. (Exhibits 15, 16-23.) The valve was still opened too far and the burner did not light.

9



Russell Mann was instructed by James Willson to open the valve further which occurred at approximately the three or four minute mark. *Id.* At this point the trend flat-lined which the Investigation Team concluded is the point where John Koesler and James Willson had an argument and Koesler walked away. *Id.* Shortly thereafter, Wesley Walker, the Alky CT, noticed that J.D. Sutton's FCCU screen showed high fuel flow, and he radioed to the outside operators that the boiler was fuel flooded. (Exhibit 18.) James Willson signaled to Russell Mann to close the valve, which witnesses said he began to do, and the boiler detonated. (Exhibits 16-23.)

### (g.) CT Startup Monitoring

As indicated above, J.D. Sutton, the FCCU CT responsible for the Wickes Boiler lighting was involved with clearing alarms from water levels in the boiler as part of startup. (Exhibit 17.) Sutton's interview indicated that he was concerned with getting the water levels in the boiler right for startup to avoid sending a slug of water into the steam system upon the boiler lighting and heating the water tubes. *Id.* Sutton had been working with the outside operators to adjust air flow; first, when the pilot blew out and roughly every 30 seconds thereafter during the burner light off sequence when he adjusted air flow from roughly 15,000 scfm to 14,000 scfm. *Id.* It is the Investigation Team's belief that Sutton was not paying close attention to the burner fuel flow as he was trying to establish proper water levels within the boiler system.

Wesley Walker, the Alky CT (also FCCU CT qualified) was sitting right next to J.D. Sutton and was working on alky operations, but had been monitoring radio traffic as well as watching what Sutton was doing adjacent to him. (Exhibit 19.) Walker apparently recognized that the boiler had not lit off and looked at Sutton's screen and saw that the fuel flow value for the boiler was, from his experience, way above normal for startup operations. *Id.* Walker immediately notified the outside operators by radio that the boiler was fuel flooded. *Id.* Witness interviews indicated at this time that Lead Operator James Willson gave the direction to Russell Mann to close the bypass fuel valve. (Exhibits 16-23.)

### (h.) Oxygen Analyzer Readings

The oxygen analyzer readings during the event showed a drop in the reading that would normally indicate that the boiler had lit off. (*See* Exhibits 12 and 15.) However, there was no other indication that this occurred: 1) Billy Smith did not indicate the burner had lit, and 2) the firebox temperature did not show an immediate rise associated with successfully lighting the burner.

The Investigation Team researched the oxygen analyzer, a Rosemount Oxymitter 4000 Hazardous Area Oxygen Transmitter, and found that the instrument works by way of zirconium oxide cell technology that measures net oxygen remaining after combusting any free hydrocarbon or other combustibles in the flue gas stream. The oxygen probe

10



operates at approximately 1,500° F. A literature search indicated that hydrocarbon combustion at the analyzer cell will combust hydrocarbon at the sensor and will then measure the oxygen remaining. The ratio of consumption of methane to oxygen is reported to be about 1:2 in the zirconium oxide cell. Because the atmosphere at the time of detonation in the Wickes Boiler was approximately 8% natural gas to air, the oxygen analyzer should have shown a drop in oxygen in the furnace to approximately 5%. The analyzer reading immediately before the detonation was approximately 4%, which is consistent with the literature, and explains why the data historian trend showed a reduction in oxygen in the flue gas.

Discussions with Rosemount indicated that the WRC analyzer had been purchased with a flame arrester on the probe tip. Therefore, the Investigation Team ruled out the oxygen analyzer as the source of combustion for the incident.

11


## IV. Root Cause(s)

### 1. Lead Operator Targeted Burner Pressure as Startup Criteria:

The Lead Operator, James Willson, provided direction to Russell Mann, who was operating the fuel bypass valve, to open the valve to a point where the high burner pressure resulted in a fuel velocity that far exceeded the condition necessary to light the burner. Willson's interview indicated that he had been involved in a number of startups of the Wickes Boiler and that, in his experience, it was necessary to achieve 3 to 5 psig burner pressure in order to light the main burner. (Exhibit 22.) Based upon review of past successful startups, past and current Operating Procedures, as well as interviews with other Lead Operators and Supervisors who have been Lead Operators, this has never been part of any training, nor has it been or is it currently a work practice used by other operators. Normal operation data indicated that a 3-5 psig burner pressure is in the range to support normal operation of the boiler at about 50 to 65 thousand pounds per hour (klbs/hr) of steam. (*See* Exhibits 12-15.) This data also shows that the burner pressure should have been between 1.4 to 1.8 psig. *Id.*

The Investigation Team determined that fuel flow to the burner during the startup was roughly 2-3 times higher than normal startup practice. Proper action to abort the startup was delayed as Willson and John Koesler started arguing with one another as Koesler indicated to Mann that the fuel valve needed to be closed more. (*See* Exhibits 16-23.) This back and forth argument resulted in the firebox filling with an extremely large quantity of an ignitable mixture of fuel and air.

### 2. Operations Failed to Recognize High Gas Flow:

The FCCU CT failed to immediately notify the outside operators that the gas flow to the burner ring was too high for startup. Operating practices and procedures, and training clearly indicate that the CT is responsible for monitoring gas flow during startup in addition to making adjustments on air flow to the burner ring. (Exhibits 43 and 44.)

The FCCU CT, J.D. Sutton, indicated in his interview that he typically utilized 15,500 scfm of air flow for startup because he felt more comfortable there than what the SOP specifies (13,500 scfm). (Exhibit 17.)

Additional issues with boiler startup had caused Sutton's attention to be occupied by clearing alarms and properly establishing water levels in anticipation of a successful startup. *Id.* Sutton also indicated that he had thought the boiler had lit off successfully as he did not hear from the outside operators on the radio. *Id.*

12


3. **Standard Operating Procedure Did Not Include Critical Safety Information from Earlier Startup Procedures as Part of Its Current Startup Procedure:**

WRC's earlier startup procedures for the Wickes Boiler contained instruction to slowly open the valve 1/16" at a time to no further than 1 spoke open. (Exhibit 42.) Additionally, the procedure also indicated that the fuel gas was not to exceed 1,000 MSCFD of gas, and, that if the burner did not light off immediately, to close the valve and restart the lighting sequence. *Id.*

As part of its 2008 OSHA settlement, WRC updated its SOPs, but failed to include all the earlier startup steps in the revised (December 2009) SOP.

4. **Training Did Not Include Previous Wickes Boiler Startup Steps in Latest Training**

The A operators involved in the incident had been trained in the start up process for the Wickes boiler during their tenure by "hands on" demonstrations from seasoned operators, review and testing on operating procedures, and related heater/boiler operating practices. (Exhibits 16-23, 32-35.) It was evident from the interviews that the vast majority knew and understood the steps necessary to safely light the Wickes Boiler as they mentioned the concepts of limiting fuel flow to less than 1,000 MSCFD, by opening the fuel by pass valve with slight and slow movements and aborting the lighting attempt if the burner did not light off immediately. *Id.* However, a review of the current knowledge demonstration testing associated with operator certification process revealed that there were no specific questions regarding lighting the burner of the Wickes Boiler as part of the test.

5. **Lead Operators failed to Provide Expected Guidance**

Lead Operators did not fulfill management expectations to provide guidance to other operators in a number of instances in this incident: 1) the SOP was not reviewed for familiarizing operators on boiler startup sequencing, 2) not following the work practice of aborting the lighting sequence when the burner failed to light immediately, and 3) arguing with each other resulting in the boiler filling with the fuel/air mixture.

13


| Causes | Corrective Actions |
|---|---|
| **Operations used burner pressure as startup criteria** | 1. Review training curriculum to ensure that Wickes Boiler startup SOP is modified and includes all required critical elements for startup.<br><br>2. Install a burner management system on the repaired Wickes Boiler or its replacement that meets industry standard. |
| **Operations failed to recognize high gas flow** | 1. Review training curriculum to ensure that Wickes Boiler startup SOP requires FCCU CT to ensure that all preliminary startup steps are completed before the lighting sequence begins.<br><br>2. Evaluate other alarms to be established that would aid CT in Wickes Boiler startup operations. |
| **SOP did not include earlier startup procedures in current revision** | 1. Review and modify SOPs to ensure that adequate detail and instruction is provided to safely start up and operate the affected equipment.<br><br>2. Ensure that SOPs are updated to indicate that a formal and/or informal Job Safety Analysis is required for all non-routine tasks.<br><br>3. Consider modifying startup SOPs to indicate tasks to be completed by CT and outside operators, and that SOPs are designed to serve as checklists to be filled out by CT as part of startup operations. |
| **Training did not include earlier startup procedures in latest training** | 1. Review and modify SOPs to ensure that adequate detail and instruction is provided to safely start up and operate the affected equipment.<br><br>2. Review training to ensure that operators are working consistently and in accordance with approved procedures. |
| **Lead operators failed to provide expected guidance** | 1. Review training and require that operator conflicts result in the immediate safe shutdown of task at hand until all issues are resolved.<br><br>2. Ensure that CT and Lead Operator training includes curriculum on expectations to provide leadership to outside operators.<br><br>3. Ensure that Zone supervisors monitor Lead Operator behavior in leadership of outside operators in all facets of operation. |

14



## V. Team Members

| Name | Member Information |
| --- | --- |
| Chris Swanberg | Team Leader |
| Richard Vogel | Team Member |
| Ron McGill | Team Member |
| Joshua S. Warner | Team Member |

**Chris Swanberg, Vice President EHS**

**Richard Vogel, Security / Safety Supervisor**

**Ron McGill,  Safety Manager**

**Joshua S. Warner, Safety Specialist Technician**

15

# TAB 4

```
Vernon's Texas Statutes and Codes Annotated
   Civil Practice and Remedies Code (Refs & Annos)
      Title 2. Trial, Judgment, and Appeal
         Subtitle C. Judgments
            Chapter 33. Proportionate Responsibility (Refs & Annos)
               Subchapter A. Proportionate Responsibility
```

V.T.C.A., Civil Practice & Remedies Code § 33.004

§ 33.004. Designation of Responsible Third Party

Effective: September 1, 2011
Currentness

(a) A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party. The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.

(b) Nothing in this section affects the third-party practice as previously recognized in the rules and statutes of this state with regard to the assertion by a defendant of rights to contribution or indemnity. Nothing in this section affects the filing of cross-claims or counterclaims.

(c) Repealed by Acts 2003, 78th Leg., ch. 204, § 4.10(2).

(d) A defendant may not designate a person as a responsible third party with respect to a claimant's cause of action after the applicable limitations period on the cause of action has expired with respect to the responsible third party if the defendant has failed to comply with its obligations, if any, to timely disclose that the person may be designated as a responsible third party under the Texas Rules of Civil Procedure.

(e) Repealed by Acts 2011, 82nd Leg., ch. 203 (H.B. 274), § 5.02.

(f) A court shall grant leave to designate the named person as a responsible third party unless another party files an objection to the motion for leave on or before the 15th day after the date the motion is served.

(g) If an objection to the motion for leave is timely filed, the court shall grant leave to designate the person as a responsible third party unless the objecting party establishes:

(1) the defendant did not plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirement of the Texas Rules of Civil Procedure; and

(2) after having been granted leave to replead, the defendant failed to plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirements of the Texas Rules of Civil Procedure.

(h) By granting a motion for leave to designate a person as a responsible third party, the person named in the motion is designated as a responsible third party for purposes of this chapter without further action by the court or any party.

(i) The filing or granting of a motion for leave to designate a person as a responsible third party or a finding of fault against the person:

(1) does not by itself impose liability on the person; and

(2) may not be used in any other proceeding, on the basis of res judicata, collateral estoppel, or any other legal theory, to impose liability on the person.

(j) Notwithstanding any other provision of this section, if, not later than 60 days after the filing of the defendant's original answer, the defendant alleges in an answer filed with the court that an unknown person committed a criminal act that was a cause of the loss or injury that is the subject of the lawsuit, the court shall grant a motion for leave to designate the unknown person as a responsible third party if:

(1) the court determines that the defendant has pleaded facts sufficient for the court to determine that there is a reasonable probability that the act of the unknown person was criminal;

(2) the defendant has stated in the answer all identifying characteristics of the unknown person, known at the time of the answer; and

(3) the allegation satisfies the pleading requirements of the Texas Rules of Civil Procedure.

(k) An unknown person designated as a responsible third party under Subsection (j) is denominated as "Jane Doe" or "John Doe" until the person's identity is known.

(l) After adequate time for discovery, a party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage. The court shall grant the motion to strike unless a defendant produces sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury or damage.

**Credits**
Added by Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995. Amended by Acts 2003, 78th Leg., ch. 204, §§ 4.03, 4.04, 4.10(2), eff. Sept. 1, 2003; Acts 2011, 82nd Leg., ch. 203 (H.B. 274), §§ 5.01, 5.02, eff. Sept. 1, 2011.

Notes of Decisions (71)

V. T. C. A., Civil Practice & Remedies Code § 33.004, TX CIV PRAC & REM § 33.004

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle C. Judgments
        Chapter 33. Proportionate Responsibility (Refs & Annos)
          Subchapter A. Proportionate Responsibility

V.T.C.A., Civil Practice & Remedies Code § 33.003

§ 33.003. Determination of Percentage of Responsibility

Effective: September 1, 2003
Currentness

(a) The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

(1) each claimant;

(2) each defendant;

(3) each settling person; and

(4) each responsible third party who has been designated under Section 33.004.

(b) This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission.

**Credits**
Added by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, eff. Sept. 2, 1987. Amended by Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995; Acts 2003, 78th Leg., ch. 204, § 4.02, eff. Sept. 1, 2003.

Notes of Decisions (101)

V. T. C. A., Civil Practice & Remedies Code § 33.003, TX CIV PRAC & REM § 33.003
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.